# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HARLAN GOLDBERG and H GOLD LLC,

*Plaintiffs,*

vs.

BESPOKE REAL ESTATE LLC, BESPOKE LUXURY
MARKETING LLC, BESPOKE REAL ESTATE
FLORIDA LLC, and PMG RESIDENTIAL, LLC,

*Defendants.*

Index No._____/2023

Date Filed:

**SUMMONS**

Venue is based on a
provision of an
agreement between
Plaintiffs and
Defendants Bespoke
Real Estate LLC and
Bespoke Luxury
Marketing LLC

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve
a copy of your answer, or, if the Complaint is not served with this Summons, to serve a Notice of
Appearance, on Plaintiffs' attorneys within twenty (20) days after service of this Summons,
exclusive of the day of service (or within thirty (30) days after service is complete if this
Summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Dated: New York, New York
       March 21, 2023

Yours, etc.,

ADAM LEITMAN BAILEY, P.C.
*Attorneys for Plaintiffs Harlan Goldberg
and H Gold LLC*

By: _____
    Adam Leitman Bailey, Esq.
    One Battery Park Plaza, Eighteenth Floor
    New York, NY 10004
    (212) 825-0365

[900532/1]                          1

**DEFENDANTS' ADDRESSES:**

Bespoke Real Estate LLC
903 Montauk Highway
Water Mill, NY 11976

Bespoke Luxury Marketing LLC
903 Montauk Highway
Water Mill, NY 11976

Bespoke Real Estate Florida LLC
119 Washington Avenue, Suite 500
Miami Beach, FL 33139

PMG Residential, LLC
1441 Brickell Avenue, Suite 1110
Miami, FL 33131

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HARLAN GOLDBERG and H GOLD LLC,

*Plaintiffs,*

vs.

BESPOKE REAL ESTATE LLC, BESPOKE LUXURY
MARKETING LLC, BESPOKE REAL ESTATE
FLORIDA LLC, and PMG RESIDENTIAL, LLC,

*Defendants.*

Index No.:

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs HARLAN GOLDBERG and H GOLD LLC ("Plaintiffs"), by their attorneys,

ADAM LEITMAN BAILEY, P.C., complaining of Defendants BESPOKE REAL ESTATE

LLC, BESPOKE LUXURY MARKETING LLC, BESPOKE REAL ESTATE FLORIDA LLC,

and PMG RESIDENTIAL, LLC (collectively, "Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action by Plaintiffs, an employee of a real estate brokerage and the
employee's wholly owned company through which he transacts business, to recover commissions
owed to them on sales of high-end residential real estate in Florida. The brokerage, Defendant
Bespoke Real Estate Florida LLC ("Bespoke Florida"), branded itself as dealing only in properties
worth in excess of $10,000,000, yet stinted Plaintiffs on their share of the lucrative commissions
Bespoke Florida received from transacting in such properties, in the transactions which Plaintiffs
had made possible through their efforts.

## PARTIES

2.      Plaintiff Harlan Goldberg ("Goldberg") is a natural person.

3.      Plaintiff H Gold LLC ("Gold") is a limited liability company.

4.      Goldberg is the sole owner and member of Gold.

[901738/1]                                   1

5.      Prior to in or about April 2019, and from in or about June 2020 to the present, Goldberg has been a real estate broker duly licensed by the Department of Business and Professional Regulation of the State of Florida to broker real estate transactions in the state of Florida.

6.      At all relevant times, Goldberg has transacted all of his real estate brokerage business through Gold, and has received, through Gold, the commissions he earned on real estate transactions.

7.      Defendant Bespoke Real Estate LLC ("Bespoke RE") is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York.

8.      Defendant Bespoke Luxury Marketing LLC ("Bespoke Marketing") is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York.

9.      Defendant Bespoke Real Estate Florida LLC ("Bespoke Florida") is a limited liability company.

10.     Bespoke RE and Bespoke Florida are real estate brokerage firms that represent both buyers and sellers in residential real estate transactions. They represent both buyers and sellers. They participate only in deals in which the sale price is $10 million or greater. Thus, they appeal to a wealthy clientele.

11.     Bespoke RE and Bespoke Florida are related entities. They share common ownership and common management.

12.     Bespoke Marketing ostensibly serves as the marketing arm for Bespoke RE and Bespoke Florida. It ostensibly performs marketing services for Bespoke RE and Bespoke Florida.

Case 1:23-cv-05614-JPO   Document 1-1   Filed 06/30/23   Page 6 of 40

It shares common ownership and common management with Bespoke RE and Bespoke Florida. Bespoke Marketing, Bespoke RE, and Bespoke Florida are related entities. (Collectively, Bespoke RE, Bespoke Florida, and Bespoke Marketing are the "Bespoke Entities.")

13.     Bespoke RE and Bespoke Marketing, the first Bespoke Entities formed, were formed prior to 2019, in the State of New York.

14.     Bespoke Florida was formed in or about March 2020.

15.     Cody Vichinsky ("C. Vichinsky") is a natural person who is, upon information and belief, a founding partner, and the president, of the Bespoke Entities.

16.     C. Vichinsky resides in the State of New York.

17.     Zachary Vichinsky ("Z. Vichinsky") is a natural person who, upon information and belief, a founding partner, and the CEO and managing member, of the Bespoke Entities. (Collectively, C. Vichinsky and Z. Vichinsky are the "Vichinskys.")

18.     Upon information and belief, Defendant PMG Residential, LLC ("PMG Residential") is a limited liability company.

19.     PMG Residential is being named as a defendant herein solely as a nominal defendant as a stakeholder.

## Venue

20.     Venue as to the claims asserted herein is proper in this county because the Goldberg Agreement, as that term is defined below, provides for the courts located in the County of New York to be the exclusive venue of any action in New York state courts for all matters arising out of, in connection with, or relating to the Goldberg Agreement. (*See* Exhibit 1, Goldberg Agreement, p. 5, ¶ 13.)

21.     In addition, the Bespoke Entities' main offices are in the State of New York.

[901738/1]                                    3

## Background

### Plaintiffs' Employment with the Bespoke Entities

22.     In or about April 2019, Plaintiffs began working for Bespoke RE and Bespoke Marketing pursuant to a written agreement that Goldberg signed on April 4, 2019 (Exhibit 1 hereto) (the "Goldberg Agreement").

23.     The Goldberg Agreement was between Bespoke RE and Bespoke Marketing on the one side, and Goldberg and Gold on the other. (Exhibit 1, Goldberg Agreement, p. 1.)

24.     Exhibit A to the Goldberg Agreement provides for compensation to Plaintiffs. (Exhibit 1, Goldberg Agreement, Exhibit A, pp. 7-8.) This compensation includes commissions, the terms of which are set forth in Exhibit B to the Goldberg Agreement. (*See id.*, Compensation ¶ 2 [citing Exhibit B]; Exhibit 1, Goldberg Agreement, Exhibit B [setting forth categories of transactions eligible for commissions; "Milestones," or circumstances in which each category applies; compensation amounts and percentages; compensation method; and obligations].) It also includes a fixed annual salary of $150,000, to be paid out in installments every two weeks. (Exhibit 1, Goldberg Agreement, Exhibit A p. 7, Compensation ¶ 1(A).)

25.     The compensation to Plaintiffs, under the Goldberg Agreement, has always been paid to Gold.

26.     In or about March 2021, Goldberg became the president of Bespoke Florida.

27.     Goldberg's responsibilities as president of Bespoke Florida included managing Bespoke Florida's office in Miami Beach, Florida ("Miami Beach Office"), and the procurement of buyers and/or sellers for residential real estate transactions brokered by Bespoke Florida.

28.     When Goldberg became the president of Bespoke Florida, Gold ceased receiving compensation from Bespoke RE and Bespoke Marketing, and began receiving compensation from Bespoke Florida.

[901738/1]                                          4

29.     In 2022, Gold received a Form 1099-NEC reflecting the compensation Plaintiffs had received in 2021 for Goldberg's work pursuant to the Goldberg Agreement. This Form 1099-NEC (the "Form 1099-NEC") listed, as the "Payer," "Bespoke Real Estate Florida LLC." (Exhibit 2 hereto, Form 1099-NEC.)

30.     The Form 1099-NEC encompassed all compensation that Goldberg or Gold received for any work they performed for any of the Bespoke Entities in 2021.

31.     Bespoke Florida's payment of commissions and salary to Gold, and its issuance of a 1099-NEC to Gold, constituted a modification of the Goldberg Agreement to add Bespoke Florida as an additional contracting party on the side of Bespoke RE and Bespoke Marketing.

32.     In or about March 2021, Goldberg began procuring buyers and sellers, on behalf of Bespoke Florida, for transactions involving real property in the state of Florida.

33.     The Goldberg Agreement does not reference Bespoke Florida, which had not yet been formed as of the time of the Goldberg Agreement, or Goldberg's role as president thereof.

34.     Although the Goldberg Agreement separates out commissions owed by property location and type of service provided, nothing in the Goldberg Agreement addresses transactions involving real property in the state of Florida, as at issue in this case. Therefore, any such transactions are outside the scope of the Goldberg Agreement and must be the subject of a new oral agreement.

35.     Beginning when Goldberg began procuring, on behalf of Bespoke Florida, buyers and sellers for transactions involving real property in the state of Florida, Bespoke Florida paid Gold commissions on such transactions.

36.     Goldberg's procurement, on behalf of Bespoke Florida, of buyers and sellers for transactions involving real property in the state of Florida, and Bespoke Florida's payment to Gold

of commissions on such transactions, constituted a modification of the Goldberg Agreement such that it encompassed commission payments to Gold for such performance by Goldberg (the "Florida Modification").

### The Override Agreement

37.     When Bespoke Florida's Miami Beach Office first opened in early 2021, Z. Vichinsky promised Plaintiffs, through Goldberg, that they would receive a ten percent (10%) override on the commissions received on all transactions that were brokered through the Miami Beach Office, *i.e.*, they would receive ten percent (10%) of the total commissions paid to Bespoke Florida on all transactions, regardless of whether Plaintiffs had any personal involvement in such transactions (the "Override Agreement").

38.     The Override Agreement was repeated several times to Plaintiffs, through Goldberg, by officers of Bespoke Florida, including both Z. Vichinsky and Kayt Gray Schadley ("Gray"), who was and is the Vice President of Client Services for the Bespoke Entities and the broker of record in Florida for Bespoke Florida, between early 2021 and September 2022.

39.     The Override Agreement constitutes a valid modification of the Goldberg Agreement and Florida Modification and a contractual obligation thereunder.

40.     Plaintiffs have performed all of their obligations under the Goldberg Agreement and Florida Modification.

41.     Between the first time the Override Agreement was first made and Bespoke Florida's termination of Goldberg, as discussed below, the Miami Beach Office brokered multiple transactions that had, during that period, gone to contract.

42.     During that period, the Miami Beach Office brokered at least two transactions on which Plaintiffs did not receive a brokerage commission, which had gone to contract. Even

assuming *arguendo* Plaintiffs were not entitled to a brokerage commission on those transactions, they were still entitled to a 10% override pursuant to the Override Agreement.

43.    Nevertheless, Bespoke Florida has never paid to Plaintiffs any monies pursuant to the Override Agreement.

### Goldberg Brokers the Waldorf Transaction

44.    The Waldorf Astoria Residences Miami ("Waldorf") is a high-end residential development being constructed in Miami, Florida.

45.    In 2021, Goldberg, as president of Bespoke Florida, learned of the Waldorf while researching upcoming new developments in Miami.

46.    In 2021, Goldberg contacted PMG Downtown Developers, LP ("PMG Downtown"), the developer of the Waldorf, in an attempt to obtain, on behalf of Bespoke Florida, the right to sell units thereof.

47.    Goldberg obtained, for Bespoke Florida, the semi-exclusive right to sell eight specified units within the Waldorf (the "Listed Waldorf Units").

48.    Goldberg learned of the existence of units within the Waldorf, other than the Listed Waldorf Units, that had not yet been sold ("Unlisted Waldorf Units").

49.    The Unlisted Waldorf Units included Unit 8802 and the "Lanai Unit," which consisted of two penthouses, *i.e.*, PH 101 and PH 102, which were to be located on the 90th floor of the Waldorf. (Collectively, Unit 8802 and the "Lanai Unit" are the "Waldorf Transaction Units.")

50.    Goldberg called several contacts in the real estate sales industry in an effort to find potential purchasers for the Waldorf Transaction Units.

51.    One contact suggested, as a possible purchaser, Jake Vogel ("J. Vogel"), who had a Miami listing with Goldberg.

[901738/1]                                    7

52.     Goldberg and his sales contact at PMG Downtown made a Zoom presentation to J. Vogel to persuade him to purchase one of the Waldorf Transaction Units.

53.     After the presentation, J. Vogel declined to purchase any of the Waldorf Transaction Units.

54.     Goldberg then discussed, with a contact, other potential purchasers of Waldorf Transaction Units. The contact mentioned, as a possibility, J. Vogel's father, Steven Vogel ("S. Vogel").

55.     PMG Downtown had earlier informed Goldberg that the Lanai Unit had been sold. However, Goldberg saw that the Lanai Unit, which was one of a kind within the Waldorf and would have a huge amount of outdoor space, had significant value.

56.     Goldberg called his sales contact at PMG Downtown and asked about the status of the Lanai Unit. The sales contact informed Goldberg that the Lanai Unit was not yet sold, but it had been contracted to be sold to a would-be purchaser in Switzerland.

57.     Goldberg asked his sales contact at PMG Downtown and asked if the contract could be withdrawn and Goldberg could offer the Lanai Unit to Goldberg's potential buyer.

58.     Goldberg's sales contact at PMG Downtown told Goldberg that they would do so for Goldberg, but Goldberg had to get his potential buyer to buy quickly.

59.     In or about early October 2021, Goldberg telephoned S. Vogel. Goldberg told S. Vogel about the Waldorf and about the Lanai Unit. Prior to Goldberg's call, S. Vogel had not known about the Lanai Unit, or even about the Waldorf as a whole.

60.     Prior to being first contacted by Goldberg, S. Vogel had not contacted Bespoke Florida or requested that Bespoke Florida search for a property for him to acquire.

61.     During this first phone call between Goldberg and S. Vogel, S. Vogel expressed interest in the Lanai Unit.

62.     Within approximately one week of the first phone call between Goldberg and S. Vogel, an in-person meeting was held at PMG Downtown's office in Miami, Florida, among S. Vogel, Goldberg, and Goldberg's sales contact at PMG Downtown. Goldberg set up this meeting and invited S. Vogel, who lived in Palm Beach, Florida, to it. While at this meeting, Goldberg showed S. Vogel, within PMG Downtown's office's "Experience Center," an artistic rendering of what the Lanai Unit would look like when complete, which further piqued S. Vogel's interest. At this meeting, Goldberg also discussed with S. Vogel the possibility of purchasing additional units at the Waldorf, including Unit 8802. S. Vogel expressed interest in purchasing Unit 8802 as well.

63.      During this first in-person meeting with S. Vogel, Goldberg curated a lunch with PMG Downtown's in-house sales team, and ordered the delivery of some of S. Vogel's favorite dishes from a well-known Miami restaurant.

64.     Over a period of months, lasting until February 2022, Goldberg negotiated with PMG Downtown, on behalf of S. Vogel, the purchase of the Lanai Unit and Unit 8802 to S. Vogel and his wife, Caroline Vogel ("C. Vogel") (collectively, S. Vogel and C. Vogel are "the Vogels").

65.     In the course of negotiations, Goldberg managed to obtain for the Vogels a price reduction for the Waldorf Transaction Units in the millions of dollars. He also obtained for the Vogels direct access, via Zoom meetings, to the architect of the Waldorf.

66.     During the course of these negotiations, Goldberg curated two more in-person lunches with S. Vogel at PMG Downtown's sales office.

67.     Goldberg then had several more lunches, in Palm Beach, with the Vogels, where Goldberg discussed opportunities at the Waldorf and how great a deal it would be.

[901738/1]                                9

68.     On or about January 18, 2022, final terms were agreed to for the Vogels' purchase of the Waldorf Transaction Units, including the price for each unit.

69.     On January 25, 2022, Goldberg met the Vogels in person in Palm Beach, and over lunch the Vogels signed a contract to purchase the Waldorf Transaction Units (such contract being the "Waldorf Contract"). At this lunch, S. Vogel was still discussing with Goldberg the terms of the Waldorf Contract, but Goldberg managed to persuade S. Vogel to sign the Waldorf Contract.

70.     Under the Waldorf Contract, the Vogels purchased Unit 8802 for $9,000,000, and PH 101 and PH 102 in the Lanai Unit for $17,000,000 each, comprising a total of $43,000,000 (the "Waldorf Transaction").

71.     Under Florida law, a purchaser of a unit in a new real estate development may cancel the contract within fifteen (15) days of signing.

72.     In early February 2022, S. Vogel was having misgivings about the Waldorf Contract, expressing concerns that the Waldorf Transaction Units were not the right place to purchase, and that the price was too high.

73.     S. Vogel sent text messages to Goldberg expressing these concerns. Goldberg was, at the time of these text messages, attending a wedding in Connecticut.

74.     To save the Waldorf Transaction, Goldberg, instead of returning to Florida, went from Connecticut to New York City and took a plane from there to Chicago, Illinois, where S. Vogel and his family were temporarily staying while S. Vogel was attempting to sell a penthouse unit he owned. Goldberg did so at his own expense.

75.     Goldberg visited S. Vogel and his family in Chicago for approximately four or five days.

76.     During this period, Goldberg viewed the unit in Chicago that S. Vogel desired to sell, met with the interior designer, and discussed with S. Vogel listing it.

77.     During this period, Goldberg got to know S. Vogel and met his family, and they established a bond of trust.

78.     This trust enabled Goldberg to save the Waldorf Transaction. Goldberg was able to persuade S. Vogel to complete the Waldorf Transaction if the deposit schedule under the Waldorf Transaction were amended. Goldberg then succeeded in negotiating with PMG Downtown a deposit schedule for the Waldorf Transaction that differed, in terms of dates and amounts, from any other deposit schedule in any other sale PMG Downtown had made of any units in the Waldorf. This amended deposit schedule ("Amended Deposit Schedule") was executed in the form of addenda to the contracts to purchase each of the Waldorf Transaction Units. The Vogels and PMG Downtown executed these addenda.

79.     The Vogels completed the Waldorf Transaction because of the Amended Deposit Schedule. In the absence of the Deposit Schedule Addenda that Goldberg negotiated, S. Vogel would have cancelled the Waldorf Transaction.

80.     Subsequent to the sale to the Vogels, Goldberg and S. Vogel have had a multitude of conversations, and meetings, and Goldberg has been invited to multiple events held by the Vogels, including C. Vogel's birthday party.

**Commissions to Bespoke Florida Under the Waldorf Transaction**

81.     The Waldorf Transaction was brokered pursuant to three separate co-broker agreements, one for each of the individual units, between PMG Residential as the "Listing Broker" and Bespoke Florida as the "Cooperating Broker" (the "Co-Broker Agreements"). (Exhibit 3 hereto, Co-Broker Agreements.)

82.     The Co-Broker Agreements provided that Bespoke Florida would receive from PMG Residential, as its commission on the Waldorf Transaction, eight percent (8%) of the total unit purchase price for Unit 8802 (Exhibit 3, Co-Broker Agreements, first page), and seven percent (7%) of the total unit purchase prices for PH 101 and PH 102 (*id.*, fifth and ninth pages).

83.     Given the purchase prices under the Waldorf Contract, Bespoke Florida was to receive eight percent (8%) of $9,000,000, or $720,000, on the sale of Unit 8802, and seven percent (7%) of $34,000,000, or $2,380,000, on the sale of the Lanai Unit, for a total commissions amount of $3,100,000.

84.     The Co-Broker Agreements provided that the commissions to Bespoke Florida would be payable in two installments:

(a)     Fifty percent (50%), upon thirty days after the later of (i) the closing of PMG Downtown's construction loan with respect to the Waldorf, and (ii) the Vogels' payment to PMG Downtown of an earnest money deposit equal to or exceeding 20% of the purchase price set forth in the applicable sales agreement (Exhibit 3, Co-Broker Agreements, first page ¶ 1(a)(i), fifth page ¶ 1(a)(i), and ninth page ¶ 1(a)(i)); and

(b)     Fifty percent (50%), upon thirty days after the later of (ii) one year following closing of PMG Downtown's construction loan with respect to the Waldorf, and (ii) the Vogels' payment to PMG Downtown of an earnest money deposit equal to or exceeding thirty percent (30%) of the purchase price set forth in the applicable sales agreement (Exhibit 3, Co-Broker Agreements, first page ¶ 1(a)(ii), fifth page ¶ 1(a)(ii), and ninth page ¶ 1(a)(ii)).

## Bespoke Florida Agreed to Pay Plaintiffs 60% of Bespoke Florida's Commission on the Waldorf Transaction

85.     The Waldorf Transaction was a unique type of transaction for Bespoke Florida, because Goldberg had procured both the seller, since the Waldorf Transaction Units had not been listed for sale with Bespoke Florida, and the purchaser, since the Vogels had not previously asked Bespoke Florida to find them a property to purchase.

86.     Accordingly, Gray agreed that Waldorf Transaction was different from the others, and merited a greater percentage commission to Plaintiffs.

87.     Gray agreed with Goldberg, and told him orally, in person in the boardroom of the Miami Beach Office, prior to April 2022, that Bespoke Florida would pay Plaintiffs a commission on the Waldorf Transaction in the amount of sixty percent (60%) of the total commissions that Bespoke Florida received in connection with the Waldorf Transaction, and informed Goldberg as such. Such agreement constituted a modification of the Goldberg Agreement and Florida Modification (the "Waldorf Modification").

88.     Gray confirmed to Goldberg, at a meeting in April 2022 ("April 2022 Meeting") in Goldberg's office at the Miami Beach Office, that Bespoke Florida would pay Plaintiffs a commission on the Waldorf Transaction of sixty percent (60%) of the total commissions Bespoke Florida received on the Waldorf Transaction..

## Bespoke Florida's Reneging on the Waldorf Modification

89.     Subsequent to the April 2022 Meeting, Kaitlyn Magro ("Magro"), the controller of the Bespoke Entities, informed Goldberg that Bespoke Florida would instead pay Plaintiffs only $707,650 in commissions on the Waldorf Transaction.

90.     Upon information and belief, the Vogels have paid to PMG Downtown, in connection with the Waldorf Transaction, an earnest money deposit of at least fifty percent (50%)

of the purchase prices set forth in the sales agreements applicable to each of the units sold in the Waldorf Transaction.

91.     Upon information and belief, PMG Downtown's construction loan with respect to the Waldorf closed in or about November 2022.

92.     PMG Residential has not yet paid to Bespoke Florida any portion of the commissions due on the Waldorf Transaction.

93.     Under the Goldberg Agreement, Florida Modification, and Waldorf Modification, Plaintiffs are not entitled to payment of commissions on any transaction, including but not limited to the Waldorf Transaction, until after Bespoke Florida has been paid on that transaction.

## The Asia Transaction

94.     After S. Vogel had contracted in the Vogel Transaction, he asked Goldberg to assist him in selling an apartment he owned in Miami, Florida, in a building known as "Asia" (the "Asia Apartment").

95.     Goldberg, while employed by Bespoke Florida, arranged for Bespoke Florida to list the Asia Apartment for sale.

96.     The Asia Apartment was listed for a sale price between $4,000,000 and $5,000,000.

97.     The Bespoke Entities' business model provides for listing only of units for sale at a price of over $10,000,000.

98.     To avoid acting contrary to the Bespoke Entities' business model, Z. Vichinsky took the listing for the Asia Apartment away from Goldberg and gave it to a subordinate of Goldberg's at Bespoke Florida, Luiza Chiminacio ("Chiminacio"), for Chiminacio to sell through her former employer, another real estate brokerage firm.

99.     The Asia Apartment was ultimately sold through this other brokerage firm.

100.    Goldberg was the procuring cause of the Asia Transaction.

[901738/1]                                   14

101.   On the night before the closing on the sale of the Asia Apartment (the "Asia Transaction"), the transaction almost collapsed, but Goldberg, through his personal intervention, was able to persuade the Vogels to complete the deal. There was a dispute over whether an expensive painting believed to still be in the Asia Apartment was included in the Asia Transaction, and the Vogels threatened not to close in the event the purchasers did not furnish them with such painting, but Goldberg was able to determine that such painting was, in fact, already in the Vogels' possession, and the painting in the Asia Apartment was a different painting.

102.   At the closing on the Asia Transaction on or about August 22, 2022, payment of a commission was made to Chiminacio's former employer as the ostensible brokerage firm, which, in turn, paid part of this amount to Bespoke Florida.

103.   As far as S. Vogel was aware, Goldberg was the broker involved in the Asia Transaction on the seller's side.

104.   Goldberg was not paid the full commission he otherwise would have received, had the Asia Transaction been brokered by Bespoke Florida in accordance with the listing for the Asia Property, of which Goldberg was the procuring cause.

## The Parkland Transaction

105.   While employed by Bespoke Florida, Goldberg received, from a friend, the name of a couple, Chris Murphy ("Murphy") and Tina Broderson ("Broderson"), who were interested in purchasing real property in Florida.

106.   Goldberg also procured a listing of real property in a new development, located at 7493 Knight Street, Parkland, FL 33067 (the "Parkland Property").

107.   Goldberg presented the Parkland Property to Murphy and Broderson.

108.   While Plaintiffs were employed by Bespoke Florida, Murphy and Broderson contracted to purchase the Parkland Property (the "Parkland Transaction").

[901738/1]                                          15

109.    Murphy and Broderson closed on the Parkland Transaction on or about December 10, 2022.

110.    Goldberg was the procuring cause of the Parkland Transaction, having obtained both the seller and the purchasers of the Parkland Property for Bespoke Florida.

111.    Upon information and belief, Bespoke Florida received a commission of approximately $5,000-$7,500 on the Parkland Transaction.

112.    Bespoke Florida has not paid to Plaintiffs any portion of the commission Bespoke Florida received on the Parkland Transaction.

### **The Bespoke Entities as a Single Integrated Enterprise and as Joint Employers**

113.    The Bespoke Entities function as a single integrated enterprise and as joint employers.

114.    All three of the Bespoke Entities have the same owners, and many of the same officers.

115.    The officers of Bespoke RE and of Bespoke Florida are the same persons in the same offices.

116.    Z. Vichinsky is a founding partner, and the CEO, of all three of the Bespoke Entities.

117.    Z. Vichinsky is the chief decision-maker of all three of the Bespoke Entities.

118.    C. Vichinsky is a founding partner, and the president, of Bespoke RE and Bespoke Florida.

119.    Michael Cantwell ("Cantwell") is a founding partner, and the Chief Marketing Officer and Chief Creative Officer, of all three of the Bespoke Entities.

120.    Gray is the Vice President of Client Services of all three of the Bespoke Entities.

121.    Magro is the controller of all three of the Bespoke Entities.

[901738/1]                               16

122.    The Bespoke Entities disregard distinctions between each individual company among them, and other corporate formalities.

123.    For example, the Goldberg Agreement permitted payment of Plaintiffs' salary to be made from any of Bespoke RE or Bespoke Marketing's "company or affiliated entity accounts." (Exhibit 1, Goldberg Agreement, Exhibit A p. 7, Compensation ¶ 1(A).)

124.    Bespoke RE has a web site, www.bespokerealestate.com. This web site does not distinguish between Bespoke RE and Bespoke Florida, although it refers to the sale of properties in both New York State and in Florida, and to separate offices located in New York State ("New York Office") and Miami Beach, Florida (Miami Beach Office).

125.    Until approximately a year and a half ago, Bespoke RE and Bespoke for years shared the same office space in the New York Office, with the same administrative assistant answering phones for both of them.

126.    One officer of Bespoke Entities, Gray, has had control over hiring employees of all Bespoke Entities, regardless of the company or office at which they worked. For example, she prepared the contracts for employees working out of the New York Office, including but not limited to Jarret Willis ("Willis"), a licensed real estate sales associate, and employees working out of the Miami Beach Office, including but not limited to Goldberg and Chiminacio.

127.    All payroll for the Bespoke Entities is run out of one office, the New York Office.

128.    All employee records for all employees of the Bespoke Entities are maintained in one office, the New York Office.

129.    One officer, Joseph De Sane ("De Sane"), the managing director of Bespoke RE and Bespoke Florida, oversees all real estate transactional work in all of the offices of Bespoke RE and Bespoke Florida.

Case 1:23-cv-05614-JPO   Document 1-1   Filed 06/30/23   Page 21 of 40

130.    De Sane receives an override on all real estate transactions made by all of the offices of Bespoke RE and Bespoke Florida.

131.    The Bespoke Entities also share officers and employees between individual companies and their respective offices.

132.    For example, from early 2021 to the present, Z. Vichinsky has spent most of the year working out of Bespoke Florida's Miami Beach Office, but between in or about June 2021 and in or about August 2021, and again between in or about June 2022 and in or about August 2022, Z. Vichinsky worked out of Bespoke RE's New York Office. Even while working out of the Miami Beach Office, Z. Vichinsky frequently visits the New York Office.

133.    Gray also frequently shuttled between the Miami Beach Office and New York Office, before moving to Cincinnati approximately a year and a half ago.

134.    Beginning with the inception of the Miami Beach Office in early 2021, the Bespoke Entities required Goldberg to visit the New York Office twice per month, to meet there with the Vichinskys and Cantwell, and with Bespoke RE's employees with regard to real estate transactions and with Bespoke Marketing's employees with regard to marketing.

135.    The Bespoke Entities consistently move lower-ranking employees from one office to another. Ira Hasson ("Hasson"), a business development manager with the Bespoke Entities, and Carter Young, a concierge with the Bespoke Entities, work most of the year out of Bespoke Florida's Miami Beach Office, but during the summers work out of Bespoke RE's New York Office.

136.    Willis was employed by Bespoke RE. From in or about April 2021 to in or about September or October of 2021 and from in or about April 2022 to in or about mid-December 2022, Willis worked at the New York Office on real estate transactions in New York State brokered by

[901738/1]                                    18

Bespoke RE. On the other hand, from in or about September or October of 2021 to in or about April of 2022, he was moved to the Miami Beach Office and worked on deals in Florida brokered by Bespoke RE during that period.

137.    The Bespoke entities had Lauren Canetti ("Canetti"), a Bespoke RE employee in the New York Office, work from there on real estate transactions in Florida, which ordinarily would have been within Bespoke Florida's purview. The Bespoke Entities also had Canetti frequently visit the Miami Beach Office.

138.    Employees with Bespoke RE located at the New York Office assist employees with Bespoke Florida located at the Miami Beach Office. For example, Anastasia Gromova, a Bespoke RE employee at the New York Office, has assisted Judith Pucknat, a Bespoke Florida employee at the Miami Beach Office, with selling Florida property listings. In addition, Bespoke RE employees at the New York Office ask Bespoke Florida employees at the Miami Beach office to assist them in marketing listings in the New York market, and Bespoke Florida employees at the Miami Beach office ask Bespoke RE employees at the New York Office to assist them in marketing listings in the Florida markets.

139.    In internal presentations and discussions, officers and employees of the Bespoke Entities refer to the New York Office as the "mother ship," and the Miami Beach Office as a subordinate office.

140.    Many of the financial aspects of Bespoke Florida's Miami Beach Office are dependent upon Bespoke RE's New York Office.

141.    For example, "deal sheets" on transactions in Florida real property, such at the Waldorf Transaction, can only be originated at the New York Office.

[901738/1]                                    19

Case 1:23-cv-05614-JPO   Document 1-1   Filed 06/30/23   Page 23 of 40

142.    Similarly, "DocuSigns" – documents, in connection with real estate transactions, that can be signed electronically – may only be created at the New York Office.

143.    Upon information and belief, Bespoke Florida does not even have a bank account in Florida. Prior to direct deposit being an optional means for the transfer of monies, in order to deposit checks it received, the Miami Beach Office needed to send them physically to the New York Office to be deposited. Upon information and belief, all transactions of the Miami Beach Office were banked through the New York Office.

144.    Accordingly, the Bespoke Entities should be treated as a single integrated enterprise and a single employer, and as joint employers, such that each of the Bespoke Entities shares the liabilities of the others.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

**(Declaratory Judgment as to Waldorf Transaction Commissions)**

145.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

146.    Plaintiffs performed in accordance with the Goldberg Agreement, Florida Modification, and Waldorf Modification, in effectuating the Waldorf Transaction.

147.    At all times since prior to when he began working on the Waldorf Transaction, the Goldberg has been a real estate broker duly licensed to broker real estate transactions in the State of Florida.

148.    Under the Goldberg Agreement, Florida Modification, and Waldorf Modification, Plaintiffs had a valid and binding contract with the Bespoke Entities.

149.    Plaintiffs have performed all of their obligations under the Goldberg Agreement, Florida Modification, and Waldorf Modification.

150.    Plaintiffs were the procuring cause of the Waldorf Transaction.

[901738/1]                                                    20

151.    Plaintiffs are entitled, under the Goldberg Agreement, Florida Modification, and Waldorf Modification, to receive sixty percent (60%) of the commissions to be received by Bespoke Florida under the Co-Broker Agreements, or $1,860,000.

152.    In the event that Bespoke Florida were not to pay to Plaintiffs sixty percent (60%) of the commissions Bespoke Florida were to receive under the Co-Broker Agreements, as it has informed Plaintiffs it intends to do, Bespoke Florida would breach the Goldberg Agreement as modified by the Florida Modification and Waldorf Modification.

153.    In the alternative, assuming *arguendo* that the Waldorf Modification did not modify the Goldberg Agreement and Florida Modification to require that Plaintiffs receive a sixty percent (60%) commission on the Waldorf Transaction, Plaintiffs are entitled to a fair and reasonable commission for having procured the Waldorf Transaction, and to a commission that reflects the customary rate in the community in which the Waldorf is located at the time when the Waldorf Transaction was procured, and the customary percentage amount of a commission under such circumstances is sixty percent (60%) of the commission that Bespoke Florida is to receive under the Co-Broker Agreements, or $1,860,000.

154.    In the alternative to a contract claim, assuming *arguendo* that the Waldorf Modification did not modify the Goldberg Agreement and Florida Modification to require that Plaintiffs receive a sixty percent (60%) commission on the Waldorf Transaction, were Bespoke Florida to receive the commissions for the Waldorf Transaction under the Co-Broker Agreement, and not pay to Plaintiffs a sixty percent (60%) commission on the Waldorf Transaction, Plaintiffs would have a claim for unjust enrichment against the Bespoke Entities in that:

(a)      Plaintiffs conferred a benefit upon Bespoke Florida by procuring the Waldorf Transaction, and the payment of $3,100,000 in commissions to Bespoke Florida;

(b)      Such commissions would enrich Bespoke Florida;

(c)      At the expense of Plaintiffs, who had expended extraordinary efforts to procure the Waldorf Transaction for Bespoke Florida, only not to receive compensation commensurate with those efforts; and

(d)      It would be against equity and good conscience for Bespoke Florida to retain the commissions for the Waldorf Transaction under the Co-Broker Agreement without paying to Plaintiffs sixty percent (60%) of same.

155.      In the alternative to a contract claim, assuming *arguendo* that the Waldorf Modification did not modify the Goldberg Agreement and Florida Modification to require that Plaintiffs receive a sixty percent (60%) commission on the Waldorf Transaction, were Bespoke Florida to receive the commissions for the Waldorf Transaction under the Co-Broker Agreement, and not pay to Plaintiffs a sixty percent (60%) commission on the Waldorf Transaction, Plaintiffs would have a claim for promissory estoppel against the Bespoke Entities in that:

(a)      Bespoke Florida's promise to Plaintiffs of a sixty percent (60%) commission on the Waldorf Transaction was a clear and ambiguous promise;

(b)      Plaintiffs reasonably and foreseeably relied on Bespoke Florida's promises to their detriment by working for Bespoke Entities and by not seeking other employment opportunities;

(c)    Bespoke Entities reasonably and foreseeably expected that Plaintiffs would act, or refrain from acting, in reliance upon Bespoke Florida's promises;

(d)    Plaintiffs were injured by such reliance, in that Bespoke Florida did not pay them their promised commissions.

156.    In the alternative to a contract claim, assuming *arguendo* that the Waldorf Modification did not modify the Goldberg Agreement and Florida Modification to require that Plaintiffs receive a sixty percent (60%) commission on the Waldorf Transaction, were Bespoke Florida to receive the commissions for the Waldorf Transaction under the Co-Broker Agreement, and not pay to Plaintiffs a sixty percent (60%) commission on the Waldorf Transaction, Plaintiffs would have a claim for quantum meruit against the Bespoke Entities in that:

(a)    Plaintiffs performed, in good faith, their services in procuring the seller and purchaser in the Waldorf Transaction;

(b)    Bespoke Florida, the person to whom such services were rendered, accepted such services by brokering the Waldorf Transaction;

(c)    Plaintiffs expected compensation for their services in procuring the Waldorf Transaction; and

(d)    The reasonable value of the services rendered by Plaintiff was that which Gray arrived at and promised to Plaintiffs, *i.e.*, sixty percent (60%) of the commissions Bespoke Florida was to receive in connection with the Waldorf Transaction.

157.    Bespoke Entities have taken the position that Plaintiffs are entitled to commissions, from the amount to be received by Bespoke Florida under the Co-Broker Agreements, in the amount of only $707,650. However, the position of Bespoke Entities is incorrect.

[901738/1]            23

158.    PMG Residential presently holds the funds which are the subject of the dispute between Plaintiffs and the Bespoke Entities, and is therefore a stakeholder with respect to this declaratory judgment action.

159.    There is a justiciable controversy among Plaintiffs, Bespoke Entities, and PMG Residential with regard to the proper allocation of the total commissions payable on the Waldorf Transaction.

160.    There is no adequate remedy at law.

161.    Plaintiffs are entitled to a declaratory judgment against the Bespoke Entities holding that Plaintiffs are entitled to $1,860,000 in commissions in connection with the Waldorf Transaction.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Injunctive Relief Against Bespoke Florida and PMG Residential)

162.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

163.    The Vogels have already paid to PMG Downtown an earnest money deposit in the amount equal to, or exceeding, 20% of the purchase prices of each of the units that are the subject of the Waldorf Transaction, and did so at least thirty (30) days prior to the date of this complaint.

164.    The closing of PMG Downtown's construction loan with respect to the Waldorf has occurred, and did so at least thirty (30) days prior to the date of this complaint.

165.    Thus, at least fifty percent (50%) of the commissions due to Bespoke Florida in accordance with the Co-Broker Agreements is due now.

166.    PMG Residential has not yet released to Bespoke Florida any part of the commissions due on the Waldorf Transaction.

167.     PMG Residential thus presently holds the funds payable to Bespoke Florida as commissions in connection with the Waldorf Transaction (the "Waldorf Commission Funds").

168.     The Waldorf Commission Funds are a specific, identifiable fund.

169.     The funds owed to Plaintiffs in connection with the Waldorf Transaction are part of that specific, identifiable Waldorf Commission Funds.

170.     Plaintiffs are threatened with an imminent violation of their right to full commissions on the Waldorf Transaction, in that Bespoke Florida has indicated that it will not pay them such full commissions once it receives the Waldorf Commission Funds.

171.     Bespoke Florida, through Z. Vichinsky, has threatened to use any funds it receives in connection with the Waldorf Transaction to finance threatened litigation against Goldberg and others, rather than pay commissions owed to Goldberg and others.

172.     Upon information and belief, the Bespoke Entities are in financial distress, and are in the process of attempting to terminate leases they have to property in the Hamptons in New York State, and the Bespoke Entities' owners are attempting to sell their interests in the Bespoke Entities.

173.     Under the aforesaid circumstances, in the event PMG Residential releases to Bespoke Florida the Waldorf Commission Funds, the Bespoke Entities will dissipate such funds without paying to Plaintiffs the portion thereof owed to them.

174.     This threat of dissipation represents serious and irreparable harm to Plaintiffs in the event that PMG Residential is not enjoined from releasing the Waldorf Commission Funds to Bespoke Florida.

175.     There is no adequate remedy at law.

176.     The equities are balanced in Plaintiffs' favor.

[901738/1]                                        25

177.     Accordingly, Plaintiffs are entitled to imposition of a permanent injunction prohibiting PMG Residential from releasing to Bespoke Florida the Waldorf Commission Funds, and any other funds to which Bespoke Florida may become entitled to under the Co-Broker Agreements, including but not limited to those payable by reason of the Vogels making additional payments to PMG Downtown in connection with the Waldorf Transaction.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Breach of Contract Against Bespoke Entities)

178.     Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

179.     Plaintiffs performed in accordance with the Goldberg Agreement, Florida Modification, and Override Agreement, in procuring, *inter alia*, the Asia Transaction and the Parkland Transaction.

180.     At all times since prior to when he began working on the Waldorf Transaction, the Asia Transaction, and the Parkland Transaction, Goldberg has been a real estate broker duly licensed to broker real estate transactions in the State of Florida.

181.     Under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Agreement, Plaintiffs had a valid and binding contract with the Bespoke Entities.

182.     Plaintiffs have performed all of their obligations under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Agreement.

183.     Plaintiffs were the procuring cause of the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

184.     Bespoke Entities have breached the Goldberg Agreement and Florida Modification by not paying Plaintiffs their full commission in connection with the Asia Transaction.

[901738/1]                                         26

185.    Bespoke Entities have breached the Goldberg Agreement and Florida Modification by not paying Plaintiffs any commission in connection with the Parkland Transaction.

186.    Bespoke Entities have breached the Override Agreement by not paying Plaintiffs any override in connection with the Asia Transaction, Parkland Transaction, and possibly other transactions of which Plaintiffs are not presently aware.

187.    Plaintiffs have been injured by Bespoke Entities' breach of the Goldberg Agreement and Florida Modification, in that Plaintiffs have not received monies to which they are entitled.

188.    Plaintiffs have been injured by Bespoke Entities' breach of the Override Agreement, in that Plaintiffs have not received monies to which they are entitled.

189.    Plaintiffs are entitled to damages in an amount to be determined at trial.

190.    In addition to damages, Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Goldberg Agreement and/or Florida Modification and/or Waldorf Modification and/or Override Agreement, a determination of commissions owed but not yet paid on the Asia Transaction and Parkland Transaction, and the amount of commissions owed to Plaintiffs that Plaintiffs are not yet aware of. The amounts owed are believed to be in excess of $1,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Promissory Estoppel Against the Bespoke Entities)

191.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

192.    Statements by Bespoke Florida, through Z. Vichinsky and Gray, to Goldberg that Plaintiffs would be receive a ten percent (10%) override on the commissions received on all

[901738/1]                              27

transactions that were brokered through the Miami Beach Office, *i.e.*, the Override Agreement, constituted a clear and definite promise.

193. Plaintiffs reasonably and foreseeably relied upon the Override Agreement by remaining employed by Bespoke Florida at the Miami Beach Office and not seeking other employment opportunities.

194. Plaintiffs were injured by their reliance on the Override Agreement, in that Bespoke Florida did not pay them their override on commissions promised thereunder.

195. Plaintiffs are entitled to damages in an amount to be determined at trial.

196. In addition to damages, Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Unjust Enrichment Against the Bespoke Entities)

197. Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

198. In the alternative to a contract cause of action with regard to the Override Agreement, the Bespoke Entities have been unjustly enriched by receiving Plaintiffs' services without paying Plaintiffs pursuant to the Override Agreement, or for the Asia Transaction or the Parkland Transaction.

199. Bespoke Entities have been enriched by Plaintiffs' conduct with regard to the Override Agreement, Asia Transaction, and Parkland Transaction, in that Plaintiffs procured purchasers and/or sellers for properties in Florida for Bespoke Florida, on which transactions Bespoke Florida has received payment of commissions, and in that Goldberg has managed the

[901738/1]                                28

Case 1:23-cv-05614-JPO   Document 1-1   Filed 06/30/23   Page 32 of 40

Miami Beach Office, enabling Bespoke Florida to receive commissions on additional transactions conducted by brokers and other sales representatives whom Goldberg supervised.

200.     Bespoke Entities have been enriched at Plaintiffs' expense with regard to the Override Agreement, in that Plaintiffs performed the work necessary to obtain the commissions for Bespoke Florida, but Bespoke Florida did not compensate Plaintiffs for that work in accordance with the Override Agreement.

201.     Bespoke Entities have been enriched at Plaintiffs' expense with regard to the Asia Transaction and Parkland Transaction, in that Plaintiffs performed the work necessary to obtain the commissions for Bespoke Florida, but Bespoke Florida did not pay commissions to Plaintiffs for those transactions in accordance with the Goldberg Agreement and Florida Modification.

202.     It is against equity and good conscience to permit Bespoke Entities to retain the portions of the commissions payable to Plaintiffs pursuant to the Override Agreement and/or on the Asia Transaction and Parkland Transaction.

203.     Plaintiffs have been injured by the unjust enrichment of Bespoke Entities, in that Plaintiffs have not received the commissions owed to them pursuant to the Override Agreement and/or on the Asia Transaction and Parkland Transaction.

204.     Plaintiffs are entitled to damages in an amount to be determined at trial.

205.     In addition to damages, Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement and on the Asia Transaction and Parkland Transaction.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Quantum Meruit Against Bespoke Entities)

206.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

207.    In the alternative to a contract cause of action with regard to the Override Agreement, Asia Transaction, and Parkland Transaction, Plaintiffs are entitled to recover their share of profits from business they generated for Bespoke Florida, pursuant to the doctrine of quantum meruit.

208.    Plaintiffs performed, in good faith, their services under the Goldberg Agreement and Florida Modification and the Override Agreement, by procuring purchasers and/or sellers for properties in Florida for Bespoke Florida, including but not limited to the Asia Transaction and the Parkland Transaction and in that Goldberg has managed the Miami Beach Office, enabling Bespoke Florida to receive commissions on additional transactions conducted by brokers and other sales representatives whom Goldberg supervised.

209.    Bespoke Florida, the person to which Plaintiffs rendered such services, accepted such services by brokering transactions generated by the Miami Beach Office, including but not limited to the Asia Transaction and the Parkland Transaction, and by accepting commissions paid pursuant to such transactions.

210.    Plaintiffs expected compensation for their services under the Override Agreement, in the form of the 10% of commissions to which they were entitled under the Override Agreement.

211.    Plaintiffs expected compensation for their services in connection with the Asia Transaction and the Parkland Transaction, in the amounts commensurate with the percentages of the commissions received by Bespoke Florida that Plaintiffs were paid on similar transactions on which they had procured sellers and/or buyers for Bespoke Florida.

[901738/1]                                        30

212.     Plaintiffs have been injured financially.

213.     Plaintiffs are entitled to damages in an amount to be determined at trial.

214.     In addition to damages, Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement and on the Asia Transaction and Parkland Transaction.

<u>**AS AND FOR A SEVENTH CAUSE OF ACTION**</u>

**(New York Labor Law § 740, Against Bespoke Entities)**

215.     Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

216.     Goldberg was an employee of Bespoke Entities.

217.     In the alternative, Goldberg was an independent contractor employed by Bespoke Entities.

218.     The Bespoke Entities racially discriminated against Willis, a licensed real estate sales associate at Bespoke RE who is African American, by various means. (For a more detailed Charge of Discrimination that Goldberg has filed with the United States Equal Employment Opportunity Commission ("EEOC"), and a more detailed Employment Discrimination Complaint Form that Willis has filed with the New York State Division of Human Rights ("DHR"), detailing the discrimination against Goldberg and Willis by the Bespoke Entities, please go to the following link: https://www.alblawfirm.com/goldberg-v-bespoke/. When right to sue letters are received from the EEOC and DHR, a more detailed discrimination lawsuit will be filed against the Bespoke Entities.)

219.     The Bespoke Entities discriminated against Willis in that, beginning in or about July 2021, Hasson, an employee of Bespoke Florida who is white, contacted Willis's clients and

[901738/1]                                                         31

demanded that they deal with the Bespoke Entities through him rather than Willis. (This is the "Hasson Client Interference.")

220.    The Bespoke Entities discriminated against Willis in that on many occasions, from in or about March 2021 to in or about September 2022, the Vichinskys, in the presence of Willis, told Willis that he was stupid, knew nothing about the real estate industry, and messed everything up. (This is the "Unfounded Willis Criticism.") In fact, Willis was the Bespoke Entities' star employee, and had generated significant amounts of commissions to the Bespoke Entities to his vast network of personal connections.

221.    The Bespoke Entities discriminated against Willis, a real estate salesperson, in that Bespoke RE would not permit Willis to show to prospective buyers, by himself, properties that he was attempting to sell. This was contrary to industry practice; contrary to common sense, in that, in many cases, Willis had past familiarity with the properties being sold from having visited them as a friend of the properties' owners; and, upon information and belief, was done so that Willis, as an African American, would not be the public-facing face of Bespoke RE. (This is the "Discriminatory Selling Restriction.")

222.    At both Bespoke Florida's Miami Beach Office, and Bespoke RE's New York Office, officers and employees of Bespoke Entities disparaged Willis in racist terms. An employee at the New York Office orally called Willis a "nigger" on a daily basis, and sent him text messages calling him a "nigger" or a variation on that word. This employee was never terminated for such conduct, nor, apparently, was she disciplined therefor. The Vichinskys, and other officers and employees of Bespoke Entities at both offices, frequently called Willis "Jafar," in comparison to the manipulative, brown-skinned villain of the same name in the movie "Aladdin." (This conduct is the "Hostile Work Environment.")

[901738/1]                                        32

223.    In or about late April 2022, Bespoke RE stripped Willis of his title of Vice President of Bespoke Parallel, a division of the Bespoke Entities, in which Willis's role was to develop relationships with other realtors physically located in geographic areas in which the Bespoke Entities did not have a significant presence. (This is the "Discriminatory Demotion.") Bespoke RE replaced Willis in this role with Hasson, who at the time had less than a year's worth of experience in the real estate industry. Bespoke RE attempted to rationalize this by claiming that Willis had performed poorly, but, as noted above, Willis had generated considerable commissions for Bespoke RE.

224.    Goldberg reasonably believed that the Bespoke Entities' treatment of Willis, including the Hasson Client Interference, Unfounded Willis Criticism, Discriminatory Selling Restriction, Hostile Work Environment, and Discriminatory Demotion (collectively, the "Bespoke Discriminatory Acts"), were activities, policies, and practices of the Bespoke Entities that were in violation of federal and state civil rights laws.

225.    Goldberg disclosed the Hasson Client Interference to supervisors of the Bespoke Entities, i.e., the Vichinskys and Gray.

226.    Goldberg told Gray that the Hasson Client Interference was discriminatory, as well as unacceptable and a firing offense.

227.    Goldberg disclosed, to a supervisor within the Bespoke Entities, the Hasson Client Interference, Unfounded Willis Criticism, Discriminatory Selling Restriction, Hostile Work Environment, and Discriminatory Demotion. Goldberg did so in August 2022, by disclosing each of those to counsel who was representing Goldberg in a commissions dispute with Bespoke Entities, and such counsel, in turn, disclosed each of those to counsel to the Bespoke Entities. (This is the "August 2022 Disclosure.")

228.     Goldberg objected to the Hasson Client Interference, Unfounded Willis Criticism, Discriminatory Selling Restriction, Hostile Work Environment, and Discriminatory Demotion.

229.     On or about September 22, 2022, the month after the August 2022 Disclosure, the Bespoke Entities terminated Plaintiffs' employment with them, by email from Z. Vichinsky (the "Termination").

230.     Upon information and belief, the Termination was effectuated because of the August 2022 Disclosure, and because Goldberg had objected to the Hasson Client Interference, Unfounded Willis Criticism, Discriminatory Selling Restriction, Hostile Work Environment, and Discriminatory Demotion.

231.     The Termination was an adverse employment action against Goldberg, discriminating against him for having exercised his rights under New York Labor Law § 740 ("LL § 740"), and constituted a retaliatory action within the meaning of LL § 740.

232.     Upon information and belief, Bespoke Florida's denial to Goldberg of commissions to which he was entitled (the "Commission Denials") occurred because of the August 2022 Disclosure, and because Goldberg had objected to the Hasson Client Interference, Unfounded Willis Criticism, Discriminatory Selling Restriction, Hostile Work Environment, and Discriminatory Demotion.

233.     The Commission Denials were an adverse employment action against Goldberg, discriminating against him for having exercised his rights under LL § 740, and constituted a retaliatory action within the meaning of LL § 740.

234.     The Termination and Commission Denials constituted violations of LL § 740.

235.     The Bespoke Entities' violations of LL § 740 were willful, malicious, and wanton.

[901738/1]                                        34

236.    Goldberg has been unable, despite reasonable efforts, to find comparable employment.

237.    As a result of the Termination and Commission Denials, Goldberg has been denied employment; has lost wages, benefits, and promotional activities; and has incurred damages thereby.

238.    Because the Bespoke Entities form a single integrated enterprise and employer, and act as joint employers, the Bespoke Discriminatory Acts are considered to have been the acts of Bespoke Florida and Bespoke Marketing as well as Bespoke RE.

239.    Because the Bespoke Entities form a single integrated enterprise and employer, and act as joint employers, the Termination and Commission Denials are considered to have been the acts of Bespoke RE and Bespoke Marketing as well as Bespoke Florida, and to have been as retaliation for Goldberg's having disclosed, and objected to, the Bespoke Discriminatory Acts.

240.    Pursuant to LL §§ 740(4) and (5), Goldberg is entitled to recover from Bespoke Entities lost wages; the value of lost benefits; interest on lost wages and benefits; and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with a civil penalty of an amount not to exceed ten thousand dollars, and reasonable costs, disbursements, and attorney fees incurred in the prosecution of this action.

**WHEREFORE,** Plaintiffs demand judgment as follows:

A.      On the First Cause of Action, against Bespoke Entities, a declaratory judgment holding that Plaintiffs are entitled to $1,860,000 in commissions in connection with the Waldorf Transaction;

B.      On the Second Cause of Action, imposition of a permanent injunction prohibiting PMG Residential from releasing to Bespoke Florida the Waldorf Commission

Funds, and any other funds to which Bespoke Florida may become entitled to under the Co-Broker Agreements, including but not limited to those payable by reason of the Vogels making additional payments to PMG Downtown in connection with the Waldorf Transaction;

C.      On the Third Cause of Action, against Bespoke Entities, awarding Plaintiffs damages in an amount to be determined at trial, and an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Goldberg Agreement and/or Florida Modification and/or Waldorf Modification and/or Override Agreement, a determination of commissions owed but not yet paid on the Asia Transaction and Parkland Transaction, and the amount of commissions owed to Plaintiffs that Plaintiffs are not yet aware of;

D.      On the Fourth Cause of Action, against Bespoke Entities, awarding Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement;

E.      On the Fifth Cause of Action, against Bespoke Entities, awarding Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement and on the Asia Transaction and Parkland Transaction;

F.   On the Sixth Cause of Action, against Bespoke Entities, awarding Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Plaintiffs pursuant to the Override Agreement and on the Asia Transaction and Parkland Transaction; and

G.   On the Seventh Cause of Action, against Bespoke Entities, awarding Goldberg lost wages; the value of lost benefits; interest on lost wages and benefits; and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with a civil penalty of an amount not to exceed ten thousand dollars, and reasonable costs, disbursements, and attorney fees incurred in the prosecution of this action;

H.   Together with interest, costs and disbursements of this action, and such other and further relief which may seem to the Court to be just and proper.

Dated: New York, New York
       March 21, 2023

Yours, etc.,

ADAM LEITMAN BAILEY, P.C.

By: _____

Adam Leitman Bailey, Esq.
Brandon M. Zlotnick, Esq.
One Battery Park Plaza, Eighteenth Floor
New York, NY 10004
(212) 825-0365

*Attorneys for Plaintiffs Harlan Goldberg
and H Gold LLC*

[901738/1]                    37