# EXHIBIT B

INDEX NO. 651458/2023
NYSCEF DOC. NO. 9
RECEIVED NYSCEF: 06/12/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HARLAN GOLDBERG, H GOLD LLC, and JARRET
WILLIS,

*Plaintiffs,*

vs.

BESPOKE REAL ESTATE LLC, BESPOKE LUXURY
MARKETING LLC, BESPOKE REAL ESTATE
FLORIDA LLC, ZACHARY VICHINSKY, and CODY
VICHINSKY,

*Defendants.*

Index No. 651458/2023

Date Filed:

**AMENDED
SUMMONS**

Venue is based on
provisions of agreements
between Plaintiffs and
Defendants Bespoke
Real Estate LLC and
Bespoke Luxury
Marketing LLC

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Amended Complaint in this action
and to serve a copy of your answer, or, if the Amended Complaint is not served with this
Amended Summons, to serve a Notice of Appearance, on Plaintiffs' attorneys within twenty (20)
days after service of this Amended Summons, exclusive of the day of service (or within thirty
(30) days after service is complete if this Amended Summons is not personally delivered to you
within the State of New York); and in case of your failure to appear or answer, judgment will be
taken against you by default for the relief demanded in the Amended Complaint.

Dated: New York, New York
       June 12, 2023

Yours, etc.,

ADAM LEITMAN BAILEY, P.C.
*Attorneys for Plaintiffs Harlan Goldberg, H Gold
LLC, and Jarret Willis*

By: _____
    Adam Leitman Bailey, Esq.
    One Battery Park Plaza, Eighteenth Floor
    New York, NY 10004
    (212) 825-0365

[922866/1]                                    1

INDEX NO. 651458/2023

NYSCEF DOC. NO. 9                                              RECEIVED NYSCEF: 06/12/2023

**DEFENDANTS' ADDRESSES:**

Bespoke Real Estate LLC
903 Montauk Highway
Water Mill, NY 11976

Bespoke Luxury Marketing LLC
903 Montauk Highway
Water Mill, NY 11976

Bespoke Real Estate Florida LLC
119 Washington Avenue, Suite 500
Miami Beach, FL 33139

Zachary Vichinsky
c/o Bespoke Real Estate Florida LLC
119 Washington Avenue, Suite 500
Miami Beach, FL 33139

Cody Vichinsky
c/o Bespoke Real Estate LLC
903 Montauk Highway
Water Mill, NY 11976

[922866/1]                                    2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| HARLAN GOLDBERG, H GOLD LLC, and JARRET WILLIS, | Index No.: 651458/2023 |
| *Plaintiffs,* | **AMENDED COMPLAINT** |
| vs. | |
| BESPOKE REAL ESTATE LLC, BESPOKE LUXURY MARKETING LLC, BESPOKE REAL ESTATE FLORIDA LLC, ZACHARY VICHINSKY, and CODY VICHINSKY, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiffs HARLAN GOLDBERG, H GOLD LLC, and JARRET WILLIS (collectively, "Plaintiffs"), by their attorneys, ADAM LEITMAN BAILEY, P.C., complaining of Defendants BESPOKE REAL ESTATE LLC, BESPOKE LUXURY MARKETING LLC, BESPOKE REAL ESTATE FLORIDA LLC, ZACHARY VICHINSKY, and CODY VICHINSKY (collectively, "Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This case concerns three related corporate defendants whose principals created a toxic atmosphere of racial and religious bigotry and discrimination and, over a period of years, subjected the individual plaintiffs to an unending onslaught of abuse. They formed a real estate brokerage enterprise which, even as it sought to cater to the elite elements of society, embraced and perpetuated the basest aspects of prejudice, and demeaned its employees with a flood of pejoratives, not the least of which was a constant refrain of the words "nigger" and "kike," in stark contrast to the refinement of the clientele whom the business sought and whom the plaintiffs, in spite of the abuse they endured, procured for it.

[922842/1]                                              1

2.     In so doing, the corporate defendants and their principals violated state and federal laws, both which barred discrimination in employment and contracting and which prohibited retaliation against those bringing violations of the law to the awareness of the public. Those who committed the transgressions as set forth below bore sufficient malice and hatred to brand one of the plaintiffs "Jafar," after a villainous dark-skinned cartoon character. But it was they, and not plaintiffs, who acted in a cartoonish manner beneath the decency of any person with a conscience, and it is they and their misdeeds which shall share, in a metaphorical sense, Jafar's fate as a prisoner of the lamp. They shall find themselves imprisoned economically by the damages that will be imposed upon them. And while bigotry is the evil genie that can never entirely be put back in the proverbial bottle, when justice is done in this case, the defendants' bigotry will face its just moral and legal admonishment and will be banished back under the rock from whence it came.

3.     In addition, this is an action by one plaintiff and the wholly owned company through which he transacts business, to recover commissions owed to them by the related corporate defendants on sales of high-end residential real estate in Florida. The corporate defendants branded themselves as dealing only in properties worth in excess of $10,000,000, yet stinted those plaintiffs on their share of the lucrative commissions the defendants received from transacting in such properties, in the transactions which those plaintiffs had made possible through their efforts.

## PARTIES

4.     Plaintiff Harlan Goldberg ("Goldberg") is a natural person.

5.     Plaintiff H Gold LLC ("Gold") is a limited liability company.

6.     Goldberg is the sole owner and member of Gold. (Collectively, Goldberg and Gold are the "Goldberg Plaintiffs.")

7.     Goldberg is Jewish.

[922842/1]                                        2

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 06/12/2023

8.    Prior to in or about April 2019, and from in or about June 2020 to the present, Goldberg has been a real estate broker duly licensed by the Department of Business and Professional Regulation of the State of Florida to broker real estate transactions in the state of Florida.

9.    At all relevant times, Goldberg has transacted all of his real estate brokerage business through Gold, and has received, through Gold, the commissions he earned on real estate transactions.

10.    Plaintiff Jarret Willis ("Willis") is a natural person.

11.    At all relevant times, Willis has resided and been domiciled in the State of New York.

12.    Willis is African American.

13.    At all relevant times, Willis has been a real estate salesperson duly licensed by the Department of State of the State of New York.

14.    Defendant Bespoke Real Estate LLC ("Bespoke RE") is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York.

15.    Defendant Bespoke Luxury Marketing LLC ("Bespoke Marketing") is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York.

16.    Defendant Bespoke Real Estate Florida LLC ("Bespoke Florida") is a limited liability company.

17.    Bespoke RE and Bespoke Florida are real estate brokerage firms that represent both buyers and sellers in residential real estate transactions. They represent both buyers and sellers.

[922842/1]                                    3

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

They participate only in deals in which the sale price is $10 million or greater. Thus, they appeal to a wealthy clientele.

18.     Bespoke RE and Bespoke Florida are related entities. They share common ownership and common management.

19.     Bespoke Marketing ostensibly serves as the marketing arm for Bespoke RE and Bespoke Florida. It ostensibly performs marketing services for Bespoke RE and Bespoke Florida. It shares common ownership and common management with Bespoke RE and Bespoke Florida. Bespoke Marketing, Bespoke RE, and Bespoke Florida are related entities. (Collectively, Bespoke RE, Bespoke Florida, and Bespoke Marketing are the "Bespoke Entities.")

20.     Bespoke RE and Bespoke Marketing, the first Bespoke Entities formed, were formed prior to 2019, in the State of New York.

21.     Bespoke Florida was formed in or about March 2020.

22.     Defendant Cody Vichinsky ("C. Vichinsky") is a natural person who is, upon information and belief, a founding partner, and the president, of Bespoke RE and Bespoke Florida.

23.     At all relevant times, C. Vichinsky has resided and been domiciled in the State of New York.

24.     Defendant Zachary Vichinsky ("Z. Vichinsky") is a natural person who is, upon information and belief, a founding partner, and the CEO and managing member, of the Bespoke Entities. (Collectively, C. Vichinsky and Z. Vichinsky are the "Vichinskys.")

25.     During at least part of the period in which Z. Vichinsky was committing acts and omissions discussed in this Complaint, Z. Vichinsky resided, and was domiciled in, the State of New York.

[922842/1]                                4

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 06/12/2023

## VENUE

26.     Venue as to the First, Second, Third, Fourth, Eighth, Ninth, Tenth, and Eleventh Causes of Action, asserted by Goldberg Plaintiffs, or by Goldberg alone, herein is proper in this county because the Goldberg Agreement, as that term is defined below, provides for the courts located in the County of New York to be the exclusive venue of any action in New York state courts for all matters arising out of, in connection with, or relating to the Goldberg Agreement. (*See* Exhibit 1, Goldberg Agreement, p. 5, ¶ 13.)

27.     Venue as to the Fifth, Sixth, and Seventh Causes of Action, asserted by Willis herein, is proper in this county because the Willis Agreement, as that term is defined below, provides for the courts located in the County of New York to be the exclusive venue of any action in New York state courts for all matters arising out of, in connection with, or relating to the Willis Agreement. (*See* Exhibit 2, Willis Agreement, third page, ¶ 11.)

28.     In addition, the Bespoke Entities' main offices are in the State of New York.

## BACKGROUND

### Goldberg Plaintiffs' Employment with the Bespoke Entities

29.     In or about April 2019, Goldberg Plaintiffs began working for Bespoke RE and Bespoke Marketing pursuant to a written agreement between Goldberg and his wholly owned company, Gold, on the one side, and Bespoke RE and Bespoke Marketing on the other (the "Goldberg Agreement"). (Exhibit 1 hereto, Goldberg Agreement.)

30.     Exhibit A to the Goldberg Agreement provides for compensation to Goldberg Plaintiffs. (Exhibit 1, Goldberg Agreement, Exhibit A, pp. 7-8.) This compensation includes commissions, the terms of which are set forth in Exhibit B to the Goldberg Agreement. (*See id.*, Compensation ¶ 2 [citing Exhibit B]; Exhibit 1, Goldberg Agreement, Exhibit B [setting forth categories of transactions eligible for commissions; "Milestones," or circumstances in which each

[922842/1]                              5

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

category applies; compensation amounts and percentages; compensation method; and obligations].)

31.      Compensation to Goldberg Plaintiffs under the Goldberg Agreement also includes a fixed annual salary of $150,000, to be paid out in installments every two weeks. (Exhibit 1, Goldberg Agreement, Exhibit A p. 7, Compensation ¶ 1(A).)

32.      At all relevant times, the compensation to Goldberg Plaintiffs, under the Goldberg Agreement, has always been paid to Gold.

33.      In or about March 2021, Goldberg became the president of Bespoke Florida.

34.      Goldberg's responsibilities as president of Bespoke Florida included managing Bespoke Florida's office in Miami Beach, Florida ("Miami Beach Office"), and the procurement of buyers and/or sellers for residential real estate transactions brokered by Bespoke Florida.

35.      When Goldberg became the president of Bespoke Florida, Gold ceased receiving compensation from Bespoke RE and Bespoke Marketing, and began receiving compensation from Bespoke Florida.

36.      In 2022, Gold received a Form 1099-NEC reflecting the compensation Goldberg Plaintiffs had received in 2021 for Goldberg's work pursuant to the Goldberg Agreement. This Form 1099-NEC (the "Form 1099-NEC") listed, as the "Payer," "Bespoke Real Estate Florida LLC." (Exhibit 3 hereto, Form 1099-NEC.)

37.      The Form 1099-NEC encompassed all compensation that Goldberg or Gold received for any work they performed for any of the Bespoke Entities in 2021.

38.      Bespoke Florida's payment of commissions and salary to Gold, and its issuance of a 1099-NEC to Gold, constituted a modification of the Goldberg Agreement to add Bespoke Florida as an additional contracting party on the side of Bespoke RE and Bespoke Marketing.

[922842/1]                                                   6

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

39.     In or about March 2021, Goldberg began procuring buyers and sellers, on behalf of Bespoke Florida, for transactions involving real property in the state of Florida.

40.     The Goldberg Agreement does not reference Bespoke Florida, which had not yet been formed as of the time of the Goldberg Agreement, or Goldberg's role as president thereof.

41.     Although the Goldberg Agreement separates out commissions owed by property location and type of service provided, nothing in the Goldberg Agreement addresses transactions involving real property in the state of Florida, as at issue in this case. Therefore, any such transactions are outside the scope of the Goldberg Agreement and must be the subject of a new oral agreement.

42.     Beginning when Goldberg began procuring, on behalf of Bespoke Florida, buyers and sellers for transactions involving real property in the state of Florida, Bespoke Florida paid Gold commissions on such transactions.

43.     Goldberg's procurement, on behalf of Bespoke Florida, of buyers and sellers for transactions involving real property in the state of Florida, and Bespoke Florida's payment to Gold of commissions on such transactions, constituted a modification of the Goldberg Agreement such that it encompassed commission payments to Gold for such performance by Goldberg (the "Florida Modification").

44.     Goldberg's work for Bespoke Entities was part of the regular business of the Bespoke Entities.

45.     While president of Bespoke Florida, Goldberg worked at the Miami Beach Office on a regular schedule, working there all weekdays each week.

46.     Z. Vichinsky worked at the Miami Beach Office, and oversaw Goldberg's work. Goldberg reported to Z. Vichinsky on a daily basis.

[922842/1]                                        7

47. Z. Vichinsky had authority to, and did, give work assignments to Goldberg and take them away from him.

48. The Vichinskys were Goldberg's supervisors throughout Goldberg's employment by Bespoke Entities. They had authority from Bespoke Entities to fire Goldberg, promote or fail to promote Goldberg, and reassign Goldberg with significantly different responsibilities.

49. Goldberg used only the Bespoke Entities' resources, not Goldberg's own, for his work. For example, Goldberg was permitted to use only a computer issued to him by the Bespoke Entities, and not Goldberg's own personal computer, to perform work for the Bespoke Entities.

50. Z. Vichinsky issued to Goldberg a debit card to be used to draw from Bespoke Entities' bank account, to be used to pay for business lunches.

51. The Goldberg Agreement prohibited Goldberg Plaintiffs from:

without the prior written consent of Bespoke, engag[ing], whether directly or indirectly, in any business or employment which is similar or in any way connected to or in competition with the business of Bespoke, its subsidiaries, affiliates, associates and joint ventures, or which may be considered by Bespoke in its entire unfettered opinion to impair [Goldberg Plaintiffs'] capability to act at all times in the best interests of Bespoke.

(Exhibit 1, Goldberg Agreement, pp. 1-2 § 5.)

52. Accordingly, Goldberg Plaintiffs were employees of Bespoke Entities.from in or about April 2019 until their wrongful termination on or about September 22, 2022, as discussed below.

**Willis's Employment with the Bespoke Entities**

53. Willis began working for Bespoke Entities in or about 2017 in the position of licensed real estate sales associate.

54. At all relevant times, Willis was a real estate salesperson duly licensed by the Department of State of the State of New York.

[922842/1]                                    8

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

55.     Throughout his time with Bespoke Entities, Willis was involved with residential real estate sales for Bespoke, on behalf of both buyers and sellers, including persuading potential sellers to sell their properties and to use Bespoke Entities as their broker, and managing the relationship between potential buyers and sellers throughout the course of the transaction.

56.     Willis's work for Bespoke Entities was part of the regular business of Bespoke Entities.

57.     At all relevant times, Willis had a vast interpersonal network of contacts. Throughout his employment with Bespoke Entities, Willis drew from this network to bring to Bespoke Entities a large number of clients and a tremendous amount of business.

58.     On or about March 16, 2021, Willis entered into a written agreement with Bespoke Entities, effective as of March 15, 2021, entitled "Employment Agreement" (the "Willis Agreement") (Exhibit 2 hereto, Willis Agreement).

59.     The Willis Agreement stated that it was

by and between Bespoke Real Estate LLC (together with all of its direct and indirect affiliates and subsidiaries, collectively, "Employer", or "Bespoke"), having an office at 903 Montauk Highway, Unit 1, Water Mill, New York, 11976 and Jarret Willis ("Employee" or "You") . . .

(Exhibit 2, Willis Agreement, p. 1, preamble.)

60.     The Willis Agreement described the nature of Willis's employment with Bespoke Entities as follows:

EMPLOYMENT. Employer shall employ Employee as a Director of Referral and Collaboration Business Development. Employee accepts and agrees to be employed on the terms and conditions set out in this Agreement and agrees to be subject to the general supervision, advice and direction of Employer and Employer's supervisory personnel. Employee shall perform all duties as are customarily performed by an employee in a similar position. Employee shall also perform all other duties Employer may assign to Employee from time to time. Please see Exhibit A for description of work and division overview.

(Exhibit 2, Willis Agreement, p. 1 § 1.)

[922842/1]                                    9

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

61.     The Willis Agreement provided that Willis would receive an annual starting salary of $75,000, which was to be reviewed 74 days after the date of the Willis Agreement for a reduction to $50,000 per year. (Exhibit 1, Willis Agreement, p. 1 § 2.) The Willis Agreement provided that Willis was to be paid biweekly (*id.* ¶ 2(A)), and that Willis would also receive compensation in the form of commissions on property sales pursuant to a formula in an exhibit to the Willis Agreement (*id.* ¶ 2(C) [citing Exhibit B to Willis Agreement]; *see id.* Exhibit B [setting forth formula and definitions of terms used to calculate commissions]). Furthermore, the Willis Agreement provided that, "[i]n light of the nature of Employee's position with Employer, Employee will be exempt from overtime laws." (Exhibit 2, Willis Agreement, p. 1 ¶ 2(B)).

62.     The Willis Agreement provided that "Bespoke reserves the right to make salary payments from any of its company or affiliated entity accounts, which will not void any aspect of your employment agreement." (Exhibit 2, Willis Agreement, Exhibit B, second page, ¶ 1(c).)

63.     The Willis Agreement prohibited Willis from:

without the prior written consent of Employer, engag[ing], whether directly or indirectly, in any business or employment which is similar or in any way connected to or in competition with the business of Employer, its subsidiaries, affiliates, associates and joint ventures, or which may be considered by Employer in its entire unfettered opinion to impair Employee's capability to act at all times in the best interests of Employer.

(Exhibit 2, Willis Agreement, pp. 1-2 § 6.)

64.     The Willis Agreement provided that "Employee's employment shall be subject to all rules, regulations and policies of Employer as may be prescribed by Employer from time to time . . . ." (Exhibit 2, Willis Agreement, p. 2 § 7.)

65.     While Bespoke Entities employed Willis under the Willis Agreement, Bespoke Entities paid for health insurance for Willis.

[922842/1]                              10

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

66.     While working under the Willis Agreement, Willis performed work for Bespoke Entities using a laptop computer that Bespoke Entities had purchased and issued to him (the "Bespoke Laptop").

67.     While working under the Willis Agreement, Willis transacted business for Bespoke Entities using solely an email address, under the Bespoke Entities' domain name, that Bespoke Entities had issued to him.

68.     Bespoke Parallel ("Bespoke Parallel") was and is a division of Bespoke Entities that operated in real estate markets in which Bespoke Entities did not yet have a significant presence. Bespoke Entities, at the time Bespoke Parallel was formed in or about March 2021 or April 2021, had a significant presence in, among other locations, the Hamptons on New York's Long Island, and New York City. Bespoke Parallel worked with other real estate brokerage firms with greater presences, and home offices, in other markets, in order to enable Bespoke Entities to conduct purchase and sale transactions involving properties in those markets, and to represent persons residing in those markets who wished to purchase or sell properties in markets in which Bespoke Entities already had a significant presence.

69.     In or about late March or April, 2021, Willis was promoted to the position of Vice President of Bespoke Parallel ("Vice President"). Willis's responsibilities as Vice President to carry out the objectives of Bespoke Parallel, as described in paragraph 68 above. As Vice President, Willis built relationships with other brokers with existing offices in locations including Miami, Florida; Palm Beach, Florida; and Aspen, Colorado.

70.     In or about 2017, after he began working for Bespoke Entities, Willis periodically came to Bespoke RE's principal office, which was located in New York State (the "New York

[922842/1]

11

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                              RECEIVED NYSCEF: 06/12/2023

Office"). From 2018 to in or about April 2021, Willis came to the New York Office between one and three days per week.

71.     In or about April 2021, after entering into the Willis Agreement and being promoted to Vice President, Willis began performing work for Bespoke Entities at the New York Office, four or five days per week. Willis did so through September or October 2021.

72.     Throughout his time as Vice President, Willis continued to perform his existing duties for Bespoke Entities as a licensed real estate sales associate. Willis received from Bespoke Entities, prior to, during, and after his holding the position of Vice President, commissions from real estate transactions brokered by Bespoke Entities in which he was involved.

73.     The New York Office was open only during the hours of approximately 9:00 a.m. to 6:00 p.m. each day while Willis worked under the Willis Agreement. Willis's ability to work on-site at the New York Office was limited to the hours in which the New York Office was open. He did not have a key to the door of the New York Office that permitted him to be at the office at other times.

74.     Throughout the time Willis worked for Bespoke Entities, each of the Vichinskys was Willis's supervisor. Each of the Vichinskys had the authority, from Bespoke Entities, to assign work to Willis, take assigned work away from Willis, to promote or demote Willis, to discipline Willis, to reassign Willis with significantly different responsibilities, and to terminate Willis's employment with Bespoke Entities.

75.     From September or October 2021 to in or about April 2022, Willis temporarily relocated to Miami Beach, Florida, to work for Bespoke Florida in person with respect to property transactions in real estate markets in Miami, Florida and Palm Beach, Florida. Willis worked in Bespoke Florida's Miami Beach Office during that time, approximately four to five days per week

[922842/1]                                 12

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

from September or October 2021 to February 2022, and approximately two to three days per week from February 2022 to April 2022.

76.     While working out of the Miami Beach Office, Willis received instructions and work assignments from, and reported to, officers of Bespoke Florida who were working in the Miami Beach Office, including but not limited to Z. Vichinsky and Goldberg.

77.     In April 2022, Willis returned to New York State and resumed working out of the New York Office. From April 2022 through in or about the end of November 2022, Willis worked out of the New York Office approximately two or three days a week.

78.     Willis then temporarily returned to Florida and worked in the Miami Beach Office approximately two or three days a week, from on or about December 1, 2022 through December 12, 2022, when he was constructively discharged from Bespoke Entities, as discussed below.

79.     Accordingly, from in or about 2017 until December 12, 2022, Willis was an employee of Bespoke Entities.

## Willis's Performance as an Employee of Bespoke Entities

80.     Willis's performance for Bespoke Entities was stellar. Willis procured many clients for Bespoke Entities, leading to substantial business for, and income to, Bespoke Entities. Transactions that Willis obtained that Bespoke Entities brokered include, but are not limited to, the following:

(a)     115 Beach Lane, Wainscott, New York (the "115 Beach Property"), for which Willis procured the sellers, which sold for $43 million, generating commissions to Bespoke RE of, upon information and belief, $860,000.00;

(b)     236 Quimby Lane, Bridgehampton, New York, for which Willis procured the purchaser, which sold for $26 million, generating commissions of $520,000 to Bespoke RE;

[922842/1]                                        13

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

(c)   140 Hayground Cove Road, Water Mill, New York, for which Willis procured the seller, which sold for $13 million, generating commissions to Bespoke RE of $260,000;

(d)   2 East Drive, Sag Harbor, New York, for which Willis procured the seller;

(e)   157 Jobs Lane, Bridgehampton, New York, for which Willis procured the seller;

(f)   105 Jobs Lane, Bridgehampton, New York, for which Willis procured the seller;

(g)   38 Matthews Lane, Wainscott, New York, for which Willis procured the seller;

(h)   Referral to Bespoke Florida of the listing of a condominium in the Miami Beach Edition Hotel in Miami Beach, Florida, which sold for a price of approximately $7 million; and

(i)   Willis was instrumental in obtaining most of Bespoke Florida's property listings.

81.   Willis's strengths included a vast interpersonal network, from which he drew on preexisting personal relationships with many of the clients whom he procured for Bespoke Entities as either sellers or buyers. In addition, Willis showed tremendous persistence in acting to obtain and keep clients with Bespoke Entities and complete their transactions.

82.   These two qualities were fundamental to Willis's achievement of the sale of the 115 Beach Property.

83.   Willis was friends with David Susser ("D. Susser") and Marla Susser ("M. Susser") (collectively, D. Susser and M. Susser are the "Sussers"), the owners of the 115 Beach Property.

[922842/1]

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                         RECEIVED NYSCEF: 06/12/2023

84.     On or about July 12, 2020, D. Susser asked Willis to inform the Vichinskys that the Sussers wished to sell the 115 Beach Property through Bespoke RE.

85.     Willis promptly informed the Vichinskys of the Sussers' desire to sell the 115 Beach Property through Bespoke RE.

86.     The Vichinskys were slow to react to the Sussers' request, and as a result the 115 Beach Property was instead initially listed for sale through another brokerage.

87.     Willis then communicated with the Sussers, and was able to persuade them first to add Bespoke RE as a co-broker with the initial broker, and then to make Bespoke RE the sole broker on the transaction. Willis did so by persuading the Sussers that Bespoke RE, *inter alia*, had the best list of potential purchasers available.

88.     However, Bespoke RE, through no fault of Willis's own, used ineffective measures in marketing the 115 Beach Property, including scheduling few showings of the property, and not showing the property at night, when the property would appear at its most appealing. At nighttime, the darkness highlighted the views of the property, and the architecture and detail of the house located thereon.

89.     On Labor Day weekend of 2021, D. Susser told Willis that the Sussers were going to remove their listing of the 115 Beach Property from Bespoke RE and list it with another brokerage, due to extended lack of performance on Bespoke RE's part.

90.     Willis then promptly visited D. Susser at the Sussers' home and persuaded him to keep the listing with Bespoke RE. Willis, whom Bespoke RE had previously excluded from efforts to market the 115 Beach Property, including showings of the property, promised D. Susser that Willis would become personally involved in its marketing.

[922842/1]                                  15

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

91.     As a result of Willis's intervention, the Sussers kept the 115 Beach Property listed with Bespoke RE.

92.     After Willis persuaded D. Susser to keep the listing with Bespoke RE, Bespoke RE took Willis's advice and began showing the 115 Beach Property to prospective purchasers when it was darker outside, *i.e.*, later in the afternoon or in the evening.

93.     Approximately two weeks after Willis persuaded D. Susser to keep the listing with Bespoke RE, Bespoke RE found a purchaser for the 115 Beach Property.

94.     Upon information and belief, Bespoke RE was able to find a purchaser for the 115 Beach Property because Bespoke RE had begun showing that property at night as Willis had recommended.

95.     Bespoke RE would not permit Willis to negotiate the sale of the 115 Beach Property, and instead C. Vichinsky did the negotiating directly with the agent for the prospective purchaser. However, during the course of negotiations, C. Vichinsky would frequently come to Willis with offers by the potential purchaser and ask Willis whether D. Susser would accept such offers.

96.     The sale of the 115 Beach Property closed in or about November 2021, with Bespoke RE as the broker for the Sussers as sellers. (Such sale is the "115 Beach Transaction.")

97.     D. Susser has recently informed Willis that Plaintiff was "100%" responsible for Bespoke RE's receiving and keeping the listing for the 115 Beach Property.

**<u>Bespoke Entities' Hostile Work Environment</u>**

98.     The Bespoke Entities' work environment was markedly hostile towards both African Americans and Jews, as well as other minority groups.

[922842/1]                                             16

**Racism in Bespoke Entities' Work Environment**

99.    Two persons who were normally present at the New York Office when Willis was working there, from in or about April 2021 on, were Defendant C. Vichinsky and Lisa Kling ("Kling"), an employee of Bespoke.

100.    In addition, between in or about June 2021 and in or about August 2021, and again between in or about June 2022 and in or about August 2022, Z. Vichinsky was normally present at the New York Office when Willis was working there.

101.    Upon information and belief, Kling began working as an employee of Bespoke RE, at the New York Office, in or about January 2021.

102.    Kling's initial position at Bespoke RE, when she began working at the New York Office, was that of secretary.

103.    From the beginning of Willis's working out of the New York Office in or about April 2021, whenever Willis was present, Kling would, on a daily basis, orally address Willis with a racial epithet, *i.e.*, the word "nigger." Kling thus directed racial epithets at Willis on a continuous basis. Kling consistently did so with other employees of Bespoke Entities present and within earshot, such that they heard it as well. She continued to do so throughout the entire period in which Willis worked out of the New York Office, as discussed herein.

104.    Notwithstanding her overt racist abuse of Willis, Kling was promoted from secretary to C. Vichinsky's assistant in or about July 2021.

105.    Kling's racist abuse of Willis took written form as well. On or about August 17, 2022, Kling sent Plaintiff a text message in which she exclaimed, *inter alia*, "Happpy birthday you nigger!!!!" (the "8/17/22 Text Message") (Exhibit 4 hereto).

106.    In the afternoon of October 11, 2022, Adam Leitman Bailey, Esq. ("Bailey"), an individual attorney with Adam Leitman Bailey, P.C. ("ALBPC"), the firm then representing

[922842/1]                                    17

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                      RECEIVED NYSCEF: 06/12/2023

Goldberg in a commission dispute with Bespoke Entities, spoke with counsel to Bespoke Entities, and advised such counsel that Kling had sent a racist text message to Willis and asked that Bespoke Entities put a stop to all racist text messages from Bespoke Entities employees.

107.    Notwithstanding this request, Kling sent Willis a series of additional racist text messages on October 12, 2022. The event occasioning these messages was the New York Office's receipt of Willis's new real estate salesperson license from New York State. The license included a photograph of Willis's face. Also visible in the photo is part of an orange shirt Willis was wearing when the photograph was taken.

108.    At 9:42 a.m. on October 12, 2022, Kling texted to Willis a photo of the license, along with a series of texts that stated:

"The orange shirt really makes you look like an inmate"

"Kinda scared"

"Lmao so Niggerish"

"I have ur card here"

"Want me to mail or you'll pick up?" (Exhibit 5 hereto.)

109.    Upon information and belief, throughout the time Kling worked at the New York Office, Bespoke Entities, through the Vichinskys, knew, or should have known, that Kling was addressing Willis by a racial epithet on a daily basis.

110.    Beginning in or about July 2022, the seating arrangement at the New York Office was changed, and both of the Vichinskys' desks were relocated to positions near Kling's desk, such that each of the Vichinskys could, and did, consistently hear the racial epithets that Kling was directing at Willis on a daily basis.

[922842/1]                                      18

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                           RECEIVED NYSCEF: 06/12/2023

111.    In addition, Bespoke Entities received, through the August 2022 Disclosure, as that term is defined below, actual notice of Kling's daily orally addressing Willis as a "nigger" and of the 8/17/22 Text Message.

112.    The Vichinskys and Gray were supervisors of Kling, and had authority to assign work to Kling, take assigned work away from Kling, to promote or demote Kling, to discipline Kling, and to terminate Kling's employment with Bespoke Entities.

113.    Despite the constant nature of Kling's racist abuse of Willis, to Plaintiffs' knowledge, Kling was reprimanded only once by anyone within the Bespoke Entities for doing so. On that one occasion, which occurred in or about August or September 2022, C. Vichinsky orally told Kling, "you'll put the company out of business" if she used such language. Following this occasion, Kling continued to address Willis as a "nigger" on a daily basis.

114.    Bespoke Entities failed to take appropriate remedial action to curtail Kling's racist harassment of Willis. Such failure to act reflected, at best for Bespoke Entities, gross negligence and deliberate indifference.

115.    Upon information and belief, neither C. Vichinsky, nor anyone else within the Bespoke Entities, ever disciplined Kling for her racist abuse of Willis. Upon information and belief, Kling remains employed at Bespoke RE as C. Vichinsky's assistant.

116.    The Vichinskys' continuation of Kling's employment with Bespoke RE, and their failure to discipline her, or take other appropriate remedial action, despite their actual knowledge of her misconduct towards Willis, represented personal involvement on their part in her misconduct, in that it represented a failure to take corrective action upon learning of Kling's unlawful conduct, gross negligence in supervising Kling, and deliberate indifference towards Willis's rights.

[922842/1]                                   19

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

117.     Bespoke Entities' continued employment of Kling, and their failure to discipline her despite their actual knowledge of her misconduct towards Willis, or otherwise act to curtail her racist abuse of Willis, represented a tacit encouragement, approval, and condoning of Kling's racist abuse of Willis.

118.     On another occasion, C. Vichinsky himself both addressed Willis by a racial epithet and invoked a racist stereotype in Willis's presence. In or about early 2021, at the then-new Miami Beach Office, Willis, C. Vichinsky, and Goldberg were present. Willis asked C. Vichinsky, "What should we get for lunch?" C. Vichinsky replied, in a manner audible to both Willis and Goldberg, "How about some watermelon and fried chicken, you nigger?" C. Vichinsky's question was doubly discriminatory, for it both declared an offensive racial epithet and invoked the common racist stereotype that African Americans enjoy eating watermelon and fried chicken.

119.     On another occasion, C. Vichinsky asked Goldberg, "What are you, a nigger-lover?"

120.     Nor was C. Vichinsky the only founding partner and officer of the Bespoke Entities to propound a noxious mixture of racial epithets and stereotypes.

121.     On or about October 27, 2017, Z. Vichinsky sent Willis a text message wherein he Z. Vichinsky addressed Willis as "squigga," a racist epithet that disparages African Americans. (Exhibit 6 hereto.)

122.     In or about March 2021, Z. Vichinsky, in the physical presence of Goldberg and with Willis present by telephone, stated, in reference to a personal purchase that C. Vichinsky was considering, "It's hard because [C. Vichinsky] spends his money like a fucking nigger."

123.     On or about December 1, 2022, Z. Vichinsky sent Willis, through Instagram, a direct message containing a vulgar cartoon video that Willis believed was racist. It featured a

NYSCEF DOC. NO. 10
INDEX NO. 651458/2023
RECEIVED NYSCEF: 06/12/2023

talking dark brown coconut tree telling a white woman to suck the milk out of his nuts, then telling the viewers "you've all sucked on these nuts." The tree spoke with a stereotypically African American voice. This video perpetuated stereotypes about African Americans being sexually promiscuous, and exploited fears of white women being romantically involved with African Americans.

124.    Another means the Vichinskys, and other officers and employees of the Bespoke Entities, used to abuse Willis on racial grounds, was to refer to him, to his face, by the name "Jafar," and to use the word "Jafar" as a verb, both in disparaging the nature of his work in his then-role with the Bespoke Entities, and, paradoxically, in requesting that he continue to perform such work as they so characterized it.

125.    "Jafar" is the name of the villain in the 1992 Disney animated movie "Aladdin," as well as in the more recent live-action remake of that film. Jafar is an evil magician who manipulates persons into doing his bidding. Jafar is also brown-skinned.

126.    From 2018 to in or about April 2021, when Willis sporadically visited the New York Office in the course of his work for Bespoke Entities, at a frequency of one to three days per week, C. Vichinsky and Z. Vichinsky, when in that office, consistently addressed Willis as "Jafar."

127.    On a daily basis in the New York Office and the Miami Beach Office, when Willis was present at those respective offices, from in or about April 2021 through December 2022, the Vichinskys and other Bespoke officers, including Kayt Gray Schadley ("Gray"), Bespoke' Entities' Vice President of Client Services, and Joseph De Sane ("De Sane"), Bespoke Entities' Managing Director, addressed Willis as "Jafar." When Willis asked why they addressed him with that offensive moniker, Z. Vichinsky replied that it was because "you [Willis] look like Jafar" and that, like Jafar, Willis is an evil sorcerer who conjures things up and manipulates his friends.

[922842/1]                                            21

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

128.    During the course of Willis's employment with Bespoke Entities, C. Vichinsky and Z. Vichinsky each addressed Willis as "Jafar" on between one hundred (100) and two hundred (200) occasions.

129.    In addition, the Bespoke Entities' officers would urge Willis to engage in devious acts to which they assigned a newly minted verb, *i.e.*, "to Jafar," for example, "Jafar your friends into listing their properties with Bespoke." This term had a negative connotation, in that it meant that Willis was expected to con persons, including his friends, into doing his bidding, for the benefit of the Bespoke Entities. The term "Jafar" was double-edged, in that it was both a criticism of Willis's allegedly shady methods in obtaining past deals for the Bespoke Entities, yet also encouragement to him to reuse such methods in order to procure new deals and income for the Bespoke Entities.

130.    Z. Vichinsky also sent at least one text message to Willis, in February 2022, in which he accused Willis of "Jaffaring" [sic] employees of the Bespoke Entities.

131.    To Plaintiffs' knowledge, neither the Vichinskys, nor any other employee of the Bespoke Entities, ever referred to any person, including any Bespoke Entities employee, other than Willis as "Jafar," nor did any of them ever use the name "Jafar" as a verb in reference to any person, including any Bespoke Entities employee, other than Willis. There were other Bespoke Entities employees at the New York Office and Miami Office who were not African American, and neither the Vichinskys, nor any other employee of the Bespoke Entities, referred to any such employees as "Jafar" or used the name "Jafar" as a verb in reference to any of them.

132.    The Bespoke Entities also branded Willis with the "Jafar" epithet in a more surreptitious manner. Willis was issued an email account under the Bespoke Entities' domain name (the "Willis Email Account"). Bespoke Entities did not directly divulge to Willis the password for

[922842/1]                                       22

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                              RECEIVED NYSCEF: 06/12/2023

the Willis Email Account, and instead set up the password to autofill on the Bespoke Laptop. By default, the autofilled password was not shown. However, on or about December 10, 2022, Willis selected the option to show the password on the Bespoke Laptop, and discovered to his horror that the password was "Jafar24!".

133. The very seating arrangement at the New York Office also served to make Willis feel excluded. Throughout the time Willis worked at the New York Office, all Bespoke Entities employees working there except Willis had an assigned seat. Willis, however, on a daily basis had to see whether a seat was available within that office, and take whatever seat was free. This amounted to not just segregation evocative of the 1950s, but outright exclusion.

134. Bespoke Entities also excluded Willis from a social function to which, upon information and belief, all other Bespoke Entities employees in the New York Office were invited. Each August, the Hampton Classic, a horse show, is held in Bridgehampton, New York. In August 2022, Bespoke Entities rented a booth at the Hampton Classic, and Bespoke Entities invited all employees at the New York Office, except Willis, to the event. Upon information and belief, Willis was excluded from this company event for the sole reason that he is African American.

135. The Vichinskys also denigrated Willis by means that were not racially explicit. On many occasions, from in or about March 2021 to in or about December 2022, in the presence of both Willis and Goldberg, both of the Vichinskys said that Willis was stupid, knew nothing about the real estate industry, and messed everything up. (This is the "Unfounded Willis Criticism.")

136. Goldberg opposed and objected to the Unfounded Willis Criticism. Goldberg told the Vichinskys that Willis was Bespoke Entities' star employee.

137. Upon information and belief, the Unfounded Willis Criticism was racially motivated, and would not have occurred but for Willis's status as an African American. The bases

[922842/1]                                          23

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

for this information and belief are the many explicitly racist statements made by Bespoke Entities'

officers and employees, both denigrating Willis himself and other African Americans, and Willis's

strong job performance with Bespoke Entities.

138.    In addition, in Willis's presence, the Vichinskys and Kling, on multiple occasions,

used racial slurs with regard to members of other racial minorities, including "spic" and "sand

nigger." (Collectively, the aspects of Bespoke Entities' work environment described in paragraphs

98 through 138 hereof, and the failure of Bespoke Entities to put an end to it, are the "Racism in

Bespoke Entities' Work Environment.")

139.    Bespoke Entities are strictly vicariously liable for the Bespoke Entities' Work

Environment as a result of the direct participation of Willis's supervisors, the Vichinskys, in the

creation of such environment.

**Anti-Semitism in Bespoke Entities' Work Environment**

140.    Bespoke Entities' work environment was also permeated by anti-Semitism. Both

Vichinskys frequently used the word "kike" in reference to Jews.

141.    C. Vichinsky had a bizarre habit of using, in Willis's presence, the phrase "kike

down" in place of "calm down."

142.    In the presence of Goldberg, Z. Vichinsky coined an adjective, "kikey," to denigrate

Jewish clients Z. Vichinsky perceived as being difficult, and Z. Vichinsky often used the phrase

"cheap Jew."

143.    In or about July 2022, during an argument between Goldberg and Z. Vichinsky

regarding whether Bespoke Florida would pay Goldberg commissions owed to him with regard to

Bespoke Florida's sale of three units in a new high-end residential development in Miami, Florida

called the Waldorf Astoria Residences Miami ("Waldorf") (the "Waldorf Transaction"), Z.

Vichinsky called Goldberg "a Jewish American princess" and a "bitch" and a "faggot."

[922842/1]                                  24

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

144.     The third founding partner of Bespoke, along with the Vichinskys, was Michael Cantwell ("Cantwell"), who at all relevant times was the Chief Creative Officer and Chief Marketing Officer of the Bespoke Entities and ran Bespoke Marketing.

145.     On a nearly daily basis, from in or about April 2019 to in or about September 2022, Cantwell would make business-related conference telephone calls in which Goldberg, the Vichinskys, and other employees of the Bespoke Entities would participate.

146.     In the course of nearly all such calls, Cantwell would begin the conversation by asking Goldberg, "how is your Jewish penis?" or words to that effect. Cantwell would do so, even if persons other than Cantwell and Goldberg were participating, including female officers or employees of the Bespoke Entities. This made Goldberg feel extremely uncomfortable and small.

147.     One of more of the Vichinskys was present at most of these calls, and thus had actual notice of Cantwell's inappropriate and anti-Semitic questioning of Goldberg. Neither of the Vichinskys ever objected, during the calls, to Cantwell's asking Goldberg about his Jewish penis. Upon information and belief, neither of them, nor anyone else with Bespoke Entities, ever objected, outside of the calls, to Cantwell's having done so, disciplined Cantwell for having done so, or otherwise acted to curtail Cantwell's behavior.

148.     Upon information and belief, Cantwell continues to hold the positions of Chief Creative Officer and Chief Marketing Officer of the Bespoke Entities, and continues to run Bespoke Marketing.

149.     Bespoke Entities failed to take appropriate remedial action to curtail Cantwell's anti-Semitic harassment of Goldberg. Such failure to act reflected, at best for Bespoke Entities, gross negligence and deliberate indifference.

[922842/1]                                    25

150.    Bespoke Entities' continued employment of Cantwell, and their failure to discipline him despite their actual knowledge of his misconduct towards Goldberg, or otherwise act to curtail his anti-Semitic abuse of him, represented a tacit encouragement, approval, and condoning of Cantwell's abusive conduct towards Goldberg.

151.    The Vichinskys' continuation of Cantwell's employment with Bespoke Entities,, and their failure to discipline him, or take other appropriate remedial action, despite their actual knowledge of his misconduct towards Goldberg, or otherwise act to curtail his anti-Semitic abuse of him, represented personal involvement on their part in his misconduct, in that it represented a failure to take corrective action upon learning of Cantwell's unlawful conduct, gross negligence in supervising Cantwell, and deliberate indifference towards Goldberg's rights. (Collectively, the aspects of Bespoke Entities' work environment described in paragraphs 98 through 151 hereof, and the failure of Bespoke Entities to put an end to it, are the "Bespoke Entities' Work Environment.")

**Bespoke's Systematic Failure to Pay Goldberg Plaintiffs Commissions Owed to Them**

**The Override Agreement, and Bespoke's Breach Thereof**

152.    When Bespoke Florida's Miami Beach Office first opened in early 2021, Z. Vichinsky promised Goldberg Plaintiffs, through Goldberg, that Goldberg Plaintiffs would receive a ten percent (10%) override on the commissions received on all transactions that were brokered through the Miami Beach Office, *i.e.*, they would receive ten percent (10%) of the total commissions paid to Bespoke Florida on all transactions, regardless of whether Goldberg Plaintiffs had any personal involvement in such transactions (the "Override Agreement").

153.    The Override Agreement was repeated several times to Goldberg Plaintiffs, through Goldberg, by officers of Bespoke Florida, including both Z. Vichinsky and Kayt Gray Schadley

[922842/1]                                    26

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

("Gray"), who was and is the Vice President of Client Services for the Bespoke Entities and the broker of record in Florida for Bespoke Florida, between early 2021 and September 2022.

154.    The Override Agreement constitutes a valid modification of the Goldberg Agreement and Florida Modification and a contractual obligation thereunder.

155.    Goldberg Plaintiffs have performed all of their obligations under the Goldberg Agreement and Florida Modification.

156.    Between the first time the Override Agreement was first made and Bespoke Florida's termination of Goldberg, as discussed below, the Miami Beach Office brokered multiple transactions that had, during that period, gone to contract.

157.    During that period, the Miami Beach Office brokered at least two transactions on which Goldberg Plaintiffs did not receive a brokerage commission, which had gone to contract. Even assuming *arguendo* Goldberg Plaintiffs were not entitled to a brokerage commission on those transactions, they were still entitled to a 10% override pursuant to the Override Agreement.

158.    Nevertheless, Bespoke Florida has never paid to Goldberg Plaintiffs any monies pursuant to the Override Agreement.

**Goldberg Brokers the Waldorf Transaction**

159.    The Waldorf Astoria Residences Miami ("Waldorf") is a high-end residential development being constructed in Miami, Florida.

160.    In 2021, Goldberg, as president of Bespoke Florida, learned of the Waldorf while researching upcoming new developments in Miami.

161.    In 2021, Goldberg contacted PMG Downtown Developers, LP ("PMG Downtown"), the developer of the Waldorf, in an attempt to obtain, on behalf of Bespoke Florida, the right to sell units thereof.

[922842/1]                                    27

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                      RECEIVED NYSCEF: 06/12/2023

162.    Goldberg obtained, for Bespoke Florida, the semi-exclusive right to sell eight specified units within the Waldorf (the "Listed Waldorf Units").

163.    Goldberg learned of the existence of units within the Waldorf, other than the Listed Waldorf Units, that had not yet been sold ("Unlisted Waldorf Units").

164.    The Unlisted Waldorf Units included Unit 8802 and the "Lanai Unit," which consisted of two penthouses, *i.e.*, PH 101 and PH 102, which were to be located on the 90th floor of the Waldorf. (Collectively, Unit 8802 and the "Lanai Unit" are the "Waldorf Transaction Units.")

165.    Goldberg called several contacts in the real estate sales industry in an effort to find potential purchasers for the Waldorf Transaction Units.

166.    One contact suggested, as a possible purchaser, Jake Vogel ("J. Vogel"), who had a Miami listing with Goldberg.

167.    Goldberg and his sales contact at PMG Downtown made a Zoom presentation to J. Vogel to persuade him to purchase one of the Waldorf Transaction Units.

168.    After the presentation, J. Vogel declined to purchase any of the Waldorf Transaction Units.

169.    Goldberg then discussed, with a contact, other potential purchasers of Waldorf Transaction Units. The contact mentioned, as a possibility, J. Vogel's father, Steven Vogel ("S. Vogel").

170.    PMG Downtown had earlier informed Goldberg that the Lanai Unit had been sold. However, Goldberg saw that the Lanai Unit, which was one of a kind within the Waldorf and would have a huge amount of outdoor space, had significant value.

[922842/1]                                28

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

171.    Goldberg called his sales contact at PMG Downtown and asked about the status of the Lanai Unit. The sales contact informed Goldberg that the Lanai Unit was not yet sold, but it had been contracted to be sold to a would-be purchaser in Switzerland.

172.    Goldberg asked his sales contact at PMG Downtown and asked if the contract could be withdrawn and Goldberg could offer the Lanai Unit to Goldberg's potential buyer.

173.    Goldberg's sales contact at PMG Downtown told Goldberg that they would do so for Goldberg, but Goldberg had to get his potential buyer to buy quickly.

174.    In or about early October 2021, Goldberg telephoned S. Vogel. Goldberg told S. Vogel about the Waldorf and about the Lanai Unit. Prior to Goldberg's call, S. Vogel had not known about the Lanai Unit, or even about the Waldorf as a whole.

175.    Prior to being first contacted by Goldberg, S. Vogel had not contacted Bespoke Florida or requested that Bespoke Florida search for a property for him to acquire.

176.    During this first phone call between Goldberg and S. Vogel, S. Vogel expressed interest in the Lanai Unit.

177.    Within approximately one week of the first phone call between Goldberg and S. Vogel, an in-person meeting was held at PMG Downtown's office in Miami, Florida, among S. Vogel, Goldberg, and Goldberg's sales contact at PMG Downtown. Goldberg set up this meeting and invited S. Vogel, who lived in Palm Beach, Florida, to it. While at this meeting, Goldberg showed S. Vogel, within PMG Downtown's office's "Experience Center," an artistic rendering of what the Lanai Unit would look like when complete, which further piqued S. Vogel's interest. At this meeting, Goldberg also discussed with S. Vogel the possibility of purchasing additional units at the Waldorf, including Unit 8802. S. Vogel expressed interest in purchasing Unit 8802 as well.

[922842/1]                                      29

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 06/12/2023

178.    During this first in-person meeting with S. Vogel, Goldberg curated a lunch with PMG Downtown's in-house sales team, and ordered the delivery of some of S. Vogel's favorite dishes from a well-known Miami restaurant.

179.    Over a period of months, lasting until February 2022, Goldberg negotiated with PMG Downtown, on behalf of S. Vogel, the purchase of the Lanai Unit and Unit 8802 to S. Vogel and his wife, Caroline Vogel ("C. Vogel") (collectively, S. Vogel and C. Vogel are "the Vogels").

180.    In the course of negotiations, Goldberg managed to obtain for the Vogels a price reduction for the Waldorf Transaction Units in the millions of dollars. He also obtained for the Vogels direct access, via Zoom meetings, to the architect of the Waldorf.

181.    During the course of these negotiations, Goldberg curated two more in-person lunches with S. Vogel at PMG Downtown's sales office.

182.    Goldberg then had several more lunches, in Palm Beach, with the Vogels, where Goldberg discussed opportunities at the Waldorf and how great a deal it would be.

183.    On or about January 18, 2022, final terms were agreed to for the Vogels' purchase of the Waldorf Transaction Units, including the price for each unit.

184.    On January 25, 2022, Goldberg met the Vogels in person in Palm Beach, and over lunch the Vogels signed a contract to purchase the Waldorf Transaction Units (such contract being the "Waldorf Contract"). At this lunch, S. Vogel was still discussing with Goldberg the terms of the Waldorf Contract, but Goldberg managed to persuade S. Vogel to sign the Waldorf Contract.

185.    Under the Waldorf Contract, the Vogels purchased Unit 8802 for $9,000,000, and PH 101 and PH 102 in the Lanai Unit for $17,000,000 each, comprising a total of $43,000,000 (the "Waldorf Transaction").

[922842/1]                                30

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                          RECEIVED NYSCEF: 06/12/2023

186.    Under Florida law, a purchaser of a unit in a new real estate development may cancel the contract within fifteen (15) days of signing.

187.    In early February 2022, S. Vogel was having misgivings about the Waldorf Contract, expressing concerns that the Waldorf Transaction Units were not the right place to purchase, and that the price was too high.

188.    S. Vogel sent text messages to Goldberg expressing these concerns. Goldberg was, at the time of these text messages, attending a wedding in Connecticut.

189.    To save the Waldorf Transaction, Goldberg, instead of returning to Florida, went from Connecticut to New York City and took a plane from there to Chicago, Illinois, where S. Vogel and his family were temporarily staying while S. Vogel was attempting to sell a penthouse unit he owned. Goldberg did so at his own expense.

190.    Goldberg visited S. Vogel and his family in Chicago for approximately four or five days.

191.    During this period, Goldberg viewed the unit in Chicago that S. Vogel desired to sell, met with the interior designer, and discussed with S. Vogel listing it.

192.    During this period, Goldberg got to know S. Vogel and met his family, and they established a bond of trust.

193.    This trust enabled Goldberg to save the Waldorf Transaction. Goldberg was able to persuade S. Vogel to complete the Waldorf Transaction if the deposit schedule under the Waldorf Transaction were amended. Goldberg then succeeded in negotiating with PMG Downtown a deposit schedule for the Waldorf Transaction that differed, in terms of dates and amounts, from any other deposit schedule in any other sale PMG Downtown had made of any units in the Waldorf. This amended deposit schedule ("Amended Deposit Schedule") was executed in the form of

[922842/1]                                          31

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

addenda to the contracts to purchase each of the Waldorf Transaction Units. The Vogels and PMG Downtown executed these addenda.

194.   The Vogels completed the Waldorf Transaction because of the Amended Deposit Schedule. In the absence of the Deposit Schedule Addenda that Goldberg negotiated, S. Vogel would have cancelled the Waldorf Transaction.

195.   Subsequent to the sale to the Vogels, Goldberg and S. Vogel have had a multitude of conversations, and meetings, and Goldberg has been invited to multiple events held by the Vogels, including C. Vogel's birthday party.

### Commissions to Be Paid to Bespoke Florida Under the Waldorf Transaction

196.   The Waldorf Transaction was brokered pursuant to three separate co-broker agreements, one for each of the individual units, between PMG Residential, LLC ("PMG Residential") as the "Listing Broker" and Bespoke Florida as the "Cooperating Broker" (the "Co-Broker Agreements"). (Exhibit 7 hereto, Co-Broker Agreements.)

197.   The Co-Broker Agreements provided that Bespoke Florida would receive from PMG Residential, as its commission on the Waldorf Transaction, eight percent (8%) of the total unit purchase price for Unit 8802 (Exhibit 7, Co-Broker Agreements, first page), and seven percent (7%) of the total unit purchase prices for PH 101 and PH 102 (*id.*, fifth and ninth pages).

198.   Given the purchase prices under the Waldorf Contract, Bespoke Florida was to receive eight percent (8%) of $9,000,000, or $720,000, on the sale of Unit 8802, and seven percent (7%) of $34,000,000, or $2,380,000, on the sale of the Lanai Unit, for a total commissions amount of $3,100,000.

199.   The Co-Broker Agreements provided that the commissions to Bespoke Florida would be payable in two installments:

[922842/1]                                   32

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

(a)     Fifty percent (50%), upon thirty days after the later of (i) the closing of PMG Downtown's construction loan with respect to the Waldorf, and (ii) the Vogels' payment to PMG Downtown of an earnest money deposit equal to or exceeding 20% of the purchase price set forth in the applicable sales agreement (Exhibit 7, Co-Broker Agreements, first page ¶ 1(a)(i), fifth page ¶ 1(a)(i), and ninth page ¶ 1(a)(i)); and

(b)     Fifty percent (50%), upon thirty days after the later of (ii) one year following closing of PMG Downtown's construction loan with respect to the Waldorf, and (ii) the Vogels' payment to PMG Downtown of an earnest money deposit equal to or exceeding thirty percent (30%) of the purchase price set forth in the applicable sales agreement (Exhibit 7, Co-Broker Agreements, first page ¶ 1(a)(ii), fifth page ¶ 1(a)(ii), and ninth page ¶ 1(a)(ii)).

**Bespoke Florida Agreed to Pay Goldberg Plaintiffs 60% of Bespoke Florida's Commission on the Waldorf Transaction**

200.    The Waldorf Transaction was a unique type of transaction for Bespoke Florida, because Goldberg had procured both the seller, since the Waldorf Transaction Units had not been listed for sale with Bespoke Florida, and the purchaser, since the Vogels had not previously asked Bespoke Florida to find them a property to purchase.

201.    Accordingly, Gray agreed that Waldorf Transaction was different from the others, and merited a greater percentage commission to Goldberg Plaintiffs.

202.    Gray agreed with Goldberg, and told him orally, in person in the boardroom of the Miami Beach Office, prior to April 2022, that Bespoke Florida would pay Goldberg Plaintiffs a commission on the Waldorf Transaction in the amount of sixty percent (60%) of the total

[922842/1]                                    33

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023
RECEIVED NYSCEF: 06/12/2023

commissions that Bespoke Florida received in connection with the Waldorf Transaction, and informed Goldberg as such. Such agreement constituted a modification of the Goldberg Agreement and Florida Modification (the "Waldorf Modification").

203.    Gray confirmed to Goldberg, at a meeting in April 2022 ("April 2022 Meeting") in Goldberg's office at the Miami Beach Office, that Bespoke Florida would pay Goldberg Plaintiffs a commission on the Waldorf Transaction of sixty percent (60%) of the total commissions Bespoke Florida received on the Waldorf Transaction.

### Bespoke Florida's Reneging on the Waldorf Modification

204.    Subsequent to the April 2022 Meeting, Kaitlyn Magro ("Magro"), the controller of the Bespoke Entities, informed Goldberg that Bespoke Florida would instead pay Goldberg Plaintiffs only $707,650 in commissions on the Waldorf Transaction.

205.    Upon information and belief, the Vogels have paid to PMG Downtown, in connection with the Waldorf Transaction, an earnest money deposit of at least fifty percent (50%) of the purchase prices set forth in the sales agreements applicable to each of the units sold in the Waldorf Transaction.

206.    Upon information and belief, PMG Downtown's construction loan with respect to the Waldorf closed in or about November 2022.

207.    Upon information and behalf, PMG Residential has paid to Bespoke Florida the first fifty percent (50%) of the commissions ultimately due on the Waldorf Transaction, or $1,550,000.00.

208.    Under the Goldberg Agreement, Florida Modification, and Waldorf Modification, Goldberg Plaintiffs are entitled to payment of commissions in connection with a given transaction, including but not limited to the Waldorf Transaction, in accordance with the percentage of the commissions on that transaction that Bespoke Florida has received. Thus, for example, when

[922842/1]                                                34

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                      RECEIVED NYSCEF: 06/12/2023

Bespoke Florida receives half of the commission to which it is entitled on a given transaction, Goldberg Plaintiffs are entitled to payment of half of the commissions to which they are entitled in connection with that transaction.

209.    Bespoke Florida thus owes Goldberg Plaintiffs sixty percent (60%) of the $1,550,000 in commissions it has received in connection with the Waldorf Transaction, *i.e.*, $930,000.00.

210.    However, Bespoke Florida has paid to Goldberg Plaintiffs only $352,625.00 in connection with the Waldorf Transaction, leaving the amount of $577,375.00 remaining due to Goldberg Plaintiffs.

### The Asia Transaction, and Bespoke Entities' Failure to Pay Goldberg Plaintiffs Fully Therefor

211.    After S. Vogel had contracted in the Vogel Transaction, he asked Goldberg to assist him in selling an apartment he owned in Miami, Florida, in a building known as "Asia" (the "Asia Apartment").

212.    Goldberg, while employed by Bespoke Florida, arranged for Bespoke Florida to list the Asia Apartment for sale.

213.    The Asia Apartment was listed for a sale price between $4,000,000 and $5,000,000.

214.    The Bespoke Entities' business model provides for listing only of units for sale at a price of over $10,000,000.

215.    To avoid acting contrary to the Bespoke Entities' business model, Z. Vichinsky took the listing for the Asia Apartment away from Goldberg and gave it to a subordinate of Goldberg's at Bespoke Florida, Luiza Chiminacio ("Chiminacio"), a portfolio manager, for Chiminacio to sell through her former employer, another real estate brokerage firm.

216.    The Asia Apartment was ultimately sold through this other brokerage firm.

[922842/1]                                35

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

217.    Goldberg was the procuring cause of the Asia Transaction.

218.    On the night before the closing on the sale of the Asia Apartment (the "Asia Transaction"), the transaction almost collapsed, but Goldberg, through his personal intervention, was able to persuade the Vogels to complete the deal. There was a dispute over whether an expensive painting believed to still be in the Asia Apartment was included in the Asia Transaction, and the Vogels threatened not to close in the event the purchasers did not furnish them with such painting, but Goldberg was able to determine that such painting was, in fact, already in the Vogels' possession, and the painting in the Asia Apartment was a different painting.

219.    At the closing on the Asia Transaction on or about August 22, 2022, payment of a commission was made to Chiminacio's former employer as the ostensible brokerage firm, which, in turn, paid part of this amount to Bespoke Florida.

220.    As far as S. Vogel was aware, Goldberg was the broker involved in the Asia Transaction on the seller's side.

221.    Goldberg was not paid the full commission he otherwise would have received, had the Asia Transaction been brokered by Bespoke Florida in accordance with the listing for the Asia Property, of which Goldberg was the procuring cause.

**The Parkland Transaction, and Bespoke Entities' Failure to Pay Goldberg Plaintiffs Fully Therefor**

222.    While employed by Bespoke Florida, Goldberg received, from a friend, the name of a couple, Chris Murphy ("Murphy") and Tina Broderson ("Broderson"), who were interested in purchasing real property in Florida.

223.    Goldberg presented real property in a new development, located at 7493 Knight Street, Parkland, FL 33067 (the "Parkland Property"), to Murphy and Broderson.

[922842/1]                                         36

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

224.    While Goldberg Plaintiffs were employed by Bespoke Florida, Murphy and Broderson contracted to purchase the Parkland Property (the "Parkland Transaction").

225.    Murphy and Broderson closed on the Parkland Transaction on or about December 10, 2022.

226.    Goldberg was the procuring cause of the Parkland Transaction.

227.    Upon information and belief, Bespoke Florida received a commission of $7,000.00 on the Parkland Transaction. The source of this information and belief is Bespoke Entities' having informed Goldberg Plaintiffs as such.

228.    Bespoke Florida has paid to Goldberg Plaintiffs $1,400.00 in commissions in connection with the Parkland Transaction.

229.    The amount Bespoke Florida has paid to Goldberg Plaintiffs as commissions in connection with the Parkland Transaction represents only part of the amount Goldberg Plaintiffs are owed as commissions on that transaction. (Collectively, Bespoke Entities' failure to pay Goldberg Plaintiffs full commissions in connection with the Waldorf Transaction, Asia Transaction, and Parkland Transaction is the "Systematic Goldberg Commissions Nonpayment.")

### Bespoke Entities' Systematic Nonpayment to Willis of Commissions Owed Him

230.    On multiple occasions, Willis obtained clients for Bespoke Entities that led to sales and commissions paid to Bespoke Entities, only for Bespoke Entities not to pay Willis all or part of the commissions that Bespoke Entities owed him pursuant to the Willis Agreement or a prior agreement between Bespoke Entities and Willis. These include, but are not limited to, the following transactions:

a.    Sale of property located at 115 Beach Lane in Wainscott, New York, on which Willis procured the seller;

[922842/1]

37

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

b.      Purchase of property located at 236 Quimby Lane, Bridgehampton, New York, on which Willis procured the purchaser; and

c.      Purchase of property located at 140 Hayground Cove Road, Water Mill, New York, on which Willis procured the purchaser.

(Collectively, the instances of Bespoke Entities' failure to pay Willis all of the commissions he was owed is the "Systematic Willis Commissions Nonpayment.")

### The Discriminatory Limitation of Willis's Duties

231.    Ordinarily, when Bespoke RE was attempting to sell a property, Bespoke RE would permit its employees to show that property to prospective buyers alone, with no other employees of Bespoke RE present. This was the case regardless of the employee's ranking within Bespoke RE. For example, Bespoke RE permitted Anastasia Gromova ("Gromova"), a Bespoke RE employee who was then an administrative assistant and who was working out of the New York Office, to show properties located in the Hamptons on New York's Long Island, to prospective buyers by herself. Similarly, Bespoke RE permitted Kristin Lukic ("Lukic"), a Bespoke RE employee who was a portfolio manager, to show properties to prospective buyers by herself. The properties Lukic was permitted to show were located both in the Hamptons and in New York City.

232.    This was also the case with employees of Bespoke Florida. Ira Hasson ("Hasson"), then a new portfolio manager employed by Bespoke Florida who had not previously worked in the residential real estate brokerage industry, was permitted to show a property in Florida to prospective buyers by himself. Chiminacio, also a portfolio manager with Bespoke Florida, was permitted to show a property in Florida to prospective buyers by herself.

233.    In addition, at all relevant times, it was standard custom and practice in the residential real estate sales industry for real estate salespersons working on a potential sale of a property to guide prospective purchasers on tours of that property, without another employee of

[922842/1]                              38

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

the brokerage company present. Indeed, showing properties to prospective buyers was inherently part of the job as a real estate salesperson. It was, on the other hand, not inherently part of the job for either portfolio managers or for administrative assistants. Within Bespoke Entities, as a real estate sales associate, Willis outranked Gromova, Lukic, Hasson, and Chiminacio, yet was not permitted to show properties by himself even though they could.

234.     However, with regard to Willis, Bespoke Entities conducted matters differently. From the start of Willis's employment with Bespoke Entities, Bespoke Entities, through the actions of the Vichinskys, who decided which employees could show properties to prospective purchasers, never permitted Willis to show a property to prospective purchasers by himself. Indeed, on most occasions, Bespoke Entities never even informed Willis in advance of showings of properties that he was attempting to sell. (The restrictions imposed on Willis, as described in this paragraph, are the "Discriminatory Selling Restriction.")

235.     This exclusion of Willis from the property-showing phase was particularly befuddling, considering that, on most occasions, Willis had not only persuaded the seller to list the property with Bespoke RE, but Willis had more extensive knowledge of the property being sold than a real estate salesperson ordinarily would have had, in that Willis had been personally acquainted with the seller for years and had visited the property on multiple occasions over that time, and thus was in a better position than most real estate salespersons would have been in to answer questions from prospective purchasers about that property.

236.     On a select few occasions, if the seller had asked the Vichinskys to permit Willis to show their property, the Vichinskys would permit Willis to show the property, but even then only with another representative of Bespoke RE present.

[922842/1]                                    39

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

237. The Vichinskys' refusal to permit Willis to show properties by himself, or, on most occasions, at all, was humiliating and embarrassing to Willis. Showing properties to prospective purchasers, by oneself, is an integral part of work as a real estate salesperson. Not permitting the salesperson to show properties at all, or at least not by himself, conveys to both the sellers and prospective purchasers an impression that the assigned salesperson is either untrustworthy or incompetent, neither of which descriptors fits Willis.

238. When Willis asked the Vichinskys why they would not permit Willis to show properties by himself, neither the Vichinskys, nor anyone else at Bespoke RE, ever provided a reason.

239. Upon information and belief, the reason the Vichinskys and Bespoke RE did not permit Willis to show properties by himself, and avoided, as best they could, allowing Willis to participate in showings generally, was that Willis is African American and they did not wish to present, to potential purchasers, Bespoke RE as being represented by an African American.

240. On the other hand, neither Gromova nor Lukic, whom Bespoke RE permitted to show properties by themselves, was African American. Similarly, neither Hasson nor Chiminacio, each of whom Bespoke Florida permitted to show properties by themselves, was African American.

241. Upon information and belief, the Discriminatory Selling Restriction would not have occurred, but for Willis's race.

### Hasson's Attempts to Steal Willis's Clients, Goldberg's Opposition and Objection Thereto, and Bespoke Entities' Failure to Discipline Hasson Therefor

242. In or about July 2021, Bespoke Florida hired Hasson to work in the Miami Beach Office.

243. Hasson is Caucasian, and he is of an age in his 60s.

[922842/1]                                40

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                          RECEIVED NYSCEF: 06/12/2023

244.    Upon information and belief, prior to his being hired by Bespoke Florida in or about July 2021, Hasson had no prior experience in the real estate brokerage industry.

245.    Beginning shortly after he began employment with Bespoke Florida, Hasson began contacting clients whom Willis had brought to Bespoke RE, including clients residing in New York State and who had purchased and/or sold, or were attempting to purchase or sell, properties located in New York State through Bespoke RE, disparaging Willis to those clients, and instructing them to deal with Bespoke Entities exclusively through Hasson individually rather than through Willis. (This is the "Attempt to Steal Willis Clients.")

246.    Upon learning of the Attempt to Steal Willis Clients, Willis reported the Attempt to Steal Willis Clients to Gray and the Vichinskys.

247.    Upon learning of the Attempt to Steal Willis Clients, Goldberg reported the Attempt to Steal Willis Clients to the Vichinskys and Gray. Goldberg informed Gray that "this is discrimination," and advised Gray that Hasson's conduct was unacceptable and a firing offense.

248.    The Vichinskys and Gray were supervisors of Hasson, and had authority to assign work to Hasson, take assigned work away from Hasson, to promote or demote Hasson, to discipline Hasson, and to terminate Hasson's employment with Bespoke Entities.

249.    However, upon information and belief, the Bespoke Entities never disciplined Hasson for the Attempt to Steal Willis Clients, or otherwise acted to curtail the Attempt to Steal Willis Clients. Indeed, as discussed below, the Bespoke Entities later replaced Willis with Hasson as Vice President, representing a demotion of Willis and a promotion of Hasson. (Collectively, the Attempt to Steal Willis Clients, and the Bespoke Entities' knowledge thereof and failure to act to stop it or to discipline Hasson for it, is the "Hasson Client Interference.")

[922842/1]                                              41

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

250.    Bespoke Entities failed to take appropriate remedial action to curtail the Attempt to Steal Willis Clients. Such failure to act reflected, at best for Bespoke Entities, gross negligence and deliberate indifference.

251.    Bespoke Entities' continued employment of Hasson following the Attempt to Steal Willis Clients, and their failure to discipline him despite their actual knowledge of her misconduct towards Willis, represented a tacit encouragement, approval, and condoning of the Attempt to Steal Willis Clients.

252.    Upon information and belief, the Bespoke Entities' perpetration and condoning of the Hasson Client Interference would not have occurred, but for Willis's race. The bases for this information and belief is that Willis was performing well in obtaining business for Bespoke RE and servicing its clients, there was no other reason to shift Willis's clients to another employee of the Bespoke Entities, and the Bespoke Entities' Work Environment.

### Bespoke Entities' Discriminatory Demotion of Willis

253.    In or about late April 2022, Willis was informed by Gray that he was being stripped of his position as Vice President, and that Willis was being replaced in that role by Hasson (the "Discriminatory Demotion"). (Collectively, the Hasson Client Interference, Discriminatory Selling Restriction, Discriminatory Demotion, Systematic Willis Commissions Nonpayment, and Bespoke Entities' Work Environment are the "Bespoke Entities' Discriminatory Practices.")

254.    The Discriminatory Demotion resulted in a significant diminishment of Willis's responsibilities, *i.e.*, those which came from the position as Vice President, and in a loss of Willis's prestige that had come with the job title.

255.    Willis was well qualified for the position of Vice President. By the time of the Discriminatory Demotion, he had been working for Bespoke Entities as a real estate salesperson for five (5) years, and had held the role of Vice President for approximately one (1) year.

[922842/1]                                          42

256.    Willis had also performed more than satisfactorily as Vice President. During the time that Willis had been Vice President, he had continued his exemplary performance as a real estate sales associate with Bespoke Entities. This includes the bases set forth in paragraphs 80 through 97 above, including but not limited to Willis's rescue of the 115 Beach Transaction.

257.    Upon information and belief, but for racial animus against Willis, the Discriminatory Demotion would not have occurred. The bases for this information and belief are that:

(a)     Willis is African American;

(b)     Hasson is Caucasian;

(c)     Willis was performing well for Bespoke Entities, including but not limited to having procured many clients and transactions for Bespoke Entities based primarily on his vast network of personal contacts, as noted above;

(d)     As of the time of the Discriminatory Demotion, Hasson had not procured a single deal, brought forth a single client, or, indeed, engaged in any business that produced income for any of the Bespoke Entities; and

(e)     The other Bespoke Entities' Discriminatory Practices.

258.    C. Vichinsky and Z. Vichinsky told Willis that he was being demoted due to poor work performance ("Purported Performance Critique"). However, as discussed above, Willis had brought, and was continuing to bring, a tremendous amount of business to Bespoke resulting from his vast interpersonal network of contacts.

259.    Upon information and belief, the Purported Performance Critique was mere pretext to rationalize the Discriminatory Demotion, as well as the Systematic Willis Commissions

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

Nonpayment and the perpetuation of the Bespoke Entities' Work Environment, as defined above, that injured Willis.

260.    After the Discriminatory Demotion, Willis continued to perform, for the Bespoke Entities, his duties as a licensed real estate sales associate, and continued to procure clients for the Bespoke Entities. For example, he procured the seller of the property at 105 Jobs Lane, Bridgehampton, New York.

### Goldberg's Referral to Counsel of Bespoke's Unlawful Discrimination Against Willis

261.    In or about late August 2022, Goldberg informed ALBPC, counsel he had retained in an attempt to recover commissions that Bespoke Entities owed to him, that Bespoke Entities had unlawfully discriminated against Willis on the basis of race, including but not limited to the Hasson Client Interference, Discriminatory Selling Restriction, Discriminatory Demotion, Systematic Willis Commissions Nonpayment, and those aspects of the Racism in Bespoke Entities' Work Environment that had occurred as of that point in August 2022, including but not limited to the 8/17/22 Text Message and the Unfounded Willis Criticism (collectively, the aforesaid are the "Disclosed Bespoke Entities' Discriminatory Acts").

262.    In or about late August 2022, ALBPC, by Bailey, advised Bespoke Entities, through Bespoke Entities' counsel, that Goldberg had informed ALBPC that Bespoke Entities had unlawfully discriminated against Willis on the basis of race, on grounds including but not limited to the Disclosed Bespoke Entities' Discriminatory Acts. (This is the "August 2022 Disclosure.")

### Bespoke Entities' Termination of Goldberg Plaintiffs' Employment

263.    On or about September 22, 2022, less than one month after the August 2022 Disclosure, Bespoke Entities, by email sent by Z. Vichinsky, terminated Goldberg Plaintiffs' employment with Bespoke Entities, both as President of Bespoke Florida and in any other capacity (the "Termination").

[922842/1]                                           44

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

264.     At the time of the Termination, Goldberg was well-qualified for both the position of President of Bespoke Florida and as a real estate broker in Florida for Bespoke Entities, in the following ways:

(a)     At that time, Goldberg had been working in the real estate brokerage industry for over fifteen (15) years;

(b)     He had been licensed to broker real estate transactions in Florida for nearly a decade, and had been licensed to broker real estate transactions in New York for over a decade;

(c)     Prior to Bespoke Entities, Goldberg had worked for other real estate brokerage firms, including Douglas Elliman, Corcoran, ONE Sotheby's International Realty, and Cervera Real Estate;

(d)     During most of the time he had worked in the real estate industry, he had held managerial positions at his brokerages;

(e)     He had reported directly to the CEOs of brokerage firms for which he had previously worked;

(f)     He had had considerable success with the Bespoke Entities, including but not limited to his Herculean efforts in completing the Waldorf Transaction, which would generate $3,100,000 in commissions for Bespoke Florida, the largest commission any of the Bespoke Entities had ever received on a deal;

(g)     He had sold over $4 billion worth of real estate inventory;

(h)     He had managed the sales and marketing of some of the biggest and most noteworthy projects from New York City to Miami to Boca Raton, Florida, including the sale of condominiums for multibillion-dollar international

[922842/1]                                          45

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

hotel brands including Ritz, 1 Hotel, Four Seasons, and Mandarin, and, in the course of those projects, he had reported directly to the owners and CEOs of those hotels; and

(i)      The developers for which he had sold properties includes, but is not limited to, Richard LeFrak, Barry Sternlicht, Louis Birdman, Steve Witkoff, Nadeem Ashi, Eduardo Costantini, and Aston Martin.

265.     At the time of the Termination, Goldberg's performance as President of Bespoke Florida had been exemplary. This includes, but is not limited to, his having procured the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

### Bespoke Entities' Constructive Discharge of Willis

266.     The daily humiliation of being addressed with racial epithets and the moniker "Jafar," as well as hearing the nonstop use of epithets towards other minority groups, caused Willis tremendous mental distress and anguish. The last straw was when he discovered, on or about December 11, 2022, that Bespoke Entities had made "Jafar24!" the password for the Willis Email Account.

267.     On or about December 12, 2022, Willis resigned from his position with Bespoke Entities.

268.     Such resignation constituted a constructive discharge (the "Constructive Discharge").

269.     Subsequent to his Constructive Discharge, Willis has been unable to find work in a position similar to that in which he worked for Bespoke Entities.

[922842/1]                                    46

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

## The Bespoke Entities Are a Single Integrated Enterprise, a Single Employer, and Joint Employers

270.    The Bespoke Entities function as a single integrated enterprise, a single employer, and as joint employers.

271.    All three of the Bespoke Entities have the same owners, and many of the same officers.

272.    The officers of Bespoke RE and of Bespoke Florida are the same persons holding the same positions at each company.

273.    Z. Vichinsky is a founding partner, and the CEO, of all three of the Bespoke Entities.

274.    Z. Vichinsky is the chief decision-maker of all three of the Bespoke Entities.

275.    C. Vichinsky is a founding partner, and the president, of Bespoke RE and Bespoke Florida.

276.    Cantwell is a founding partner, and the Chief Marketing Officer and Chief Creative Officer, of all three of the Bespoke Entities.

277.    Gray is the Vice President of Client Services of all three of the Bespoke Entities.

278.    Magro is the controller of all three of the Bespoke Entities.

279.    The Bespoke Entities disregard distinctions between each individual company among them, and other corporate formalities.

280.    For example, the Goldberg Agreement permits payment of Goldberg Plaintiffs' salary to be made from any of Bespoke RE or Bespoke Marketing's "company or affiliated entity accounts." (Exhibit 1, Goldberg Agreement, Exhibit A p. 7, Compensation ¶ 1(A).)

281.    In addition, the Willis Agreement defines "Employer" as Bespoke RE "together with all of its direct and indirect affiliates and subsidiaries" (Exhibit 2, Willis Agreement, p. 1,

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

Preamble), then sets forth numerous rights and obligations of "Employer" (*see id. passim*), and permits "Employer" to make salary payments to Willis "from any of its company or affiliated entity accounts" (*id.* Exhibit B, second page, ¶ 1(c)).

282.    Furthermore, the Willis Agreement provides that Willis's commissions from sales of properties, wherein Bespoke RE is representing the seller, are to be based on "Gross Commission Received" less, *inter alia*, "14% marketing cost recapture by the Company," with no indication that this "recapture" was to be paid to a company separate from Bespoke RE, *i.e,*, Bespoke Marketing. (Exhibit 2, Willis Agreement, Exhibit B, second page, ¶¶ 3(a)-(b).)

283.    Bespoke RE and Bespoke Florida together have a web site, www.bespokerealestate.com. This web site does not distinguish between Bespoke RE and Bespoke Florida, although it refers to the sale of properties in both New York State and in Florida, and to separate offices located in New York State ("New York Office") and Miami Beach, Florida (Miami Beach Office).

284.    Until approximately a year and a half ago, Bespoke RE and Bespoke Marketing for years shared the same office space in the New York Office, with the same administrative assistant answering phones for both of them.

285.    One officer of Bespoke Entities, Gray, has had control over hiring employees of all Bespoke Entities, regardless of the company or office at which they worked. For example, she prepared the contracts for employees working out of the New York Office, including but not limited to Willis, and employees working out of the Miami Beach Office, including but not limited to Goldberg and Chiminacio.

286.    All payroll for the Bespoke Entities is run out of one office, the New York Office.

[922842/1]                                        48

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                RECEIVED NYSCEF: 06/12/2023

287.    All employee records for all employees of the Bespoke Entities are maintained in one office, the New York Office.

288.    One officer, Joseph De Sane ("De Sane"), the managing director of Bespoke RE and Bespoke Florida, oversees all real estate transactional work in all of the offices of Bespoke RE and Bespoke Florida.

289.    De Sane receives an override on all real estate transactions made by all of the offices of Bespoke RE and Bespoke Florida.

290.    The Bespoke Entities also share officers and employees between individual companies and their respective physical offices.

291.    For example, from early 2021 until at least December 12, 2022, Z. Vichinsky spent most of each year working out of Bespoke Florida's Miami Beach Office, but between in or about June 2021 and in or about August 2021, and again between in or about June 2022 and in or about August 2022, Z. Vichinsky worked out of Bespoke RE's New York Office. Even while working out of the Miami Beach Office, Z. Vichinsky has frequently visited the New York Office.

292.    Gray also frequently shuttled between the Miami Beach Office and New York Office, before moving to Cincinnati approximately a year and a half ago.

293.    Beginning with the inception of the Miami Beach Office in early 2021, the Bespoke Entities required Goldberg to visit the New York Office twice per month, to meet there with the Vichinskys and Cantwell, and with Bespoke RE's employees with regard to transactions in real property in New York State and with Bespoke Marketing's employees with regard to marketing real property in New York State.

294.    The Bespoke Entities consistently move lower-ranking employees from one office to another. For example, from in or about April 2021 to in or about September or October of 2021

[922842/1]                                  49

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

and from in or about April 2022 to in or about the end of November 2022, Willis worked at the New York Office on real estate transactions in New York State brokered by Bespoke RE. On the other hand, from in or about September or October of 2021 to in or about April of 2022, and from in or about the beginning of December 2022 to December 12, 2022, Willis was moved to the Miami Beach Office and worked on real estate transactions in Florida brokered by Bespoke Florida during that period.

295.   Hasson, now a business development manager with the Bespoke Entities, and Carter Young, a concierge with the Bespoke Entities, work most of the year out of Bespoke Florida's Miami Beach Office, but during the summers the Bespoke Entities move them to work out of Bespoke RE's New York Office.

296.   The Bespoke Entities had Lauren Canetti ("Canetti"), a Bespoke RE employee in the New York Office, work from there on real estate transactions in Florida, which ordinarily would have been within Bespoke Florida's purview. The Bespoke Entities also had Canetti frequently visit the Miami Beach Office.

297.   Employees, ostensibly of Bespoke RE, located at the New York Office, assist employees, ostensibly of Bespoke Florida, located at the Miami Beach Office. For example, Gromova, a Bespoke RE employee at the New York Office, has assisted Judith Pucknat, a Bespoke Florida employee at the Miami Beach Office, with selling Florida property listings. In addition, Bespoke RE employees at the New York Office ask Bespoke Florida employees at the Miami Beach office to assist them in marketing listings in the New York market, and Bespoke Florida employees at the Miami Beach office ask Bespoke RE employees at the New York Office to assist them in marketing listings in the Florida markets.

[922842/1]

50

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

298.   As noted above, Hasson, though nominally employed by Bespoke Florida and then working at the Miami Beach Office, contacted Willis's clients, residing in New York State and who had purchased and/or sold, or were attempting to purchase and/or sell, properties located in New York State through Bespoke RE, in the Attempt to Steal Willis Clients.

299.   In internal presentations and discussions, officers and employees of the Bespoke Entities refer to the New York Office as the "mother ship," and the Miami Beach Office as a subordinate office.

300.   Many of the financial aspects of Bespoke Florida's Miami Beach Office are dependent upon Bespoke RE's New York Office.

301.   For example, "deal sheets" on transactions in Florida real property, such as the Waldorf Transaction, can only be originated at the New York Office.

302.   Similarly, "DocuSigns" – documents, in connection with real estate transactions, that can be signed electronically – may only be created at the New York Office.

303.   Upon information and belief, Bespoke Florida does not even have a bank account in Florida. Prior to direct deposit being an optional means for the transfer of monies, in order to deposit checks it received, the Miami Beach Office needed to send them physically to the New York Office to be deposited. Upon information and belief, all transactions of the Miami Beach Office were banked through the New York Office. In addition, two cashier's checks that Bespoke Florida arranged to have made out to Gold in 2023, each of which indicated Bespoke Florida was the issuer, provided Bespoke Florida's street address as being the same as that of Bespoke RE in New York State, except for omitting the unit number that was within the address for Bespoke RE's office.

[922842/1]                                    51

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

304.    Accordingly, the Bespoke Entities should be treated as a single integrated enterprise and a single employer, and as joint employers, such that each of the Bespoke Entities should be treated as the employer of Goldberg Plaintiffs and of Willis, or, in the alternative, having contracted with Goldberg Plaintiffs and Willis, each is considered to have engaged in the acts and omissions of the others giving rise to liability as set forth herein, and each shares the liabilities of the others, for the purposes of 42 U.S.C. § 1981 and any other antidiscrimination statutes and for New York Labor Law § 740.

### AS AND FOR A FIRST CAUSE OF ACTION

**(Claim by Goldberg Plaintiffs for Breach of Contract Against Bespoke Entities)**

305.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

306.    At all times since prior to when he began working on the Waldorf Transaction, Asia Transaction, and Parkland Transaction, and prior to the Override Promise, Goldberg has been a real estate broker duly licensed to broker real estate transactions in the State of Florida.

307.    Under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Promise, Goldberg Plaintiffs had a valid and binding contract with the Bespoke Entities.

308.    Goldberg Plaintiffs have performed all of their obligations under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Promise.

309.    Goldberg Plaintiffs performed in accordance with the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Agreement, in effectuating, *inter alia*, the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

310.    Under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Agreement, Goldberg Plaintiffs had a valid and binding contract with the Bespoke Entities.

[922842/1]                                52

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

311.    Goldberg Plaintiffs have performed all of their obligations under the Goldberg Agreement, Florida Modification, Waldorf Modification, and Override Agreement.

312.    Goldberg Plaintiffs were the procuring cause of the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

313.    Goldberg Plaintiffs are entitled, under the Goldberg Agreement, as modified by the Florida Modification and Waldorf Modification, to receive sixty percent (60%) of the commissions to be received by Bespoke Florida under the Co-Broker Agreements, or $1,860,000.

314.    In the alternative, assuming *arguendo* that the Waldorf Modification did not modify the Goldberg Agreement and Florida Modification to require that Goldberg Plaintiffs receive a sixty percent (60%) commission on the Waldorf Transaction, Goldberg Plaintiffs are entitled to a fair and reasonable commission for having procured the Waldorf Transaction, and to a commission that reflects the customary rate in the community in which the Waldorf is located at the time when the Waldorf Transaction was procured, and the customary percentage amount of a commission under such circumstances is sixty percent (60%) of the commission that Bespoke Florida is to receive under the Co-Broker Agreements, or $1,860,000.

315.    Bespoke Entities have breached the Goldberg Agreement, as modified by the Florida Modification and Waldorf Modification, by not paying Goldberg Plaintiffs heir full commission in connection with the Waldorf Transaction.

316.    Bespoke Entities have breached the Goldberg Agreement and Florida Modification by not paying Goldberg Plaintiffs their full commission in connection with the Asia Transaction.

317.    Bespoke Entities have breached the Goldberg Agreement and Florida Modification by not paying Goldberg Plaintiffs their full commission in connection with the Parkland Transaction.

[922842/1]                                53

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

318.   Bespoke Entities have breached the Override Agreement by not paying Goldberg Plaintiffs any override in connection with the Waldorf Transaction, Asia Transaction, Parkland Transaction, and possibly other transactions of which Goldberg Plaintiffs are not presently aware.

319.   Goldberg Plaintiffs have been injured by Bespoke Entities' breach of the Goldberg Agreement, Waldorf Modification, and Florida Modification, in that Goldberg Plaintiffs have not received monies to which they are entitled.

320.   Goldberg Plaintiffs have been injured by Bespoke Entities' breach of the Override Agreement, in that Goldberg Plaintiffs have not received monies to which they are entitled.

321.   Goldberg Plaintiffs are entitled to damages against Bespoke Entities in an amount to be determined at trial.

322.   In addition to damages, Goldberg Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid according to the Goldberg Agreement and/or Florida Modification and/or Waldorf Modification and/or Override Agreement, a determination of commissions owed but not yet paid on the Waldorf Transaction, Asia Transaction, and Parkland Transaction, and the amount of commissions owed to Goldberg Plaintiffs that Goldberg Plaintiffs are not yet aware of. The amounts owed are believed to be in excess of $1,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION

**(Claim by Goldberg Plaintiffs for Promissory Estoppel Against the Bespoke Entities)**

323.   Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

324.   Statements by Bespoke Florida, through Gray, to Goldberg, that Goldberg Plaintiffs would receive sixty percent (60%) of the commissions received by Bespoke Florida on the Waldorf Transaction, *i.e.*, the Waldorf Modification, constituted a clear and definite promise.

[922842/1]                                54

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

325.     Statements by Bespoke Florida, through Z. Vichinsky and Gray, to Goldberg that Goldberg Plaintiffs would receive a ten percent (10%) override on the commissions received on all transactions that were brokered through the Miami Beach Office, *i.e.*, the Override Agreement, constituted a clear and definite promise.

326.     Goldberg Plaintiffs reasonably and foreseeably relied upon the Waldorf Modification and the Override Agreement by remaining employed by Bespoke Florida at the Miami Beach Office and not seeking other employment opportunities.

327.     Bespoke Florida reasonably and foreseeably expected that Goldberg Plaintiffs would act, or refrain from acting, in reliance upon the Waldorf Modification and the Override Agreement.

328.     Goldberg Plaintiffs were injured by their reliance on the Waldorf Modification, in that Bespoke Florida did not pay them their override on commissions promised thereunder.

329.     Goldberg Plaintiffs were injured by their reliance on the Override Agreement, in that Bespoke Florida did not pay them their override on commissions promised thereunder.

330.     Goldberg Plaintiffs are entitled to damages against Bespoke Entities in an amount to be determined at trial.

331.     In addition to damages, Goldberg Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid in accordance with the Waldorf Modification and the Override Agreement, and a determination of commissions owed but not yet paid to Goldberg Plaintiffs pursuant to the Waldorf Modification and the Override Agreement.

## AS AND FOR A THIRD CAUSE OF ACTION

**(Claim by Goldberg Plaintiffs for Unjust Enrichment Against the Bespoke Entities)**

[922842/1]                                  55

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

332.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

333.    In the alternative to a contract cause of action with regard to the Waldorf Modification, the Bespoke Entities have been unjustly enriched by receiving Goldberg Plaintiffs' services without paying Goldberg Plaintiffs pursuant to the Waldorf Modification, or for the Waldorf Transaction.

334.    In the alternative to a contract cause of action with regard to the Override Agreement, the Bespoke Entities have been unjustly enriched by receiving Goldberg Plaintiffs' services without paying Goldberg Plaintiffs pursuant to the Override Agreement, or for the Asia Transaction or the Parkland Transaction.

335.    Bespoke Entities have been enriched by Goldberg Plaintiffs' conduct with regard to the Waldorf Modification and Waldorf Transaction, in that Bespoke Florida has received, or will receive, $3,100,000 in commissions in connection with the Waldorf Transaction, and in that Goldberg has managed the Miami Beach Office, enabling Bespoke Florida to receive commissions on additional transactions conducted by brokers and other sales representatives whom Goldberg supervised.

336.    Bespoke Entities have been enriched by Goldberg Plaintiffs' conduct with regard to the Override Agreement, Asia Transaction, and Parkland Transaction, in that Plaintiffs procured purchasers and/or sellers for properties in Florida for Bespoke Florida, on which transactions Bespoke Florida has received payment of commissions, and in that Goldberg has managed the Miami Beach Office, enabling Bespoke Florida to receive commissions on additional transactions conducted by brokers and other sales representatives whom Goldberg supervised.

[922842/1]                                          56

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

337.    Bespoke Entities have been enriched at Goldberg Plaintiffs' expense with regard to the Waldorf Modification and Waldorf Transaction, in that Goldberg Plaintiffs expended extraordinary efforts to procure the Waldorf Transaction for Bespoke Florida, but Bespoke Florida did not compensate Plaintiffs for that work in accordance with the Waldorf Modification.

338.    Bespoke Entities have been enriched at Goldberg Plaintiffs' expense with regard to the Override Agreement, in that Goldberg Plaintiffs performed the work necessary to obtain the commissions for Bespoke Florida, but Bespoke Florida did not compensate Goldberg Plaintiffs for that work in accordance with the Override Agreement.

339.    Bespoke Entities have been enriched at Goldberg Plaintiffs' expense with regard to the Asia Transaction and Parkland Transaction, in that Goldberg Plaintiffs performed the work necessary to obtain the commissions for Bespoke Florida, but Bespoke Florida did not pay commissions to Goldberg Plaintiffs for those transactions in accordance with the Goldberg Agreement and Florida Modification.

340.    It is against equity and good conscience to permit Bespoke Entities to retain the portions of the commissions payable to Goldberg Plaintiffs on the Waldorf Transaction, pursuant to the Override Agreement, and/or on the Asia Transaction and Parkland Transaction.

341.    Goldberg Plaintiffs have been injured by the unjust enrichment of Bespoke Entities, in that Plaintiffs have not received the commissions owed to them on the Waldorf Transaction, pursuant to the Override Agreement, and/or on the Asia Transaction and Parkland Transaction.

342.    Goldberg Plaintiffs are entitled to damages against Bespoke Entities in an amount to be determined at trial.

343.    In addition to damages, Goldberg Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid in

[922842/1]                                     57

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 06/12/2023

accordance with the Waldorf Modification and the Override Agreement, and a determination of commissions owed but not yet paid to Goldberg Plaintiffs pursuant to the Override Agreement and on the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Claim by Goldberg Plaintiffs in Quantum Meruit Against Bespoke Entities)

344.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

345.    In the alternative to a contract cause of action with regard to the Waldorf Transaction, Override Agreement, Asia Transaction, and Parkland Transaction, Goldberg Plaintiffs are entitled to recover their share of profits from business they generated for Bespoke Florida, pursuant to the doctrine of quantum meruit.

346.    Goldberg Plaintiffs performed, in good faith, their services under the Goldberg Agreement and Florida Modification and the Waldorf Modification, by procuring the seller and the purchaser in the Waldorf Transaction, enabling Bespoke Florida to receive commissions on the Waldorf Transaction.

347.    Goldberg Plaintiffs performed, in good faith, their services under the Goldberg Agreement and Florida Modification and the Override Agreement, by procuring purchasers and/or sellers for properties in Florida for Bespoke Florida, including but not limited to the Asia Transaction and the Parkland Transaction and in that Goldberg has managed the Miami Beach Office, enabling Bespoke Florida to receive commissions on additional transactions conducted by brokers and other sales representatives whom Goldberg supervised.

348.    Bespoke Florida, the person to which Goldberg Plaintiffs rendered such services, accepted such services by brokering transactions generated by the Miami Beach Office, including

[922842/1]                                   58

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

but not limited to the Waldorf Transaction, Asia Transaction, and Parkland Transaction, and by accepting commissions paid pursuant to such transactions.

349.   Goldberg Plaintiffs expected compensation for their services in connection with the Waldorf Transaction, in the form of the sixty percent (60%) of commissions received by Bespoke Florida on the Waldorf Transaction to which they were entitled under the Waldorf Modification.

350.   The reasonable value of the services rendered by Goldberg Plaintiffs in connection with the Waldorf Transaction is that which was determined by Gray and promised in the Waldorf Modification, *i.e.*, sixty percent (60%) of commissions received by Bespoke Florida on the Waldorf Transaction.

351.   Goldberg Plaintiffs expected compensation for their services under the Override Agreement, in the form of the ten percent (10%) of commissions to which they were entitled under the Override Agreement.

352.   Goldberg Plaintiffs expected compensation for their services in connection with the Waldorf Transaction, Asia Transaction, and Parkland Transaction, in the amounts commensurate with the percentages of the commissions received by Bespoke Florida that Goldberg Plaintiffs were paid on similar transactions on which they had procured sellers and/or buyers for Bespoke Florida.

353.   Goldberg Plaintiffs have been injured financially.

354.   Goldberg Plaintiffs are entitled to damages from Bespoke Entities in an amount to be determined at trial.

355.   In addition to damages, Goldberg Plaintiffs seek an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Goldberg

[922842/1]                                      59

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                                RECEIVED NYSCEF: 06/12/2023

Plaintiffs pursuant to the Override Agreement and on the Waldorf Transaction, Asia Transaction, and Parkland Transaction.

## AS AND FOR A FIFTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

### (Violation of 42 U.S.C. § 1981 – Hostile Work Environment With Regard to Willis)

356.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

357.    As an African American, Willis is a member of a class protected under 42 U.S.C. § 1981.

358.    At all relevant times, Willis was an employee of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

359.    Willis had a contractual relationship with Bespoke Entities in that he was an employee of Bespoke Entities.

360.    In the alternative, Willis had a contractual relationship with Bespoke Entities in that he was an independent contractor contracting with Bespoke Entities.

361.    Defendants' discriminatory acts towards Willis were with respect to Willis's enjoyment of benefits, privileges, terms, and conditions of his contractual relationship with Bespoke Entities.

362.    The Bespoke Entities' Work Environment was hostile to Willis.

363.    The Bespoke Entities' Work Environment was objectively severe and pervasive in that it created an environment that a reasonable person would find hostile or abusive.

364.    Willis subjectively perceived the Bespoke Entities' Work Environment as hostile and abusive, and felt tormented by it on a daily basis.

[922842/1]                                             60

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

365.    The Bespoke Entities' Work Environment was so severe that it altered the terms and conditions of Willis's employment and created an intimidating, hostile, and offensive work environment.

366.    Willis was subjected to inferior terms, conditions, and privileges of employment because of his status as an African American.

367.    But for his status as an African American, Willis would not have been subjected to the Bespoke Entities' Work Environment.

368.    Willis was treated less well than other employees of Bespoke Entities because of his status as an African American.

369.    Bespoke Entities deliberately and intentionally created the Bespoke Entities' Work Environment because of Willis's status as an African American.

370.    The Vichinskys, as owners and officers of Bespoke Entities, were and are proxies and alter egos of Bespoke Entities, and thus Bespoke Entities are strictly vicariously liable for their actions.

371.    In the alternative, the Vichinskys were supervisors of Willis within the Bespoke Entities, and the racial harassment of Willis culminated in the tangible employment actions of the Discriminatory Demotion, the Hasson Client Interference, the Systematic Willis Commissions Denial, and the Constructive Discharge, thus Bespoke is strictly vicariously liable for the Vichinskys' actions.

372.    The Vichinskys were physically present on many of the occasions in which Kling orally barraged Willis with racial epithets, and thus had actual notice of Kling's discriminatory conduct towards Willis.

[922842/1]                                    61

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

373.    Bespoke Entities were also informed, through the August 2022 Disclosure, of the Disclosed Bespoke Entities' Discriminatory Acts, including but not limited to the 8/17/22 Text Message and Kling's reference to Willis as a "nigger" on a daily basis. This notice is imputed to the Vichinskys through their status as officers and owners of Bespoke Entities.

374.    Despite their actual knowledge of Kling's discriminatory conduct towards Willis, the Vichinskys, and Bespoke Entities, took no disciplinary action against Kling, continued to retain Kling as a Bespoke RE employee, and did not otherwise attempt to remedy Kling's racist abuse of Willis.

375.    The Vichinskys personally engaged, on hundreds of occasions, in the racist addressing of Willis as "Jafar."

376.    Bespoke Entities failed to take appropriate remedial action to curtail the racial discrimination against Willis.

377.    Bespoke Entities were, at best, grossly negligent or deliberately indifferent in remedying the hostile work environment with which Willis was faced and of which Bespoke Entities had actual knowledge. Accordingly, Bespoke Entities are vicariously liable for the Bespoke Entities' Work Environment.

378.    Bespoke Entities are vicariously liable for the Vichinskys' creation of the hostile Bespoke Entities' Work Environment.

379.    The Vichinskys are each, by virtue of their personal involvement in the Bespoke Entities' Work Environment, individually liable therefor.

380.    Bespoke Entities intentionally discriminated against Willis because of his race in violation of 42 U.S.C. § 1981.

[922842/1]                                62

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                          RECEIVED NYSCEF: 06/12/2023

381.    Willis has suffered mental anguish and emotional distress resulting from the hostile Bespoke Entities' Work Environment, in the form of constant self-doubt and second-guessing himself, and loss of enjoyment of life.

382.    Willis has suffered physical illness resulting from the hostile Bespoke Entities' Work Environment, in the form of back pain.

383.    Willis seeks compensation for all lost wages and benefits. Reinstatement of Willis to his previous position is impractical and unworkable. Therefore, Willis seeks an award of front pay to compensate him.

384.    Although Willis has diligently sought other employment similar to that which he held with Bespoke Entities, he has been unable to find such a job at comparable pay.

385.    Bespoke engaged in discriminatory practices with respect to Willis with malice or with reckless indifference to Willis's federally protected rights.

386.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Willis is entitled to recover from all Defendants back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

### AS AND FOR A SIXTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

### (Violation of 42 U.S.C. § 1981 – Disparate Treatment With Regard to Willis)

387.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

388.    As an African American, Willis is a member of a class protected under 42 U.S.C. § 1981.

[922842/1]                                      63

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

389.    At all relevant times, Willis was an employee of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

390.    Willis had a contractual relationship with Bespoke Entities in that he was an employee of Bespoke Entities.

391.    In the alternative, Willis had a contractual relationship with Bespoke Entities in that he was an independent contractor contracting with Bespoke Entities.

392.    Defendants' discriminatory acts towards Willis were with respect to Willis's enjoyment of benefits, privileges, terms, and conditions of his contractual relationship with Bespoke Entities.

## The Discriminatory Selling Restriction

393.    The Discriminatory Selling Restriction represented an adverse employment action that caused a materially adverse change in the terms and conditions of Willis's employment with Bespoke Entities.

394.    During the period of the Discriminatory Selling Restriction, Willis was qualified to show properties on sale to potential purchasers by himself, and, indeed, at the time it was industry standard for persons in Willis's position to be permitted to do so.

395.    The Discriminatory Selling Restriction took place under circumstances giving rise to an inference of discrimination, including but not limited to:

(a)    Other employees of Bespoke Entities who were lower-ranked than Willis, but were not African American, were permitted to show properties by themselves; and

(b)    It occurred while the Bespoke Entities' Work Environment was occurring, including after the Vichinskys had used the word "nigger" in the work

[922842/1]                                    64

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                          RECEIVED NYSCEF: 06/12/2023

context and C. Vichinsky had addressed Willis as a "nigger," and while the

Vichinskys were constantly addressing Willis as "Jafar"; and

(c)     It occurred partly after the Hasson Client Interference had taken place.

### The Hasson Client Interference

396.    The Hasson Client Interference represented an adverse employment action that

caused a materially adverse change in the terms and conditions of Willis's employment with

Bespoke.

397.    During the period of the Hasson Client Interference, Willis was qualified to

continue representing his clients with Bespoke RE.

398.    The Hasson Client Interference took place under circumstances giving rise to an

inference of discrimination, including but not limited to:

(a)     Willis was African American;

(b)     Hasson was Caucasian;

(c)     Willis had years' worth of experience in residential real estate

transactions, while Hasson had just started in the business;

(d)     Hasson was never disciplined for his misconduct; and

(e)     It occurred while the Bespoke Entities' Work Environment was occurring,

including after the Vichinskys had used the word "nigger" in the work

context and C. Vichinsky had addressed Willis as a "nigger," and while

the Vichinskys were constantly addressing Willis as "Jafar."

### The Discriminatory Demotion

399.    The Discriminatory Demotion represented an adverse employment action that

caused a materially adverse change in the terms and conditions of Willis's employment with

Bespoke.

[922842/1]                                   65

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                      RECEIVED NYSCEF: 06/12/2023

400.    The Discriminatory Demotion of Willis from the position of Vice President, and the stripping from Willis of the responsibilities corresponding to that position, caused a loss of the prestige to Willis that had accompanied such position, and a substantial diminishment of Willis's responsibilities, and represented an adverse employment action that caused a materially adverse change in the terms and conditions of Willis's employment with Bespoke Entities.

401.    Willis was qualified for the position of Vice President, and, indeed, had performed more than satisfactorily in that position for over a year prior to the Discriminatory Demotion, for the reasons set forth in paragraphs 80 through 97 above.

402.    The Discriminatory Demotion took place under circumstances giving rise to an inference of discrimination, including but not limited to the following:

(a)    Willis was replaced as Vice President by Hasson, who is Caucasian and not a member of Willis's protected class of African Americans, and who had less experience in the real estate brokerage industry and less experience with Bespoke Entities than did Willis, and who had never generated any business for Bespoke Entities;

(b)    It occurred while the Bespoke Entities' Work Environment was occurring, including after the Vichinskys had used the word "nigger" in the work context and C. Vichinsky had addressed Willis as a "nigger," and while the Vichinskys were constantly addressing Willis as "Jafar"; and

(c)    It occurred after the Hasson Client Interference.

### The Systematic Willis Commissions Nonpayment

403.    The Systematic Willis Commissions Nonpayment represented an adverse employment action that caused a materially adverse change in the terms and conditions of Willis's employment with Bespoke Entities.

[922842/1]                                          66

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

404.    Willis was entitled to the commissions he did not receive as a result of the Systematic Willis Commissions Nonpayment.

405.    The Systematic Willis Commissions Nonpayment took place under circumstances giving rise to an inference of discrimination, including but not limited to the Bespoke Entities' Work Environment, the Discriminatory Demotion, the Hasson Client Interference, and the Discriminatory Selling Restriction.

406.    Bespoke Entities are vicariously liable for the Discriminatory Selling Restriction, Hasson Client Interference, Discriminatory Demotion, and Systematic Willis Commissions Nonpayment, in that those represent actions taken by Bespoke Entities' officers and/or employees, including but not limited to the Vichinskys.

407.    The Vichinskys are individually liable for the Discriminatory Selling Restriction, Hasson Client Interference, Discriminatory Demotion, and Systematic Willis Commissions Nonpayment, by virtue of their personal involvement in each of them.

408.    Defendants would not have engaged in their discriminatory acts towards Willis but for his race.

409.    Defendants intentionally discriminated against Willis because of his race in violation of 42 U.S.C. § 1981.

410.    Defendants engaged in discriminatory practices with respect to Willis with malice or with reckless indifference to Willis's federally protected rights.

411.    Willis seeks compensation for all lost wages and benefits. Reinstatement of Willis to his previous position is impractical and unworkable. Therefore, Willis seeks an award of front pay to compensate him.

[922842/1]                                67

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                                    RECEIVED NYSCEF: 06/12/2023

412.     Willis has suffered mental anguish and emotional distress resulting from the discriminatory conduct set forth above, in the form of constant self-doubt and second-guessing himself, and loss of enjoyment of life.

413.     Willis has suffered physical illness resulting from the discriminatory conduct set forth above, in the form of back pain.

414.     Although Willis has diligently sought other employment similar to that which he held with Bespoke Entities, he has been unable to find such a job at comparable pay.

415.     Pursuant to 42 U.S.C. §§ 1981 and 1988, Willis is entitled to recover from Bespoke Entities back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial but, in any event, no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

## AS AND FOR A SEVENTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

### (Violation of 42 U.S.C. § 1981 – Constructive Discharge of Willis)

416.     Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

417.     As an African American, Willis is a member of a class protected under 42 U.S.C. § 1981.

418.     At all relevant times, Willis was an employee of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

419.     Willis had a contractual relationship with Bespoke Entities in that he was an employee of Bespoke Entities.

420.     In the alternative, Willis had a contractual relationship with Bespoke Entities in that he was an independent contractor contracting with Bespoke Entities.

[922842/1]                                               68

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

421.    Defendants' discriminatory acts towards Willis were with respect to Willis's enjoyment of benefits, privileges, terms, and conditions of his contractual relationship with Bespoke Entities.

422.    Defendants deliberately made Willis's working conditions so intolerable that he was forced into an involuntary resignation.

423.    The Vichinskys' personal use of racial epithets and the racist "Jafar" moniker in Plaintiffs' presence both contributed to the hostility of the Bespoke Entities' Work Environment, and demonstrates that Bespoke Entities' actions and omissions in fostering the Bespoke Entities' Work Environment were deliberate and not merely negligent or ineffective.

424.    A reasonable person would have perceived the Bespoke Entities' Work Environment as hostile or abusive towards Willis.

425.    A reasonable person in Willis's position would have viewed Willis's working conditions as so difficult and unpleasant that such person would have felt compelled to resign.

426.    Willis in fact reasonably perceived the Bespoke Entities' Work Environment as hostile or abusive towards him, and as so difficult and unpleasant that such person would have felt compelled to resign.

427.    Defendants would not have created the Bespoke Entities' Work Environment, but for Willis's status as an African American.

428.    Defendants intentionally discriminated against Willis because of his race in violation of 42 U.S.C. § 1981.

429.    Bespoke Entities are vicariously liable for the Constructive Discharge because they are vicariously liable for the Bespoke Entities' Work Environment that led to it.

[922842/1]                                                69

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

430.    The Vichinskys are individually liable for the Constructive Discharge because they are individually liable for the Bespoke Entities' Work Environment that led to it.

431.    Willis seeks compensation for all lost wages and benefits. Reinstatement of Willis to his previous position is impractical and unworkable. Therefore, Willis seeks an award of front pay to compensate him.

432.    Willis has suffered mental anguish and emotional distress resulting from the discriminatory conduct set forth above, in the form of constant self-doubt and second-guessing himself, and loss of enjoyment of life.

433.    Willis has lost both salary and commissions as a result of his constructive discharge from Bespoke Entities, and thus has suffered financial hardship.

434.    Although Willis has diligently sought other employment similar to that which he held with Bespoke Entities, he has been unable to find such a job at comparable pay.

435.    Bespoke Entities engaged in discriminatory practices with respect to Willis with malice or with reckless indifference to Willis's federally protected rights.

436.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Willis is entitled to recover from Bespoke Entities back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

### AS AND FOR AN EIGHTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

**(Violation of 42 U.S.C. § 1981 – Hostile Work Environment With Regard to Goldberg Plaintiffs)**

437.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

[922842/1]                                    70

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                              RECEIVED NYSCEF: 06/12/2023

438.    As a Jew, Goldberg is a member of a class protected under 42 U.S.C. § 1981.

439.    For the purposes of 42 U.S.C. § 1981, discrimination against Jews is considered to be racial discrimination.

440.    As a company wholly owned by a Jew, Goldberg, Gold is a member of a class protected under 42 U.S.C. § 1981.

441.    At all relevant times, Goldberg Plaintiffs were employees of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

442.    Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were employees of Bespoke Entities.

443.    In the alternative, Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were independent contractors contracting with Bespoke Entities.

444.    Defendants' discriminatory acts towards Goldberg Plaintiffs were with respect to Goldberg Plaintiffs' enjoyment of benefits, privileges, terms, and conditions of their contractual relationship with Bespoke Entities.

445.    The manner in which Bespoke Entities and their principals and employees acted towards Goldberg Plaintiffs and against Jews in general, and against African Americans and members of other racial minorities, as set forth above, created the Bespoke Entities' Work Environment, which was hostile to Goldberg.

446.    The Bespoke Entities' Work Environment was objectively severe and pervasive in that it created an environment that a reasonable person would find hostile or abusive.

447.    Goldberg subjectively perceived the Bespoke Work Environment as hostile and abusive, and felt deeply disturbed by it on a daily basis.

[922842/1]                                    71

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                   RECEIVED NYSCEF: 06/12/2023

448.   The Bespoke Entities' Work Environment was so severe that it altered the terms and conditions of Goldberg Plaintiffs' employment and/or contractual relationship with Bespoke Entities and created an intimidating, hostile, and offensive work environment.

449.   Defendants deliberately and intentionally created the Bespoke Entities' Work Environment because of Goldberg Plaintiffs' status as Jews.

450.   Defendants intentionally discriminated against Goldberg Plaintiffs because of their race, *i.e.*, Judaism, in violation of 42 U.S.C. § 1981.

451.   Goldberg Plaintiffs would not have been subjected to the Bespoke Entities' Work Environment but for their status as Jews.

452.   The Vichinskys, as owners and officers of Bespoke Entities, were and are proxies and alter egos of Bespoke Entities, and thus Bespoke Entities are strictly vicariously liable for their actions.

453.   In the alternative, the Vichinskys were supervisors of Goldberg within Bespoke Entities, they personally participated in the harassment of Goldberg, and the harassment of Goldberg culminated in the tangible employment actions of the denial of commissions to Goldberg Plaintiffs and Goldberg Plaintiffs' termination, thus Bespoke Entities are strictly vicariously liable for the Vichinskys' actions.

454.   Bespoke Entities failed to take appropriate remedial action to curtail the racial discrimination against Goldberg Plaintiffs.

455.   Bespoke Entities were, at best, negligent in remedying the hostile work environment with which Goldberg Plaintiffs were faced and of which Bespoke Entities had actual knowledge. Accordingly, Bespoke Entities are directly liable.

456.   Bespoke Entities are vicariously liable for the Vichinskys' discriminatory conduct.

[922842/1]                                        72

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                      RECEIVED NYSCEF: 06/12/2023

457.    The Vichinskys are each, by virtue of their personal involvement in the Bespoke Entities' Work Environment, individually liable therefor.

458.    Goldberg has suffered from mental anguish as a result of the hostile Bespoke Work Environment. He has had significantly difficulty sleeping at night, requiring prescription medication as an aid.

459.    Goldberg has suffered from loss of enjoyment of life as a result of the hostile Bespoke Work Environment.

460.    Bespoke Entities engaged in discriminatory practices with respect to Goldberg Plaintiffs with malice or with reckless indifference to Goldberg Plaintiffs' federally protected rights.

461.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Goldberg Plaintiffs are entitled to recover from all Defendants back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

### AS AND FOR A NINTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

### (Violation of 42 U.S.C. § 1981 – Disparate Treatment of Goldberg Plaintiffs)

462.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

463.    As a Jew, Goldberg is a member of a class protected under 42 U.S.C. § 1981.

464.    For the purposes of 42 U.S.C. § 1981, discrimination against Jews is considered to be racial discrimination.

465.    As a company wholly owned by a Jew, Goldberg, Gold is a member of a class protected under 42 U.S.C. § 1981.

[922842/1]                                73

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023
RECEIVED NYSCEF: 06/12/2023

466.   At all relevant times, Goldberg Plaintiffs were employees of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

467.   Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were employees of Bespoke Entities.

468.   In the alternative, Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were independent contractors contracting with Bespoke Entities.

469.   Defendants' discriminatory acts towards Goldberg Plaintiffs were with respect to Goldberg Plaintiffs' enjoyment of benefits, privileges, terms, and conditions of their contractual relationship with Bespoke Entities.

470.   Goldberg was qualified for the positions of President of Bespoke Florida and of broker for Bespoke Florida, as set forth in paragraph 264 above, and, indeed, had performed more than satisfactorily in that position, having procured many clients for Bespoke Florida, including but not limited to both the seller and purchaser in the Waldorf Transaction, the seller in the Asia Transaction, and the purchasers in the Parkland Transaction, leading to substantial business for, and income to, Bespoke Florida.

471.   Goldberg Plaintiffs' deprival of commissions to which they were entitled from Bespoke Entities represented an adverse employment action that caused a materially adverse change in the terms and conditions of Goldberg Plaintiffs' employment and/or contractual relationship with Bespoke Entities.

472.   Bespoke Entities' termination of Goldberg Plaintiffs' employment represented an adverse employment action that caused a materially adverse change in the terms and conditions of Goldberg Plaintiffs' employment with Bespoke Entities.

[922842/1]                                    74

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

473.   The Vichinskys' individual disparagements of Jews, and the Bespoke Entities' Work Environment's hostility towards Jews, raise an inference that the aforementioned adverse employment actions occurred because of Goldberg Plaintiffs' status as Jews.

474.   Goldberg Plaintiffs' religion was a but-for cause of the aforementioned adverse employment actions.

475.   Defendants intentionally discriminated against Goldberg Plaintiffs because of their race, *i.e.*, Judaism, in violation of 42 U.S.C. § 1981.

476.   Bespoke Entities are vicariously liable for the aforementioned adverse employment actions.

477.   The Vichinskys are individually liable for the aforementioned adverse employment actions, by reason of their participation and personal involvement therein.

478.   Defendants engaged in discriminatory practices with respect to Goldberg Plaintiffs with malice or with reckless indifference to Goldberg's federally protected rights.

479.   Goldberg Plaintiffs have lost both salary and commissions from Bespoke Entities as a result of the aforesaid adverse employment actions, and thus have suffered financial hardship.

480.   Goldberg seeks compensation for all lost wages and benefits. Reinstatement of Goldberg Plaintiffs to their previous positions is impractical and unworkable. Therefore, Goldberg Plaintiffs seek an award of front pay to compensate them.

481.   Goldberg has suffered from mental anguish as a result of the aforesaid adverse employment actions. He has had significantly difficulty sleeping at night, requiring prescription medication as an aid.

482.   Goldberg has suffered from loss of enjoyment of life as a result of the aforesaid adverse employment actions.

[922842/1]                                     75

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 06/12/2023

483.    Although Goldberg has diligently sought other employment similar to that which he held with Bespoke Entities, he has been unable to find such a job at comparable pay.

484.    Pursuant to 42 U.S.C. §§ 1981 and 1988, Goldberg Plaintiffs are entitled to recover from all Defendants back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

## AS AND FOR A TENTH CAUSE OF ACTION, AGAINST ALL DEFENDANTS

### (Violation of 42 U.S.C. § 1981 – Retaliation for opposing unlawful employment practices – With Regard to Goldberg Plaintiffs)

485.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

486.    As persons against whom Defendants retaliated for opposing Defendants' racially discriminatory practices against Willis, Goldberg Plaintiffs are members of a class protected by 42 U.S.C. § 1981.

487.    At all relevant times, Goldberg Plaintiffs were employees of Bespoke Entities within the meaning of 42 U.S.C. § 1981.

488.    Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were employees of Bespoke Entities.

489.    In the alternative, Goldberg Plaintiffs had a contractual relationship with Bespoke Entities in that they were independent contractors contracting with Bespoke Entities.

490.    Defendants' discriminatory acts towards Goldberg Plaintiffs were with respect to Goldberg Plaintiffs' enjoyment of benefits, privileges, terms, and conditions of their contractual relationship with Bespoke Entities.

[922842/1]                          76

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

491.    Bespoke Entities' conduct towards Willis, in the Bespoke Entities' Discriminatory Practices, constituted employment practices made unlawful by 42 U.S.C. § 1981.

492.    Goldberg Plaintiffs', through Goldberg, disputing of the Vichinskys' Unfounded Willis Criticism, raising to Gray of an objection to the Attempt to Steal Willis Clients, and reporting to Bespoke Entities, through ALBPC and Bespoke Entities' counsel, of the Disclosed Bespoke Entities' Discriminatory Practices, constituted opposition to employment practices made unlawful by 42 U.S.C. § 1981.

493.    Knowledge of Goldberg Plaintiffs' disputing of the Unfounded Willis Criticism is imputed to Bespoke Entities by reason of their officers, the Vichinskys, having direct knowledge of such dispute.

494.    Knowledge of Goldberg Plaintiffs' raising to Gray of an objection to the Attempt to Steal Willis Clients, is imputed to Bespoke Entities by reason of Gray, an officer and employee of Bespoke Entities, having direct knowledge of such objection.

495.    Knowledge of Goldberg Plaintiffs' reporting to Bespoke Entities, through ALBPC and Bespoke Entities' counsel, of the Disclosed Bespoke Entities' Discriminatory Practices, is imputed to Bespoke Entities by reason of Bespoke Entities' counsel's knowledge of such reporting.

496.    Upon information and belief, but for Goldberg Plaintiffs' disputing the Vichinskys' Unfounded Willis Criticism, raising to Gray of an objection to the Attempt to Steal Willis Clients, and reporting to Bespoke Entities, through ALBPC and Bespoke Entities' counsel, the Disclosed Bespoke Entities' Discriminatory Practices, Bespoke Entities would not have perpetrated the Systematic Goldberg Commissions Nonpayment.

[922842/1]                                   77

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                    RECEIVED NYSCEF: 06/12/2023

497.     Bespoke Entities' Termination of Goldberg Plaintiffs less than a month after the Goldberg Plaintiffs' reporting to Bespoke Entities, through ALBPC and Bespoke Entities' counsel, of the Disclosed Bespoke Entities' Discriminatory Practices, raises an inference of a causal relationship between the two events.

498.     Bespoke Entities are vicariously liable for the Systematic Goldberg Commissions Nonpayment and the Termination.

499.     The Vichinskys are individually liable for the Systematic Goldberg Commissions Nonpayment and the Termination by reason of their participation and personal involvement therein.

500.     Bespoke Entities' Systematic Goldberg Commissions Nonpayment constituted a materially adverse employment action against Goldberg Plaintiffs.

501.     Bespoke Entities' failure to pay employees and/or contractors commissions it owed them, could well dissuade a reasonable employee and/or contractor from making or supporting a charge of discrimination.

502.     Upon information and belief, but for Goldberg Plaintiffs' disputing the Vichinskys' Unfounded Willis Criticism, raising to Gray of an objection to the Attempt to Steal Willis Clients, and reporting to Bespoke Entities, through ALBPC and Bespoke Entities' counsel, the Disclosed Bespoke Entities' Discriminatory Practices, Bespoke Entities would not have perpetrated the Termination.

503.     Bespoke Entities' Termination constituted a materially adverse employment action against Goldberg Plaintiffs.

[922842/1]                                   78

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

504. Bespoke Entities intentionally retaliated against Goldberg Plaintiffs because of their opposition to Bespoke Entities' intentional discrimination against Willis on the basis of race, in violation of 42 U.S.C. § 1981.

505. Bespoke Entities' termination of an employee and/or contractor could well dissuade a reasonable employee and/or contractor from making or supporting a charge of discrimination.

506. Goldberg Plaintiffs have lost both salary and commissions from Bespoke Entities as a result of their Termination, and thus has suffered financial hardship.

507. Although Goldberg has diligently sought other employment similar to that which he held with Bespoke Entities, he has been unable to find such a job at comparable pay.

508. Bespoke Entities engaged in discriminatory practices with respect to Goldberg Plaintiffs with malice or with reckless indifference to Goldberg Plaintiffs' federally protected rights.

509. Goldberg has suffered from mental anguish as a result of his Termination. He has had significantly difficulty sleeping at night, requiring prescription medication as an aid.

510. Goldberg Plaintiffs seeks compensation for all lost wages and benefits. Reinstatement of Goldberg Plaintiffs to their previous positions is impractical and unworkable. Therefore, Goldberg Plaintiffs seek an award of front pay to compensate them.

511. Pursuant to 42 U.S.C. §§ 1981 and 1988, Goldberg Plaintiffs entitled to recover from all Defendants back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action.

[922842/1]                              79

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

**(New York Labor Law § 740, By Goldberg Against Bespoke Entities)**

512.    Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

513.    Goldberg was an employee of Bespoke Entities.

514.    In the alternative, Goldberg was an independent contractor employed by Bespoke Entities.

515.    The Bespoke Entities racially discriminated against Willis, an African American employee of Bespoke Entities, by various means, as set forth above. (For a detailed Charge of Discrimination that Goldberg has filed with the United States Equal Employment Opportunity Commission ("EEOC"), and a detailed Employment Discrimination Complaint Form that Willis has filed with the New York State Division of Human Rights ("DHR"), detailing the discrimination against Goldberg and Willis by the Bespoke Entities, please go to the following link: https://www.alblawfirm.com/goldberg-v-bespoke/. When right to sue letters are received from the EEOC and/or DHR, claims under other federal and state employment discrimination laws will also be filed against the Bespoke Entities.)

516.    The Bespoke Entities discriminated against Willis, on the basis of race, in the form of the Hasson Client Interference, Discriminatory Selling Restriction, Discriminatory Demotion, Systematic Willis Commissions Nonpayment, and the Bespoke Entities' Work Environment.

517.    Goldberg reasonably believed that the Bespoke Entities' treatment of Willis, including the Hasson Client Interference, Discriminatory Selling Restriction, Discriminatory Demotion, Systematic Willis Commissions Nonpayment, and those aspects of the Racism in Bespoke Entities' Work Environment that had occurred as of August 2022, including but not limited to the 8/17/22 Text Message and the Unfounded Willis Criticism (collectively, the

[922842/1]                                    80

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                            RECEIVED NYSCEF: 06/12/2023

aforesaid are the Disclosed Bespoke Entities' Discriminatory Acts), were activities, policies, and practices of the Bespoke Entities that were in violation of federal and state civil rights laws.

518.   Goldberg disclosed the Attempt to Steal Willis Clients to supervisors of the Bespoke Entities, *i.e.*, the Vichinskys and Gray.

519.   Goldberg told Gray that the Attempt to Steal Willis Clients was discriminatory, as well as unacceptable and a firing offense.

520.   Goldberg disclosed, to a supervisor within the Bespoke Entities, the Disclosed Bespoke Entities' Discriminatory Acts. Goldberg did so in August 2022, by disclosing each of those to ALBPC, and ALBPC, in turn, disclosed each of those to counsel to the Bespoke Entities. (This is the August 2022 Disclosure.)

521.   Goldberg objected to the Disclosed Bespoke Entities' Discriminatory Acts.

522.   On or about September 22, 2022, less than a month after the August 2022 Disclosure, the Bespoke Entities terminated Goldberg Plaintiffs' employment with them, by email from Z. Vichinsky (the Termination).

523.   Upon information and belief, the Termination was effectuated because of the August 2022 Disclosure, and because Goldberg had objected to the Disclosed Bespoke Entities' Discriminatory Acts.

524.   The Termination was an adverse employment action against Goldberg, discriminating against him for having exercised his rights under New York Labor Law § 740 ("LL § 740"), and constituted a retaliatory action within the meaning of LL § 740.

525.   Upon information and belief, the Systematic Goldberg Commissions Nonpayment occurred because of the August 2022 Disclosure, and because Goldberg had objected to the Disclosed Bespoke Entities' Discriminatory Acts.

[922842/1]                                    81

NYSCEF DOC. NO. 10

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

526. The Systematic Goldberg Commissions Nonpayment were an adverse employment action against Goldberg, discriminating against him for having exercised his rights under LL § 740, and constituted a retaliatory action within the meaning of LL § 740.

527. The Termination and Systematic Goldberg Commissions Nonpayment constituted violations of LL § 740.

528. The Bespoke Entities' violations of LL § 740 were willful, malicious, and wanton.

529. Goldberg has been unable, despite reasonable efforts, to find comparable employment.

530. As a result of the Termination and Systematic Goldberg Commissions Nonpayment, Goldberg has been denied employment; has lost wages, benefits, and promotional activities; and has incurred damages thereby.

531. Because the Bespoke Entities form a single integrated enterprise and employer, and act as joint employers, the Bespoke Discriminatory Acts are considered to have been the acts of Bespoke Florida and Bespoke Marketing as well as Bespoke RE.

532. Because the Bespoke Entities form a single integrated enterprise and employer, and act as joint employers, the Termination and Systematic Goldberg Commissions Nonpayment are considered to have been the acts of Bespoke RE and Bespoke Marketing as well as Bespoke Florida, and to have been as retaliation for Goldberg's having disclosed, and objected to, the Disclosed Bespoke Entities' Discriminatory Acts.

533. Pursuant to LL §§ 740(4) and (5), Goldberg is entitled to recover from Bespoke Entities lost wages; the value of lost benefits; interest on lost wages and benefits; and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000,

[922842/1]

82

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                    RECEIVED NYSCEF: 06/12/2023

together with a civil penalty of an amount not to exceed ten thousand dollars, and reasonable costs, disbursements, and attorney fees incurred in the prosecution of this action.

**WHEREFORE,** Plaintiffs demand judgment as follows:

A.      On the First Cause of Action, against Bespoke Entities, awarding Goldberg Plaintiffs damages in an amount to be determined at trial, and an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid according to the Goldberg Agreement and/or Florida Modification and/or Waldorf Modification and/or Override Agreement, a determination of commissions owed but not yet paid on the Waldorf Transaction, Asia Transaction, and Parkland Transaction, and the amount of commissions owed to Goldberg Plaintiffs that Goldberg Plaintiffs are not yet aware of;

B.      On the Second Cause of Action, against Bespoke Entities, awarding Goldberg Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid in accordance with the Waldorf Modification and the Override Agreement, and a determination of commissions owed but not yet paid to Goldberg Plaintiffs pursuant to the Waldorf Modification and the Override Agreement;

C.      On the Third Cause of Action, against Bespoke Entities, awarding Goldberg Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid in accordance with the Waldorf Modification and the Override Agreement, and a determination of commissions owed but not yet

[922842/1]                                  83

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10                                                          RECEIVED NYSCEF: 06/12/2023

paid to Goldberg Plaintiffs pursuant to the Override Agreement and on the Waldorf Transaction, Asia Transaction, and Parkland Transaction;

D.    On the Fourth Cause of Action, against Bespoke Entities, awarding Goldberg Plaintiffs damages in an amount to be determined at trial, together with an accounting and examination of Bespoke Entities' books and records to determine what Goldberg Plaintiffs were paid according to the Override Agreement, and a determination of commissions owed but not yet paid to Goldberg Plaintiffs pursuant to the Override Agreement and on the Waldorf Transaction, Asia Transaction, and Parkland Transaction;

E.    On the Fifth Cause of Action, against all Defendants, awarding Willis back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action;

F.    On the Sixth Cause of Action, against all Defendants, awarding Willis back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action;

G.    On the Seventh Cause of Action, against all Defendants, awarding Willis back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in

[922842/1]                                        84

INDEX NO. 651458/2023
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 06/12/2023

a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action;

H.   On the Eighth Cause of Action, against all Defendants, awarding Goldberg Plaintiffs back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action;

I.   On the Ninth Cause of Action, against all Defendants, awarding Goldberg Plaintiffs back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action;

J.   On the Tenth Cause of Action, against all Defendants, awarding Goldberg Plaintiffs back pay, front pay, the value of lost benefits, interest on lost wages and benefits, compensatory damages, damages for emotional distress, and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with reasonable attorney fees and costs incurred in this action; and

K.   On the Eleventh Cause of Action, against Bespoke Entities, awarding Goldberg lost wages; the value of lost benefits; interest on lost wages and benefits; and punitive damages, in a total amount to be determined at trial, but in any event no less than $15,000,000, together with a civil penalty of an amount not to exceed ten thousand

[922842/1]

85

INDEX NO. 651458/2023

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 06/12/2023

dollars, and reasonable costs, disbursements, and attorney fees incurred in the prosecution of this action;

L.      Together with interest, costs and disbursements of this action, and such other and further relief which may seem to the Court to be just and proper.

Dated: New York, New York
       June 12, 2023

                            Yours, etc.,

                            ADAM LEITMAN BAILEY, P.C.

                            By: _____
                                Adam Leitman Bailey, Esq.
                                Brandon M. Zlotnick, Esq.
                                One Battery Park Plaza, Eighteenth Floor
                                New York, NY 10004
                                (212) 825-0365

                                *Attorneys for Plaintiffs Harlan Goldberg,*
                                *H Gold LLC, and Jarret Willis*

[922842/1]                            86

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM INDEX NO. 651458/2023

NYSCEF DOC. NO. 11                                                          RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023

NYSCEF DOC. NO. 11    RECEIVED NYSCEF: 06/12/2023

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "**Agreement**") is effective as of April 2nd 2019 (the "Effective Date"), by and between Bespoke Real Estate LLC, a New York limited liability company ("**Bespoke Real Estate**", and Bespoke Luxury Marketing LLC a limited liability company ("**Bespoke Marketing**") and together with Bespoke Real Estate, "**Bespoke**", "**Company**", or "**BRE**") having an office at 903 Montauk Highway, Water Mill New York 11976 and H GOLD LLC, and Harlan Goldberg (together, "**Contractor**") having an address at  3330 NW 190TH ST APT 2410, Miami Florida 33180.

1.    **INDEPENDENT CONTRACTOR**. Subject to the terms and conditions of this Agreement, Bespoke hereby engages Contractor as an independent contractor, and not as an employee, to perform the services set forth herein. Contractor hereby accepts such engagement.

2.    Contractor accepts and agrees to be engaged on the terms and conditions set out in this Agreement, and agrees to be subject to the general supervision, advice and direction of Bespoke and Bespoke's supervisory personnel. Contractor shall perform all duties as are customarily performed by a Contractor/Consultant in a similar position.  Contractor shall also perform all other duties Bespoke may assign to Contractor from time to time.

3.    **DUTIES, TERM, AND COMPENSATION**.

(a)    Contractor's duties, term of engagement, compensation and provisions for payment thereof shall be as set forth in Exhibit A attached hereto and made a part hereof, which may be amended or supplemented in writing from time to time upon agreement of the parties.  As part of this Agreement, Contractor shall also perform other responsibilities as reasonably directed by Bespoke and accepted by Contractor, which acceptance shall not be unreasonably conditioned, delayed or withheld.

(b)    Contractor shall not have the right to make any contracts or commitments for or on behalf of Bespoke without first obtaining the express written consent of Bespoke.

(c)    Contractor shall be fully responsible to determine the method, details, and means of performing the work to be performed for Bespoke. Bespoke shall not control the manner or determine the method of accomplishing Contractor's services.  However, Bespoke may exercise broad general powers of supervision and control over the results of work performed by Contractor to ensure satisfactory performance, including the right to inspect, the right to stop work, to make suggestions as to the details of the work, and the right to propose modifications to the work.

4.    **EXPENSES**.

(a)    During the term of this Agreement, Contractor shall not bill and Bespoke shall not reimburse Contractor for any out-of-pocket expenses that are incurred in connection with the performance of the duties hereunder. Bespoke shall be responsible for supplying Contractor with an e-mail address.

(b)    Contractor shall carry automobile insurance having coverage of at least $300,000/500,000 for bodily injury and $25,000 for property damage.  Such insurance shall be maintained with an insurance company having a Best Rating of A+:X, and the insurance policy shall require that the Insurance Company provide to at least 30 days' prior written notice of any cancellation of such policy.

5.    **CONFLICT OF INTEREST**. Contractor shall not at any time during Contractor's engagement with Bespoke, without the prior written consent of Bespoke, engage, whether directly or indirectly, in any business or employment which is similar or in any way connected to or in

1

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM       INDEX NO. 651458/2023

NYSCEF DOC. NO. 11                                       RECEIVED NYSCEF: 06/12/2023

competition with the business of Bespoke, its subsidiaries, affiliates, associates and joint ventures, or which may be considered by Bespoke in its entire unfettered opinion to impair Contractor's capability to act at all times in the best interests of Bespoke. Notwithstanding the foregoing:

(a)     Existing License Placement: Contractor will place New York State, and other affiliated Real Estate Licenses with Bespoke's associated entity, and only Bespoke Entities unless otherwise approved by Bespoke.

(b)     All prospective buyers and sellers acquired by or introduced to Contractor from any source or activity will be referred into BRE system for assignment/referral and tracking. Any commission-based compensation related to applicable buyers, sellers, and/or projects will be paid in accordance with the terms and conditions of this Agreement.

6.     **TERMINATION.**

(a)     Either Bespoke or Contractor may terminate this Agreement at any time upon written notice to the other.

(b)     If Contractor is convicted of any crime or offense, fails or refuses to comply with the written policies or reasonable directive of Bespoke, is deemed guilty by Bespoke of serious misconduct in connection with performance hereunder, or materially breaches provisions of this Agreement, Bespoke at any time may terminate the engagement of Contractor immediately and without prior written notice to Contractor.

(c)     Upon any termination of this Agreement, Contractor shall not be eligible to receive any further compensation, remuneration, or consideration whatsoever. Any remaining SOW Fee due to the Contractor by the Company at the time of termination will be withheld and paid only upon the Contractor completing the satisfactory return of all Company provided materials, tools, files, e-mails, confidential and non-confidential information, and removal of Company portal, email, and file access from Contractor's personal devices.

(d)     If the Company terminates this Agreement for any reason other any stated in Section 6(b) and 6(c), the Company will compensate Contractor with a "Termination Payment" equal to thirty (30) days compensation calculated by the prorated SOW Fee at the time of Company initiated termination. Contractor will additionally be entitled to Tail-Period Commission Compensation as per the terms defined within Section 7 of this Agreement. The "Termination Payment" and Tail-Period Commission Compensation will only be due to Contractor upon the Contractor completing the return of all Company provided materials, tools, files, e-mails, confidential and non-confidential information, and removal of Company portal, email, and file access from Contractor's personal devices, in addition to any other return of information /materials and termination obligations defined within this and/or associated Bespoke agreements or policy manuals. In the event the Contractor and/or person or entity controlled by or in control of the Contractor is deemed to be in breach of this Agreement or associated agreements, Contractor shall not be eligible to receive any further compensation, remuneration, or consideration whatsoever.

(e)     If the Contractor terminates this Agreement prior to the 8th month from "Effective Date" of this Agreement, there will be NO Termination Payment" provided by Bespoke. Any remaining SOW Fee, and/or Tail-Period Commission Compensation due to the Contractor by the Company will be withheld and paid only upon the Contractor completing the return of all Company provided materials, tools, files, e-mails, confidential and non-confidential information, and removal of Company portal, email, and file access from Contractor's personal devices. In the event the Contractor and/or person or entity controlled by or in control of the Contractor is deemed to be in breach of this Agreement or associated agreements, Contractor shall not be eligible to receive any further compensation, remuneration, or consideration whatsoever.

2

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P'    INDEX NO. 651458/2023

NYSCEF DOC. NO. 11                                                    RECEIVED NYSCEF: 06/12/2023

(f)    If the Contractor terminates this Agreement prior to procuring $1 Million Dollars of Contracted Gross Income to Bespoke, from "Effective Date" of this Agreement there will be NO Termination Payment" provided by Bespoke. Any Tail-Period Commission Compensation due to the Contractor will be paid after a credit of $100,000 is reimbursed to Bespoke from income generated by the Company, collected from contract and/or commission payments for services performed for clients directly procured by the Contractor ("Tail-Period Clients"). After the $100,000 is reimbursed to Bespoke, the remaining Tail-Period Commission Compensation due to the Contractor will be paid in accordance with terms and conditions of this Agreement. Any remaining SOW Fee, and/or Tail-Period Commission Compensation due to the Contractor by the Company will be withheld and paid only upon the Contractor completing the satisfactory return of all Company provided materials, tools, files, e-mails, confidential and non-confidential information, and removal of Company portal, email, and file access from Contractor's personal devices.

(g)    In the event the Contractor and/or person or entity controlled by or in control of the Contractor is deemed to be in breach of this Agreement or associated agreements, Contractor shall not be eligible to receive any further compensation, remuneration, or consideration whatsoever.

**7.    Commission Compensation after Termination or Expiration:** Notwithstanding the terms and conditions of Section 6, the Company will pay Contractor for commission-based compensation specifically and only related to projects and listings that were directly procured by the Contractor, and are of "active", paying, and paid to date status with the Company at the time of termination. Any commissions paid during the Tail-Period will be paid to Contractor as per the payment terms and conditions defined within this and associated agreements with the Company.

(a)    **Contractor Procured and of Active Status "Direct Relationship" Single Family Listings:** (1) 50% of the commission compensation stated within Exhibit B for the duration of the specific listings term with the Company, and (2) 25% of the commission compensation stated within Exhibit B for a period of 12 months after any renewal or extension of the listing term with the Company from the effective date of termination or expiration.

(b)    **Contractor Introduced and of Active Status "New Development" Listings:** (1) 50% of the commission compensation stated within Exhibit B for the duration of the specific listings term with the Company, and (2) 25% of the commission compensation stated within Exhibit B for a period of 12 months after any renewal or extension of the listing term with the Company from the effective date of termination or expiration.

(c)    **Contractor Procured "Direct Relationship" Single Family Buyer Referral:** 75% of the commission compensation stated within Exhibit B in the event a transaction is facilitated with the Contractor referred buyer, and the Company is actually paid from the transaction.

(d)    **Contractor Introduced "New Development" Marketing Client"- Content Creation:** (1) 50% of the commission compensation stated within Exhibit B for the duration of the specific projects agreement term with the Company.

(e)    **Contractor Introduced "New Development" Marketing Client"- Ongoing Marketing Services:** (1) 50% of the commission compensation stated within Exhibit B for the duration of the specific projects agreement term with the Company.

(f)    If at any time during the Tail-Period Commission Compensation schedule, the Contractor and/or person or entity controlled by or in control of the previously contracted entity is deemed to be in breach of its non-disclosure and non-compete, non-circumvention and/or other restrictive covenants with the Company, Contractor shall not be eligible to receive any further compensation, remuneration, or consideration whatsoever and be liable to reimburse the Company upon demand, any and all SOW Termination Payments and Tail-Period Commissions received.

3

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P

NYSCEF DOC. NO. 11

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

(g)     Tail-Period Commission Compensation will only be applicable if (1) clients were directly procured by the Contractor, Company provided clients will not be included as Tail-Period Clients, (2) Tail-Period Clients were register upon termination of this Agreement by the Contractor in writing, and approved by Bespoke, (3) clients were of active status within a valid contract and/or agreement with Bespoke at the time of termination, (4) at the time of termination or expiration, the client was not in arears of any sort with Bespoke, and (5) client does not default from their agreement with the Company during the Tail-Period.

8.     **INDEPENDENT CONTRACTOR**. This Agreement shall not render Contractor an employee, partner, agent of, or joint venturer with Bespoke for any purpose. Contractor is and will remain an independent contractor in Contractor's relationship to Bespoke and Bespoke shall not (i) be responsible for withholding national, regional, local, state or other taxes or similar premiums or fees with respect to Contractor's compensation hereunder; (ii) make any insurance contributions for Contractor (or its employees, if applicable); or (iii) be responsible for any other payment on Contractor's (or its employees', if applicable) behalf whether similar or dissimilar to the foregoing. Contractor shall neither be entitled to nor have any claim against Bespoke hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, defined benefits, life insurance, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.  All amounts paid to Contractor hereunder shall constitute income from self-employment, and Contractor shall take sole responsibility for payment of any and all taxes and similar charges related thereto including, without limitation, Federal, state and local income and payroll taxes, social security and FICA, unemployment insurance, and workers' compensation. Contractor shall pay any taxes and insurance applicable to Contractor's engagement hereunder and shall bear sole responsibility if any taxing authority asserts that Contractor is not an independent contractor under this Agreement.

9.     **OWNERSHIP OF WORK PRODUCT**. The ownership of all work product and intellectual property rights such as trademarks, copyrights, brand names, registered designs and patents created by Contractor in the course of or related to Contractor's engagement (collectively, "Work Product") shall wholly and exclusively belong to Bespoke.  As a condition of Contractor's engagement, Contractor will be required to sign Bespoke's Confidential Information, Work for Hire and Covenant Agreement, a copy of which is attached.

10.     **RULES AND POLICIES**. Contractor's engagement shall be subject to all rules, regulations and policies of Bespoke as may be prescribed by Bespoke from time to time, including, but not limited to, Bespoke's anti-harassment and discrimination policy (the "Rules"). Bespoke may also add to, amend or terminate the Rules or any of the benefits applicable to Contractor's engagement or establish, suspend, or discontinue at its discretion any programs, including those devised to provide Contractor with gratuitous benefits.

11.     **CONFIDENTIALITY**. Any trade secrets, non-public or confidential information of whatever nature relating to Bespoke, its holding, subsidiary, affiliated or associated companies or their business, affairs, finance or customers, which Contractor shall prepare, receive, generate or obtain any time during Contractor's engagement with Bespoke, shall be the property of Bespoke.  Contractor shall use such trade secrets or confidential information only in the normal course of Contractor's engagement as directed by Bespoke and absolutely not for Contractor's private personal use or disclosure of the same to any third person whether for money, other consideration or otherwise any time during or after Contractor's engagement with Bespoke *provided* that this restriction shall not apply to information which may have come into the public domain otherwise than through the unauthorized disclosure by Contractor.  Upon termination of Contractor's engagement with Bespoke, Contractor must return immediately to Bespoke all property and documents belonging to Bespoke or relating to the business or affairs of any of Bespoke's holding, subsidiary, associated or affiliated companies. As a condition of Contractor's engagement, Contractor will be required to sign Bespoke's Confidential Information, Work for Hire and Covenant Agreement, a copy of which is attached.

4

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM                INDEX NO. 651458/2023

NYSCEF DOC. NO. 11                                                RECEIVED NYSCEF: 06/12/2023

12.    **REPRESENTATIONS AND WARRANTIES.** Contractor represents, warrants and covenants that: (i) Contractor is legally authorized to work in any jurisdiction in which Contractor will provide services to Bespoke, (ii) the parties are and shall be independent contractors to one another, (iii) nothing herein shall be deemed to cause this Agreement to create an agency, partnership, or joint venture between the parties, (iv) nothing herein shall be interpreted or construed as creating or establishing the relationship of employer and employee between Bespoke and Contractor, (v) Contractor shall perform Contractor's responsibilities hereunder in a professional manner with the highest level of care and skill, (vi) Contractor shall comply with all Rules, including, but not limited to, Bespoke's anti-harassment and discrimination policy, (vii) Contractor shall perform Contractor's responsibilities hereunder in a manner that does not infringe, or constitute an infringement or misappropriation of any patent, copyright, trademark, trade secret or other interest, proprietary or otherwise, of any individual or entity including, without limitation, any of Contractor's prior clients/employers, and (viii) the Work Product and any use and/or exploitation thereof shall not be improperly derived from any copyrighted or trade secret material or otherwise be subject to or infringe upon any patent, copyright, trademark, trade secret or other interest, proprietary or otherwise, of any individual or entity including, without limitation, any of Contractor's prior clients/employers. Contractor agrees to defend, indemnify and hold harmless Bespoke from and against all fines, penalties, taxes, legal fees, claims, damages, losses, liabilities and other costs arising out of or relating to any breach of the above representations and warranties.

13.    **GOVERNING LAW AND JURISDICTION.** All matters (in contract, tort or otherwise) arising out of, in connection with, or relating to this Agreement including, without limitation, the validity, interpretation, construction, performance, and enforcement of this Agreement, shall be governed, construed, and interpreted exclusively in accordance with the laws of the State of New York without giving effect to its conflicts or choice-of-law principles. The parties hereto irrevocably consent to the exclusive personal and subject matter jurisdiction of the federal and state courts located in the State of New York, County of New York, and to the exclusive venue of the United States District Court for the Southern District of New York and of the courts of the State of New York located in the County of New York. The parties hereby irrevocably waive any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement. Contractor agrees that any claim or lawsuit relating to Contractor's engagement with Bespoke must be filed no more than six (6) months after the date of the action that is the subject of the claim or lawsuit. Contractor agrees to waive any statute of limitations to the contrary.

14.    **RETURN OF PROPERTY.** Upon any termination of this Agreement, Contractor shall deliver to Bespoke all property, which is Bespoke's property or related to Bespoke's business (including keys, records, notes, data, memoranda, models, email, passwords and equipment) that is in Contractor's possession, custody or control. This includes an immediate in-person meeting with Bespoke management to affect the removal of any prior emails related to Bespoke from any/all devices of Bespoke and Contractor. This must be done prior to being paid any outstanding amounts due from the Company. In the event Contractor does not comply with any aspect of return of property, this non-compliance will be considered a material breach of this Agreement by Contractor, and will result in a forfeiture all owed compensation.

15.    **MISCELLANEOUS.** Contractor shall use the e-mail address provided by Bespoke (i) solely for business purposes, and (ii) for all electronic correspondence relating to Bespoke. All real estate business related electronic correspondence shall be conducted via Bespoke's email platform. This Agreement cannot be changed or terminated orally, and none of the terms hereof shall be deemed to be waived or modified except by an express agreement in writing signed by the party against whom such waiver or modification is sought to be enforced. No consent to either party to, or waiver of, a breach by either party, whether express or implied, will constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either party.

16.    This Agreement constitutes the entire agreement between the parties relating to the subject matter contained herein and terminates and supersedes all prior or contemporaneous

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
NYSCEF DOC. NO. 11                                          RECEIVED NYSCEF: 06/12/2023

representations, promises, warranties, covenants, undertakings, discussions, negotiations, and agreements, whether written or oral, other than those expressly contained in this Agreement. The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable, in whole or in part, the remaining terms and provisions shall be unimpaired and the unenforceable term or provision shall be replaced by such enforceable term or provision as comes closest to the intention underlying the unenforceable term or provision. This Agreement is the product of arms-length negotiations between parties knowledgeable of its subject matter that have had the opportunity to consult counsel concerning the terms and conditions of this Agreement prior to the execution hereof.

17.      Any rule of law that would require interpretation of any provision against the party responsible for its inclusion herein shall have no effect on the interpretation of this Agreement. The headings on each paragraph hereof are for convenience purposes only and shall not be used to construe the terms of this Agreement.

18.      This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile copy, or electronic copy in .pdf or similar format, of an executed counterpart shall be valid and have the same force and effect as an original.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**CONTRACTOR:**

By: _____
Name: Morlin Goldley          Date 4/4/19
Title:

**BESPOKE:**
Bespoke Luxury Marketing LLC

By: _____
Zachary Vichinsky          Date
Managing Member

**BESPOKE:**
Bespoke Real Estate LLC

By: _____
Zachary Vichinsky          Date
Managing Member

6

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023

NYSCEF DOC. NO. 11                                        RECEIVED NYSCEF: 06/12/2023

## EXHIBIT A- INDEPENDENT CONTRACTOR AGREEMENT

This is an Exhibit to the Independent Contractor Agreement (the "Agreement") dated as of April 1st 2019 (the "Effective Date"), by and between Bespoke Real Estate LLC, a New York limited liability company ("Bespoke Real Estate", and Bespoke Luxury Marketing LLC a limited liability company ("Bespoke Marketing") and together with Bespoke Real Estate, "Bespoke", "Company", or "BRE") having an office at 903 Montauk Highway, Water Mill New York 11976 and  H GOLD LLC, and Harlan Goldberg (together, "Contractor") having an address at  3330 NW 190TH ST APT 2410, Miami Florida 33180. This Exhibit shall be subject to, and incorporated in, the Agreement. In the event of any conflict between the terms of this Exhibit and the terms of the Agreement, the terms of this Exhibit shall control. Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Agreement.

**Duties:**   Independent Contractor acting as and in accordance as a Licensed Salesperson, Salesperson, agent, or Associate Broker.

1. Enhancement and management of the New Development Marketing and Sales Division of Bespoke.
2. Enhancement and management of the Bespoke Corporate Brokerage and Managed Services Business Model.
3. Enhancement and management onboarding Bespoke Marketing Projects.
4. Enhancement, management and Involvement in the lead generation, presentation, onboarding, and sales efforts for VIP Listings and Projects.
5. Work with principals to complete wire frame and action strategy in the creation of Bespoke's New Development Marketing and Sales Division.
6. Work with principals and Company members to implement and staff associated systems related to the New Development Division.
7. Work with Company to generate and implement the New Development Division specific marketing and branding strategy.
8. Work with principals and Company members to fine tune, enhance, expand lead generation /procurement systems to grow the Bespoke Portfolio of New Development, Individual High Value Resale, and Marketing projects within the specific segments and locations desired by the Company.
9. Continuously audit and enhance the budgets, systems, processes, roles, responsibilities, needs, and issues within the divisions under management.
10. Work with principals and Company members to wire frame and logistics related to expansion in additional core markets. (New Development- UHV Single Family Listings- Marketing Services)
11. Obligations related to the public facing elements of the divisions.
12. Enhancement and management of the processes related to the obtaining, onboarding, and managing Bespoke Marketing Projects.
13. Management and direct involvement in the lead generation, presentation, onboarding, and sales efforts for VIP Listings and New Development Projects.

**Compensation:**

1. Annual Contract SOW Fee: $150,000 (One Hundred Fifty Thousand Dollars)
   A. Your annual Contract SOW Fee will be paid in equal payments every Two (2) weeks, based on a 12-month calendar year. Bespoke reserves the right to make SOW Fee payments from any of its company or affiliated entity accounts, which will not void any aspect of your agreements with Company.
2. Commission Based Compensation will be paid as set forth on Exhibit B.
   A. Automatic Project and Listing Allocations Upon Agreement:
      Upon commencement of this Exhibit, Contractor will be entitled to compensation related to the following properties and projects as per the compensation terms defined

7

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM

NYSCEF DOC. NO. 11

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

within Exhibit B. The projects specified within this provision will not count towards any Portfolio Growth or Contractor Provided Gross Income Milestone Key Performance Indicators.

**I.    Bespoke Marketing: Consulting- Branding—Content Creation Clients:**
- Project:  Renegade – Remaining Contract Value: $50,625.00
- Project: IC Procured -Oil Nut Bay: Remaining Contract Value: $450,000.00

**II.    Ongoing Marketing Management Contract Clients:**
- Project: Renegade- Remaining Contract Value: $117,000.00
- Project: IC Procured OIl Nut Bay- Remaining Contract Value: $306,000.00
- Project: Half Moon Bay-: Monthly Term Gross Value- $25,000.00
- Project: William D' Agata: Remaining Contract Value: $27,000.00

**III.    New Development Listing Sales: Corporate Procured**
- Project: Oil Nut Bay
- Project: Half Moon

**IV.    Corporate Procured NYC High Value Single Family Listings:**
- 134 Charles Street NYC, Asking Price: $80,000,000 Completed- $50,000,000 "As - Is"
- Walker Tower PH 18A NYC- Asking Price: $28,000,000
- 56 East 66th Street, Upper East Side- Asking Price: $11,900,000

**Terms:** This Exhibit will continue until either party terminates this Exhibit and is subject to periodic review and amendment as required by Bespoke. The parties agree to formally review and agree upon revisions to the commission-based compensation terms one (1) year after the Effective Date. The Company reserves the rights to modify, revise, delete, or add to the provisions from time to time when, in its discretion, it determines it is appropriate. This Agreement is not intended to alter the at-will relationship between the Company and its Contractors.

1. **Real Estate Brokerage Commissions:** To receive commissions on deals involving Real Estate Brokerage Commissions, IC have a valid real estate license held with the appropriate Bespoke entity, unless otherwise legally permitted and approved by Bespoke.
2. **Reduced or Modified Commission Structures:** There may be circumstances that commission percentages will fluctuate, based on client needs and internal team goals. This will be discussed upfront with regard to the specific circumstance and client. All parties to this Exhibit will agree to reduced or modified commission splits in advance.
3. **Confidential Nature of Contractor Compensation**: The Compensation structure found in This Exhibit is to remain highly confidential. Disclosing this compensation structure can result in termination.
4. **Policy Adherence:** Contractor/Agent shall comply with all policies and rules in the Bespoke Company Handbook/Policy Manual.
5. **Company at is Sole Discretion Reserves the Rights To:**
   A. Elect to not take on a client procured by the Contractor.
   B. Elect to terminate an agreement with a client procured by the Contractor.
6. **Contractor Understands and Agrees to the Following:**
   A. Commission will be paid to Contractor within 10 business days after Bespoke deposits and receives, retainer payment from the client.
   B. Commission will only be paid on payments received, deposited, and cleared.
   C. In the event of partial payment, the commission due to Contractor will be associated to the amount of payment actually received.
   D. In the event a client goes into default on payment, and the Company elects to pursue legal actions to collect owed compensation from the client; the commission

8

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P

NYSCEF DOC. NO. 11

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

paid to the Contractor if payment is received by the Company will be based on the outstanding balance due to the Company minus the actual legal fees and expenses incurred by the Company for the collection of payment.

7. **Term Period for Exhibit B Commission Compensation:**

    A. The Term Period for the Contractor Commission based compensation will be 12 months from the effective date of This Exhibit, or upon Contractor generating $1 Million in Gross Revenue through Bespoke Services, whichever comes first. Contractor and Bespoke will review the commission schedule and conclude if a modification to the schedule is necessary based on factors of growth, procedure, divisional necessities and other factors. Any modifications to the commission-based schedule will be agreed upon in writing by both parties.

    B. Contractor and Bespoke may mutually elect to modify the commission and SOW fee at any point if necessary to benefit both parties. Any modifications to the compensation schedule will be agreed upon in writing by both parties.

8. **Counterparts.** This Exhibit may be executed in any number of counterparts as may be convenient or necessary, and it shall not be necessary that the signatures of all parties hereto be contained on any one counterpart hereof. Additionally, the parties hereto hereby covenant and agree that, for purposes of this Exhibit, (a) the signature pages taken from separate individually executed counterparts of this Exhibit may be combined to form multiple fully executed counterparts and (b) a facsimile or PDF signature shall be deemed to be an original signature. All executed counterparts of this Exhibit shall be deemed to be originals, but all such counterparts taken together shall constitute one and the same Exhibit.

IN WITNESS WHEREOF, the parties hereto have executed this Exhibit as of the day and year first above written.

**CONTRACTOR:**

By:_____
Harlan Goldberg          Date 4/4/19
Title:

**BESPOKE:**
Bespoke Luxury Marketing LLC

By:_____
Zachary Vichinsky          Date
Managing Member

**BESPOKE:**
Bespoke Real Estate LLC

By:_____
Zachary Vichinsky          Date
Managing Member

9

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023

NYSCEF DOC. NO. 11   RECEIVED NYSCEF: 06/12/2023

EXHIBIT B

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P...

NYSCEF DOC. NO. 11

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

## New Development and Marketing Platform

| Location | Milestone | Compensation | Compensation Method | Obligations |
|---|---|---|---|---|
| Partner-Growth New Development Listing (Approximate) or | NYC + FL | Every $100 Million in Portfolio Growth | $30,000.00 | Bonus Payments to IC 2% Min Listing Side Commission - Min 12 Month Term | Onboarding- High Level Ongoing Management |
| IC Introduced New Development Listing Sales | NYC+FL + | Sale Overrides Brokerage Transactions | 10% | Paid at 10% of 50% of the Gross Commission | Onboarding- High Level Ongoing Management |
| Corporate Procured New Development Listing Sales | NYC and FL + | Specific Transaction | 20% | Paid at 20% of 50% of the Gross Commission | Onboarding- High Level Ongoing Management |
| | NYC | Specific Transaction | 15% | Paid at 15% of 50% of the Gross Commission | Onboarding- High Level Ongoing Management |
| Corporate Procured- IC/Onboarded NYC Single Family Listing Sale | NYC | Specific Transaction | 30% | Paid or 30% of Gross Commission | Onboarding- High Level Ongoing Management |
| IC Direct Relationship Referral Listing Sale | NYC Hamptons | Specific Transaction | 35% | Paid on 35% of Gross Commission | Onboarding- High Level Ongoing Management |
| IC Direct Relationship Referral Buyer $50 Million + | NYC + Hamptons | | | | |

## Bespoke Marketing - Paid Services Marketing Platform:

| Location | Milestone | Compensation | Compensation Method | High Level Ongoing Client and Internal Management Obligations |
|---|---|---|---|---|
| IC Procured- Content Creation Services - Individual Project | Not Limited | Project Introduced by IC- Collected by IC Onboarded | 10% | Commission on Gross Payment Received- Paid as Bespoke is Paid by Client | Onboarded by an MD- Ongoing High Level Client and Internal Management Obligations |
| IC Procured- Content Creation (specific) Individual Projects | Not Limited | Projects Obtained by Corporate or Non IC Sales Team | 3% | Commission on Gross Payment Received- Paid as Bespoke is Paid by Client | High Level Ongoing Client and Internal Management Obligations |
| IC Procured New Development (specific) Project | Not Limited | Project Introduced by IC - Collected by IC Onboarded | 10% | Commission on Gross Payment Received- Paid as Bespoke is Paid by Client | Onboarding High Level Ongoing Client and Internal Management Obligations |
| IC Procured- Ongoing Month Management Service | Not Limited | Projects Obtained by Corporate or Non-IC Sales Team | 5% | Commission on Gross Payment Received- Paid as Bespoke is Paid by Client | Onboarding High Level Ongoing Client and Internal Management Obligations |
| Corporate Procured- Ongoing Month Management Service | Not Limited | | 5% | | |
| IC Procured Gross Income Generation KPI | Not Limited | $3,000,000+ in Direct Paid Services Commissions - 30% Fee | $50,000.00 | Increase of $50,000 Against the IC Annual SOW Fee | Paid Service Income generated by IC Direct Client Procurement |

Notes:

Bespoke Marketing "Paid Services KPI 45- First $3 Million

Bespoke Marketing #3+ Minus Contract 3 quarterd Marketing Spend Included in Monthly Retainer

Bespoke Marketing #5- Upon which IC Vendors are Retained and Paid next Door.

11

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
NYSCEF DOC. NO. 12                                        RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023
NYSCEF DOC. NO. 12   RECEIVED NYSCEF: 06/12/2023

EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is effective as of March 15th , 2021 by and between Bespoke Real Estate LLC (together with all of its direct and indirect affiliates and subsidiaries, collectively, "Employer", or  "Bespoke"), having an office at 903 Montauk Highway, Unit 1, Water Mill, New York, 11976 and Jarret Willis ("Employee" or "You"), having a residence at 92 Wainscott Hollow Road, Wainscott, NY 11975.

WHEREAS, Employer is engaged in the business of real estate and marketing; and

WHEREAS, Employee will commence full-time employment with Employer on March 15th ,2021 (the "Commencement Date"), provided that Employee clears Employer's background and reference checks.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.  EMPLOYMENT. Employer shall employ Employee as a Director of Referral and Collaboration Business Development.  Employee accepts and agrees to be employed on the terms and conditions set out in this Agreement and agrees to be subject to the general supervision, advice and direction of Employer and Employer's supervisory personnel. Employee shall perform all duties as are customarily performed by an employee in a similar position.  Employee shall also perform all other duties Employer may assign to Employee from time to time. Please see Exhibit A for description of work and division overview.

2.  COMPENSATION. Your annually starting salary will be US $75,000 (seventy-five thousand dollars) per year. Starting Salary will be reviewed in 74 (seventy-four) days for a reduction to US $50,000 (fifty thousand dollars) per year. In addition, you will be given a sign on bonus of $4,616.00 (four thousand six hundred and sixteen dollars).

    A.  Employee will be paid biweekly. Bespoke reserves the right to make compensation payments from any of its companies or affiliated entity accounts, which will not void any aspect of your employment agreement. Payment will be made by direct deposit.

    B.  In light of the nature of Employee's position with Employer, Employee will be exempt from overtime laws. Accordingly, Employee's annual salary will be Employee's total compensation for all hours that Employee works.

    C.  In addition, Refer to Exhibit B for Commission Compensation Mechanics.

3.  AT WILL. Employee's employment with Employer will be at-will, which means that either Employee or Employer may end it, at any time, for any reason or no reason.

4.  LOCATION. Employee's normal place of work will be as specified by Employer from time to time.

5.  CONFIDENTIAL INFORMATION AND OWNERSHIP OF WORK PRODUCT. The ownership of all work product and intellectual property rights such as trademarks, copyrights, brand names, registered designs and patents created by Employee in the course of or related to Employee's employment shall wholly and exclusively belong to Employer. As a condition of Employee's employment, Employee will be required to sign Employer's Confidential Information, Work for Hire and Covenant Agreement, a copy of which is attached.

6.  CONFLICT OF INTEREST. Employee shall not at any time during Employee's employment with Employer without the prior written consent of Employer engage, whether directly or indirectly, in any

Initial _____ Date _____   3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023
DocuSign Envelope ID: 75C1C2CA-67FC-4466-82    62CE0B4D2
NYSCEF DOC. NO. 12    RECEIVED NYSCEF: 06/12/2023

business or employment which is similar or in any way connected to or in competition with the business of Employer, its subsidiaries, affiliates, associates and joint ventures, or which may be considered by Employer in its entire unfettered opinion to impair Employee's capability to act at all times in the best interests of Employer.

7. RULES AND POLICIES. Employee's employment shall be subject to all rules, regulations and policies of Employer as may be prescribed by Employer from time to time, including, but not limited to, Employer's anti-harassment and discrimination policy (the "Rules"). Employer may also add to, amend or terminate the Rules or any of the benefits applicable to Employee's employment or establish, suspend, or discontinue at its discretion any programs, including those devised to provide Employee with gratuitous benefits.

8. DISCLAIMER OF INTEREST. Save and except any obligations Employee owes to Employer under this Agreement, Employer has neither made any comment nor put itself in any position to comment on any arrangement or restrictive covenant in connection with all of your prior employments as to your legal obligations, including but not limited to employment, commercial, tax and trust related obligations, owed by you to all individuals, companies, business associates or government authorities in any territory, as the case may be.

9. CONFIDENTIALITY. Any trade secrets, non-public or confidential information of whatever nature relating to Employer, its holding, subsidiary, affiliated or associated companies or their business, affairs, finance or customers, which you shall prepare, receive, generate or obtain any time during your employment with Employer, shall be the property of Employer. You shall use such trade secrets or confidential information only in the normal course of your employment as directed by your supervisors and absolutely not for your private personal use or disclosure of the same to any third person whether for money, other consideration or otherwise any time during or after your employment with Employer provided that this restriction shall not apply to information which may have come into the public domain otherwise than through the unauthorized disclosure by you. Upon termination of your employment with Employer, you must return immediately to Employer all property and documents belonging to Employer or relating to the business or affairs of any of Employer's holding, subsidiary, associated or affiliated companies. As a condition of Employee's employment, Employee will be required to sign Employer's Confidential Information, Work for Hire and Covenant Agreement, a copy of which is attached.

10. REPRESENTATIONS. Employee hereby represents, warrants and covenants that (i) Employee has only provided complete and accurate information to Employer (and has not withheld any material information) concerning Employee's qualifications for employment with Employer, (ii) Employee's acceptance and execution of this Agreement shall not constitute a breach under any other agreement Employee may have previously entered into, or otherwise limit the type of work that Employer may ask Employee to perform or the clients for whom Employer may ask Employee to render services (including, without limitation, any non-compete agreements or restrictive covenants Employee may have entered into with any of Employee's prior employers), and (iii) any materials Employee brings to Employer, whether electronic or otherwise, as well as the work product Employee prepares while working at Employer, shall not be improperly derived from any third party copyrighted or trade secret material, violate any confidentiality agreements Employee may have previously entered into (including, without limitation, with any of Employee's prior employers), or otherwise be subject to or infringe upon any proprietary right or interest of any third party. Employee agrees to defend, indemnify and hold Employer harmless against any claims that arise from a breach of the foregoing representations and warranties.

The terms included in this Agreement are as accurate as possible based on the information available to Employer at this time. Nonetheless, Employer must reserve the right to add to, modify or terminate any of Employer's policies at any time if Employer deems it necessary or appropriate.

Initial _____ Date _____    3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
NYSCEF DOC. NO. 12                                         RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: 75C1C2CA-87FC-4A66-82...   ...702CE0B4D2

This Agreement, and the offer of employment and terms contained herein, are contingent upon (i) any and all regulatory requirements, (ii) verification of all information Employee has submitted to Employer, (iii) Employee's consent to abide by all Employer policies, and (iv) verification of Employee's compliance with all of the foregoing representations and warranties.

Acceptance of this Agreement does not alter the at-will nature of Employee's employment with Employer and Employer reserves the right to terminate Employee's employment at any time, with or without cause.

11. GOVERNING LAW AND JURISDICTION. All matters (in contract, tort or otherwise) arising out of, in connection with, or relating to this Agreement including, without limitation, the validity, interpretation, construction, performance, and enforcement of this Agreement, shall be governed, construed, and interpreted exclusively in accordance with the laws of the State of New York without giving effect to its conflicts or choice-of-law principles. The parties hereto irrevocably consent to the exclusive personal and subject matter jurisdiction of the federal and state courts located in the State of New York, County of New York, and to the exclusive venue of the United States District Court for the Southern District of New York and of the courts of the State of New York located in the County of New York. The parties hereby irrevocably waive any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement. Employee agrees that any claim or lawsuit relating to Employee's employment with Employer must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. Employee agrees to waive any statute of limitations to the contrary.

12. EMPLOYEE'S INABILITY TO CONTRACT FOR EMPLOYER. Employee shall not have the right to make any contracts or commitments for or on behalf of Employer without first obtaining the express written consent of Employer.

13. RETURN OF PROPERTY. Upon any termination of this Agreement, Employee shall deliver to Employer all property, which is Employer's property or related to Employer's business (including keys, records, notes, data, memoranda, models, email, passwords, equipment, etc.) that is in Employee's possession, custody or control. This includes an immediate in-person meeting with Employer management to affect the removal of any prior emails related to Employer from any/all devices of Employer and Employee.

14. MISCELLANEOUS. Employee shall use the e-mail address provided by Employer (i) solely for business purposes, and (ii) for all electronic correspondence relating to Employer. All real estate business related electronic correspondence shall be conducted via Employer's email platform. This Agreement cannot be changed or terminated orally, and none of the terms hereof shall be deemed to be waived or modified except by an express agreement in writing signed by the party against whom such waiver or modification is sought to be enforced. No consent by either party to, or waiver of, a breach by either party, whether express or implied, will constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either party. This Agreement constitutes the entire agreement between the parties relating to the subject matter contained herein and terminates and supersedes all prior or contemporaneous representations, promises, warranties, covenants, undertakings, discussions, negotiations, and agreements, whether written or oral, other than those expressly contained in this Agreement. The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable, in whole or in part, the remaining terms and provisions shall be unimpaired and the unenforceable term or provision shall be replaced by such enforceable term or provision as comes closest to the intention underlying the unenforceable term or provision. This Agreement is the product of arms-length negotiations between parties knowledgeable of its subject matter that have had the opportunity to consult counsel concerning the terms and conditions of this Agreement prior to the execution hereof. Any rule of law that would require interpretation of any provision against the party responsible for its inclusion herein shall have no effect on the interpretation of this Agreement. The headings on each paragraph hereof are for convenience

3

Initial _____ Date_____   3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023
NYSCEF DOC. NO. 12                                                RECEIVED NYSCEF: 06/12/2023

purposes only and shall not be used to construe the terms of this Agreement.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A facsimile copy, or electronic copy in .pdf or similar format, of an executed counterpart shall be valid and have the same force and effect as an original.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Bespoke Real Estate LLC

By: *Zachary Vichinsky*
Name: Zachary Vichinsky
Title: Managing Member
Date: 3/16/2021 | 12:11 PM PDT

**Agreed To and Accepted By:**

Employee

By: _____
Name: Jarret Willis
Date: 3/16/2021 | 12:07 PM PDT

-You Must Initial and Date all Pages of this Agreement-

Initial ____ Date ____   3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P
NYSCEF DOC. NO. 12

INDEX NO. 651458/2023
RECEIVED NYSCEF: 06/12/2023

<u>Exhibit A- Description of Work and Referral Division Overview</u>

**Revised Date:** 3.11.2021
**Location:** All Regions and Location- Corporate Position

**Position:** Director of Referral and Collaboration Business Development
**Working Location:** Watermill Office/ Other

1. <u>Overview of Bespoke Referral and Collaborations Division:</u>

   A. **The Referral and Collaboration Division is specifically designed to enhance and grow referral-based relationships and income streams to the Bespoke company though the following methods:**
      - Unique Value Add Referral and Collaboration Programs- Designed for Luxury Brokerages and Agents
      - Seamless Documentation, Processing, Communication with Referral Agents
      - Unique Community and Culture and Benefits to participating Agents
      - Unique- Streamlined Content- Material- Engagement System to add Value to Internal and External Referral Agents
      - Elevated Referral Fees from Inception

   B. **Target Revenue Streams:**
      - **Outside Referral Agent Relationship Creation,** education related to Bespoke value adding elements, and growth.
         o Active Agents who refer Bespoke listings and buyers to manage and process in key markets Bespoke operates within.
         o Active Agents who bring bespoke onto their listings as collaboration, or co-exclusives for various benefit.
         o Active New Development Agents who provide Bespoke with exclusive overrides on high value units to promote to our community and network.
      - **Growth of Bespoke's Internal Referral Agent Affiliates-** (enrollment of strategically defined agents)
         o Non career agents who have their license and can drive referrals to Bespoke (e.g Jarrett- Heidi- Alex)
      - **Strategic Partnership Referral Brokers:** Regional Exclusive Partnership Programs with similar boutique brokerage firms that mandate or strongly encourage their agents to utilize Bespoke as a referral in key markets operated by Bespoke.

   C. **Collaborating Bespoke Divisions:**
      - Member Benefits
      - Buyer Services
      - Portfolio Management
      - Ongoing Marketing Management
      - Listing Procurement
      - Legal

3/16/2021 | 12:07 PM PDT
Initial_____ Date_____

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023
NYSCEF DOC. NO. 12    RECEIVED NYSCEF: 06/12/2023

DocuSign Envelope ID: 75CC7C2CA-87FC-4466-82...    ...02CE0B4B2...

2.  **Managing Director Role and Responsibilities:**
    A.  **Jarret Willis– Fundamental Obligations: -** "On the Business"
        - Ongoing collaboration to enhance the identity of the program
        - Ongoing collaboration to enhance existing/current suite of offerings
        - Ongoing collaboration to scale and improve company prospecting systems
        - Ongoing collaboration to scale production capabilities related t
        - Growth and management of the divisions production and assistance team
        - Ongoing collaboration regarding referral program member benefits

    B.  **Jarret Willis- General Sales Scope of Work:**
        - Introduction of Bespoke Referral and Collaboration Programs and offerings to target relationships
        - Complete management and oversight responsibilities of the upfront education process with prospective candidates.
        - Inquiry processing and first point of contact
        - Management and processing of prospective referrals though listing procurement
        - Management of referral fee structures and documentation with procured candidates
        - Identification and outreach to desired candidates
        - High level communication with active referral agents
        - Cross division business development efforts
        - Processing/management of onboarding new referral agents

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written. This agreement including individual and encompassing provisions detailed within, will supersede any associated or similar provisions, term, and or conditions defined within the "Prior Agreement" between the Employee/Contractor and the Company. Provisions, terms, and conditions, defined within the "Prior Agreement" that are unrelated to Employee/Contractors Scope of Work, Compensation, and or Commission payments will remain in full force and effect between the parties.

Bespoke Real Estate LLC
By: *Zachary Vichinsky*
    Name: Zachary Vichinsky
    Title: Managing Member
    Date: 3/16/2021  |  12:11 PM PDT


Agreed To and Accepted By:

Employee
By: _____
    Name: Jarret Willis
    Date: 3/16/2021  |  12:07 PM PDT

        -   You Must Initial and Date all Pages of this Agreement-

Initial ___ Date ___    3/16/2021  |  12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM       INDEX NO. 651458/2023
DocuSign Envelope ID: 75C7C2CA-67FC-44b6-62       62CE0b4D2
NYSCEF DOC. NO. 12                                    RECEIVED NYSCEF: 06/12/2023

Exhibit B

Commission Compensation Mechanics

**Division:** Bespoke Referral and Collaboration Division
**Contractor/ Lead Listing Manager:** Jarret Willis
**Region and Location:** All Markets
**Commission Segment:** Listing and Buyer Referral Procurement

1. **Division Procured Referral Sales Commission Override Compensation:** (Global Bespoke Key Markets)
   A. **Out of Bespoke Agent Referral - (Listing or Buyer):** 10%
   B. **Internal Agent at Bespoke- Direct Relationship Referral - (Listing or Buyer):** 10%
   C. **Internal Agent at Bespoke- Indirect Relationship Referral-(Listing or Buyer):** 5%
      I. **Detail:** Commission paid from Net Income collected by the company, as related to the specific transaction which occurred from the referral to the Company.

2. **J.W- Direct Relationship Referral Commission Compensation:** (Within Bespoke Key Market)
   A. **JW Direct Relationship Listing Referral- (Any Bespoke Key Market):** 30.0%
   B. **JW Direct Relationship Buyer Referral- (Any Bespoke Key Market):** 35.0%
   C. **Detail:** J.W Direct Relationship Referral into a Bespoke Market- to a Bespoke PM to Process
      I. Hamptons
      II. NYC
      III. South Florida/Palm Beach/Miami

3. **J.W/Division Out of Bespoke Referrals:** (Out of Bespoke)
   A. **J.W Direct Relationship Referral:**
      I. *Minimum Gross Referral Amount from Recipient Broker to Bespoke:* 25% of Listing Side Commission
      II. *Split with Bespoke for Referrals:* 70% to Contractor and 30% to Bespoke.
   B. *Referral and Collaborations Division Out of Bespoke Managed Referral:*
      I. *Detail:* Internal Agent Referral- Processed- Managed by Bespoke Referral and Collaborations
      II. *Minimum Gross Referral Amount from Recipient Broker to Bespoke:* 20% of Listing Side Commission
      III. *Division Override of Referral Commission Collected: Referrals:* 3%

4. **J.W Division Growth -KPI Milestone Bonus Payments:**
   A. **New- Bespoke (Internal) Referral Agent Licenses Obtained:** Per (20) Licenses- Bonus: $20,000
      • **Note:** Existing relationship referral agents procured by principals are not included in KPI
   B. **Milestone of Referral Agent Listings Obtained and Sold (Volume):** $30,000 Per $100M in Listing Referral Generated Sales from Referral Agents

Initial ___ Date ___     3/16/2021  |  12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023

NYSCEF DOC. NO. 12   RECEIVED NYSCEF: 06/12/2023

DocuSign Envelope ID: 75C1C2CA-67FC-4400-82...   ...02CE6B4D2

<u>-Exhibit B Continued- General Provisions-</u>

1. <u>Term Period for Exhibit B Compensation:</u>
   a) The Term Period for the Employee Commission based compensation will be 12 months from the effective date of this agreement. Employee and Bespoke will review the commission schedule and conclude if a modification to the schedule is necessary based on factors of growth, procedure, divisional necessities, and other factors. Any modifications to the commission-based schedule will be agreed upon in writing by both parties.
   b) Employee and Bespoke may mutually elect to modify the commission and SOW fee at any point if necessary, to benefit both parties. Any modifications to the compensation schedule will be agreed upon in writing by both parties.
   c) Bespoke reserves the right to make salary payments from any of its company or affiliated entity accounts, which will not void any aspect of your employment agreement.

2. <u>Buyers Service Division -Miscellaneous:</u>
   a) **Case by Case Circumstances:** Given the unique nature of the business and information accessible to the associated divisions, the company may allocate deal specific modifications based on specific individual's attribution to a specific transaction or lead/concept/idea generation.
   b) **Communication:** Internal Communication will be necessary related to overlap of employee/Contractor referrals in the event the company or another Company Contractor already has a relationship or activity with the prospect.
   c) **Commission Side Definition:** Commission Rates as defined above are based on the NET Commission Received for the Selling Side Transaction only.
   d) **NET Commission Definition:** Is defined as the Gross Commission Received minus any sale specific owed external referral fees, and Bespoke provided capital to assist with Buyers sale transaction (transportation, accommodations, professional fees etc.)

3. <u>Listing Management and Sales Division-Miscellaneous:</u>
   a) **Commission Side Definition:** Commission Rates as defined above are based on the NET Commission Received for the Listing Side Transaction only.
   b) **NET Commission Definition:** Is defined as the Gross Commission Received minus any sale specific owed external referral fees, and 14% marketing cost recapture by the Company.
   c) **Starting Period-Division Portfolio Commission Override:** Gross Commission Income that is In-Contract status at the time this agreement is fully executed, or in active negotiation will not be included in the compensation structure defined within.

4. <u>General Provisions:</u>
   a) **Real Estate Brokerage Commissions:** To receive commissions involving Real Estate Brokerage Commissions, Employee/Contractor must have a valid real estate license held with the appropriate Bespoke entity, unless otherwise legally permitted and approved by Bespoke.
   b) **Reduced or Modified Commission Structures:** There may be circumstances where Property/Deal Specific Gross Commission percentages will fluctuate in order to complete a Real Estate transaction. The company reserves the right to reduce commission associated to the Listing or Buyer Side of Company Provided and Allocated Clients at its sole discretion, which may result in a gross reduction of Employee/Contractors associated commission split to the transaction.
      I. Any commission reduction associated to a pending transaction between a Company Allocated Listing and Company Buyer will result in the gross commission reduction being equally applied between the listing and selling side of the transaction.
      II. **Employee/Contractors Deal Specific Commission Reductions:** Employee/Contractor must obtain written approval from management to reduce a commission on a Employee/Contractor Direct Relationship Listing or Buyer.

Initial [JW]  Date _____  3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
DocuSign Envelope ID: 79C1C2CA-87FC-4460-82          :02CE6B4D2
NYSCEF DOC. NO. 12                                    RECEIVED NYSCEF: 06/12/2023

 

    c) **Confidential Nature of Employee/Contractor Compensation**: The Compensation structure found in this agreement is to remain highly confidential. Disclosing this compensation structure can result in termination.

    d) **Policy Adherence:** Employee shall comply with all policies and rules in the Bespoke Company Handbook/Policy Manual.

    e) **Listing and Buyer Client Transactional Expenses:** Bespoke will provide Management approved expenses associated to potential and or pending buyer and listing side transactions in an effort to increase the probability of sale. In the event of sale, the company will recoup all provided expenses from the transaction from the collected commission. Employee/Contractor will be paid their associated commission split as defined within this Agreement from the NET amount after expenses and other applicable and stated company expense recapture is deducted.

    f) **Direct and Indirect Referrals from Employee/Contractor:** Employee/Contractor must process referrals according to company policy, through the internal tracking system to documents and confirm Employee/Contractors allocation of procured and or provided referrals or direct relationship listings and buyer clients. In the event employee/Contractor does not process direct relationship clients or referrals prior to the listing being onboarded, or Clients offer and acceptance to purchase a property, Employee/Contractor will receive the commission split as defined as a Company Client-Fully allocated to Employee/Contractor.

    g) **Company at is Sole Discretion Reserves the Rights To:**

        I.   Elect to not take on a Referral Agent, referral from any agent, any client, or listing procured by the employee/contractor.

        II.   Elect to terminate an agreement at any time with a client procured by the employee/contractor.

5. **Contractor Understands and Agrees to the Following:**

    a) Commission will be paid to employee/contractor within 15 business days after Bespoke receives commission from a transaction.

    b) Rental Commissions due to employee/Contractor will be paid the within the 2nd week of every month.

    c) In the event of partial payment, the commission due to employee/Contractor will be associated to the amount of payment received.

    d) In the event a client goes into default on payment, and the company elects to pursue legal actions to collect owed compensation from the client; the commission paid to the employee/contractor if payment is received by the company will be based on the outstanding balance due to the company minus the actual legal fees and expenses incurred by the company for the collection of payment.

 

       -   Intentionally left blank  -

 

Initial _____ Date _____    **3/16/2021 | 12:07 PM PDT**

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P   INDEX NO. 651458/2023
DocuSign Envelope ID: 75C1C2CA-87FC-44B6-82   B2CE0B4D2
NYSCEF DOC. NO. 12                              RECEIVED NYSCEF: 06/12/2023

**Counterparts**. This Agreement may be executed in any number of counterparts as may be convenient or necessary, and it shall not be necessary that the signatures of all parties hereto be contained on any one counterpart hereof. Additionally, the parties hereto hereby covenant and agree that, for purposes of this Agreement, (a) the signature pages taken from separate individually executed counterparts of this Agreement may be combined to form multiple fully executed counterparts and (b) a facsimile or PDF signature shall be deemed to be an original signature.  All executed counterparts of this Agreement shall be deemed to be originals, but all such counterparts taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written. This agreement including individual and encompassing provisions detailed within, will supersede any associated or similar provisions, term, and or conditions defined within the "Prior Agreement" between the Employee/Contractor and the Company. Provisions, terms, and conditions, defined within the "Prior Agreement" that are unrelated to Employee/Contractors Scope of Work, Compensation, and or Commission payments will remain in full force and effect between the parties.

Bespoke Real Estate LLC

By: *Zachary Vichinsky*
    Name: Zachary Vichinsky
    Title: Managing Member
    Date: 3/16/2021 | 12:11 PM PDT

Agreed To and Accepted By:

Employee

By: _____
    Name: Jarret Willis
    Date: 3/16/2021 | 12:07 PM PDT

-   You Must Initial and Date all Pages of this Agreement  -

iii

Initial ___ Date ___   3/16/2021 | 12:07 PM PDT

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023

NYSCEF DOC. NO. 13                                        RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 3

☐ CORRECTED (if checked)

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>Bespoke Real Estate Florida LLC<br><br>2121 N Bayshore Dr Apt 1102<br>Miami FL 33137 | OMB No. 1545-0116<br><br>**2021**<br><br>Form **1099-NEC** | **Nonemployee Compensation** |
|---|---|---|

| PAYER'S TIN ▇2548 | RECIPIENT'S TIN ▇4077 | **1** Nonemployee compensation<br>$ 230848.51 | **Copy B** |
|---|---|---|---|

| RECIPIENT'S name and address<br>H Gold LLC<br><br>3201 NE 183rd, Apt 404<br>Aventura FL 33160 | **2** Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale ☐ | **For Recipient**<br><br>This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | **3** | |
| | **4** Federal income tax withheld | |
| Account number (see instructions) | **5** State tax withheld<br>$<br>$ | **6** State/Payer's state no. | **7** State income<br>$<br>$ |

Form **1099-NEC**         (keep for your records)            www.irs.gov/Form1099NEC         Department of the Treasury - Internal Revenue Service
DXA

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>Bespoke Real Estate Florida LLC<br><br>2121 N Bayshore Dr Apt 1102<br>Miami FL 33137 | OMB No. 1545-0116<br><br>**2021**<br><br>Form **1099-NEC** | **Nonemployee Compensation** |
|---|---|---|

| PAYER'S TIN ▇2548 | RECIPIENT'S TIN ▇4077 | **1** Nonemployee compensation<br>$ 230848.51 | **Copy 2** |
|---|---|---|---|

| RECIPIENT'S name and address<br>H Gold LLC<br><br>3201 NE 183rd, Apt 404<br>Aventura FL 33160 | **2** Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale ☐ | **To be filed with recipient's state income tax return, when required.** |
| | **3** | |
| | **4** Federal income tax withheld | |
| Account number (see instructions) | **5** State tax withheld<br>$<br>$ | **6** State/Payer's state no. | **7** State income<br>$<br>$ |

Form **1099-NEC**                                www.irs.gov/Form1099NEC         Department of the Treasury - Internal Revenue Service
DXA

## Instructions for Recipient

You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare tax.

If you believe you are an employee and cannot get the payer to correct this form, report this amount on the line for "Wages, salaries, tips, etc" of Form 1040, 1040-SR, or 1040-NR. You must also complete Form 8919 and attach it to your return. For more information, see Pub. 1779, Independent Contractor or Employee.

If you are not an employee but the amount in this box is not self-employment (SE) income (for example, it is income from a sporadic activity or a hobby), report this amount on the "Other income" line (on Schedule 1 (Form 1040)).

**Recipient's taxpayer identification number (TIN).** For your protection, this form may show only the last four digits of your TIN (social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN)). However, the issuer has reported your complete TIN to the IRS.

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**Box 1.** Shows nonemployee compensation. If the amount in this box is SE income, report it on Schedule C or F (Form 1040) if a sole proprietor, or on Form 1065 and Schedule K-1 (Form 1065) if a partnership, and the recipient/partner completes Schedule SE (Form 1040).

**Note:** If you are receiving payments on which no income, social security, and Medicare taxes are withheld, you should make estimated tax payments. See Form 1040-ES (or Form 1040-ES (NR)). Individuals must report these amounts as explained in these box 1 instructions. Corporations, fiduciaries, and partnerships must report these amounts on the appropriate line of their tax returns.

**Box 2.** If checked, consumer products totaling $5,000 or more were sold to you for resale, on a buy-sell, a deposit-commission, or other basis. Generally, report any income from your sale of these products on Schedule C (Form 1040).

**Box 3.** Reserved for future use.

**Box 4.** Shows backup withholding. A payer must backup withhold on certain payments if you did not give your TIN to the payer. See Form W-9, Request for Taxpayer Identification Number and Certification, for information on backup withholding. Include this amount on your income tax return as tax withheld.

**Boxes 5-7.** State income tax withheld reporting boxes.

**Future developments.** For the latest information about developments related to Form 1099-NEC and its instructions, such as legislation enacted after they were published, go to www.irs.gov/Form1099NEC.

**Free File.** Go to www.irs.gov/FreeFile to see if you qualify for no-cost online federal tax preparation, e-filing, and direct deposit or payment options.

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023

NYSCEF DOC. NO. 14   RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 4

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM                 INDEX NO. 651458/2023

NYSCEF DOC. NO. 14                                          RECEIVED NYSCEF: 06/12/2023

2:12 ✈



Lisa ›

Wed, Aug 17, 10:34 AM

Happpy birthday you nigger!!!! Love and miss ya xoxoxo



Fri, Sep 2, 11:48 AM

U working

I have been working 7 days a week since May. Not a single day off so YES! What's cooking?

So black

lol jk I just passed your store

I miss you

VERY!!!

You have crazy plans this weekend

Unfortunately 

I hope I die in the process just so I can sleep

iMessage

          

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM

NYSCEF DOC. NO. 15

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 5

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023

NYSCEF DOC. NO. 15    RECEIVED NYSCEF: 06/12/2023





The orange shirt really makes you look like an inmate

Kinda scared

Lmao so Niggerish

I have ur card here

Want me to mail or you'll pick up?



FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023
NYSCEF DOC. NO. 16                                       RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 6

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023
NYSCEF DOC. NO. 16                                                                RECEIVED NYSCEF: 06/12/2023



Can you call me please?

Not now. Showings.

Ok. Should I call him?

Oct 27, 2017 at 5:26 PM

Please call me after you speak to Dan.

No shit squigga



FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023
NYSCEF DOC. NO. 17                                   RECEIVED NYSCEF: 06/12/2023

# EXHIBIT 7

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
NYSCEF DOC. NO. 17                                        RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

**CO-BROKER AGREEMENT**

**PROJECT:** Waldorf Astoria Residences Miami          **UNIT NO:** 8802 ("Unit")

**UNIT PURCHASE PRICE:** $9,000,000.00

**PURCHASER:** Steven Vogel & Caroline Vogel

**COOPERATING BROKER COMPANY:** BESPOKE REAL ESTATE FLORIDA LLC
("CooperatingBroker")

**COOPERATING AGENT** *(print name)* Harlan Goldberg          ("Cooperating Agent")

**PMG RESIDENTIAL, LLC** ("Listing Broker"), Cooperating Broker and Cooperating Agent, agree as follows as to the purchase and sale of the Unit in the Project developed by **PMG DOWNTOWN DEVELOPERS, LP** ("Owner"):

1. Subject to Cooperating Broker and/or Cooperating Agent's registration of Purchaser for the above-referenced Unit within the past ninety (90) days and involvement as participating broker/agent in connection with the above real estate transaction, Cooperating Broker shall be entitled to a total commission for the sale of the Unit to Purchaser in the amount of 8 % of the total Unit Purchase Price (the "Commission") as set forth in the purchase and sale agreement executed by Purchaser andOwner (the "PSA").

   In accordance with the aforementioned, the Commission shall be paid as follows:

   a. Pre-Groundbreaking PSA's:

      i. 50% of the Commission shall be earned only upon the later of (x) the closing of Owner's construction loan with respect to the Project ("Groundbreaking") and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 20% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

      ii. 50% of the Commission shall be earned only upon the later of (x) one (1) year following Groundbreaking and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equalto or exceeding 30% of the purchase price set forth in the applicable PSA,and shall be payable thirty (30) days after the later to occur of (x) and (y);

   b. Post-Groundbreaking PSA's:

      i. 100% of the Commission shall be earned only upon the later of (x) the expiration of the 15-day rescission period with respect to the applicable purchase and sale agreement; and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 30% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023

NYSCEF DOC. NO. 17

DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

RECEIVED NYSCEF: 06/12/2023

2. **OTHER SALES TRANSACTIONS.** This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker for any prospective purchaser at the Project other than for Purchaser's purchase of the Unit. Such an obligation may only be pursuant to a written agreement in a form acceptable to Listing Broker in its sole discretion. Listing Broker reserves the right in its sole and absolute discretion to modify the terms under which it agrees to pay Cooperating Broker commissions. Neither Cooperating Broker nor Cooperating Agent may rely upon the terms of this agreement for any transaction other than the one specifically involving the Purchaser during the effective term of this registration. This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker in the event Purchaser purchases a unit in the Project which is not listed with Listing Broker.

3. **INDEMNIFICATION.** Cooperating Broker and Cooperating Agent jointly and severally agree to indemnify and hold Listing Broker and Owner harmless from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind including reasonable attorneys' fees and costs and appellate fees and costs relating to or arising out of any claims against Listing Broker and/or Owner as a result of any representation / or other conduct by either of them which are made or done without the express written consent of Listing Broker and Owner.

4. **NO INDUCEMENTS.** Neither Cooperating Broker or Cooperating Agent shall pay or offer to any person a referral fee, rebate, bonus gratuity, commission or other form of compensation or consideration, for the purchase by Purchaser of a unit at the Project, without the prior written consent of the Owner and the Listing Broker.

5. **CONFIDENTIALITY.** The registration forms, mailing lists, purchaser lists and other records of prospective or actual purchasers are proprietary to Listing Broker and/or Owner and are confidential trade secrets. Cooperating Broker and Cooperating Agent are not entitled to review the contents of any of the foregoing. Cooperating Broker and Cooperating Agent agree not to enter into any negotiations directly or indirectly with any purchaser at the Project or prospective purchaser deemed registered to Listing Broker regarding the reservation, purchaser, lease and or option of the Project, except with the direct participation or express prior written approval of Listing Broker.

6. **ATTORNEYS' FEES AND COSTS.** In the event of any litigation arising from this Agreement, the prevailing party shall be entitled to reimbursement from the other party of all reasonable attorneys' fees and cost associated with such matter at the pretrial, trial and appellate levels.

7. **COMPLIANCE WITH LAWS AND RULES.** Cooperating Broker and Cooperating Agent agree to comply, abide and be bound by all laws, rules, regulations and codes of ethics promulgated or adopted by any state or local authority or board realtors regulating the conduct of real estate brokers and salespersons and the payment of real estate commissions. In addition, Cooperating Broker and Cooperating Agent shall not interfere with Listing Broker's employee's performance or duty of loyalty to Listing Broker and/or the Owner. Further, and unless Cooperating Broker and Cooperating Agent notify Listing Broker in writing of their respective exclusion from the requirement for such licensure upon execution of this Agreement, Cooperating Broker and Cooperating Agent represent and warrant that their respective applicable Real Estate Licenses are current and in good standing and that they will maintain such status at all times material to this Agreement.

8. **RELEASE:** Simultaneously with delivery of the amount(s) provided for in paragraph 1, Cooperating Broker and Cooperating Agent shall provide Listing Broker with a Full General Release in favor of Owner and Listing Broker as to the amount(s) delivered. The Release provided for herein shall be on

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023

NYSCEF DOC. NO. 17                                    RECEIVED NYSCEF: 06/12/2023

DocuSign Envelope ID: FB602F90-52AB-4830-81b9-A42F7429DEAA

a form prepared by and acceptable to Listing Broker within its sole discretion.

9. **DEFAULT BY COOPERATING BROKER.** If either Cooperating Broker or the Cooperating Agent violates any of the terms or conditions of this agreement or fails to fully and completely participate as needed throughout the transaction giving rise to the commission set forth herein, Listing Broker shall have the right, in its sole and absolute discretion to do any one or more of the following:

   a. Not pay any commission to Cooperating Broker or Cooperating Agent for any transaction involving the Purchaser;

   b. Not pay any commission to Cooperating Broker or Cooperating Agent for any other transaction(s) (whether involving the Purchaser or not) in which Cooperating Broker is a Cooperating Broker; and

   c. Refuse to recognize Cooperating Broker and Cooperating Agent as a Cooperating Broker for any future transactions (whether involving the Purchaser or not) in which the Listing Broker is involved.

10. **EXECUTION BY COOPERATING BROKER AND COOPERATING AGENT.** The execution of this agreement by Cooperating Agent shall be deemed to bind both the Cooperating Agent and the Cooperating Broker to the terms and conditions hereof. Notwithstanding the foregoing, this Agreement is not enforceable by Cooperating Agent or Cooperating Agent unless executed by both Listing Broker and Cooperating Broker.

11. **REJECTION OF PSA BY OWNER.** In the event that Owner, it its sole discretion, rejects the PSA, no commission shall be due to Cooperating Agent or Cooperating Broker.

12. Cooperating Agent acknowledges that s/he registered the Purchaser's name with the Project on behalf of Cooperating Broker. By registering the Purchaser's name on the form and by executing a copy of same, Cooperating Agent on behalf of itself and the Cooperating Broker acknowledges that he/she has read the terms and conditions of the Cooperating Broker Commission Agreement contained herein and agrees to abide and be bound thereby.

13. **CERTIFICATION BY COOPERATING BROKER and COOPERATING AGENT.** Cooperating Broker and Cooperating Agent hereby certify to Owner that each neither has nor will rebate, refund or otherwise credit to or for the benefit of Listing Broker or any agent or employee of Listing Broker any portion of the Commission. Further, Cooperating Broker and Cooperating Agent hereby agree that neither will look to Owner for enforcement of this Agreement or collection of the Commission provided for herein and that they will solely look to Listing Broker for same.

14. **ENTIRE AGREEMENT.** This Agreement sets for the entire agreement between Listing Broker and Cooperating Agent and shall not be altered, modified or amended, unless in writing and signed by all the parties hereto.

*[signatures on the following page]*

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM          INDEX NO. 651458/2023
NYSCEF DOC. NO. 17                                        RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: FB602F90-52AB-4830-81b5-A42F7429DEAA

**PROJECT:** Waldorf Astoria Residences Miami                    **UNIT NO:** 8802

**PURCHASE PRICE: $** 9,000,000.00

**PURCHASER:** Steven Vogel & Caroline Vogel

**LISTING BROKER:**                          **COOPERATING BROKER:**

**PMG RESIDENTIAL, LLC**                     **BESPOKE REAL ESTATE FLORIDA LLC**

By: _Rodrigo Pintos_                         By: _Kathleen Shadley_

Name: Rodrigo Pintos                         Cooperating Broker's Signature
                                             Licensed Real Estate Broker

Title:    Qualifying Broker                  Name: Kathleen Shadley

Date:    3/1/2022                            Title: Qualifying Broker

                                             Date: 2/7/2022 | 11:37 AM PST

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM   INDEX NO. 651458/2023
NYSCEF DOC. NO. 17   RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

**CO-BROKER AGREEMENT**

**PROJECT:** Waldorf Astoria Residences Miami        **UNIT NO:** PH 102 ("Unit")

**UNIT PURCHASE PRICE:** $17,000,000.00

**PURCHASER:** Steven Vogel & Caroline Vogel

**COOPERATING BROKER COMPANY:** BESPOKE REAL ESTATE FLORIDA LLC ("CooperatingBroker")

**COOPERATING AGENT** *(print name)* Harlan Goldberg ("Cooperating Agent")

**PMG RESIDENTIAL, LLC** ("Listing Broker"), Cooperating Broker and Cooperating Agent, agree as follows as to the purchase and sale of the Unit in the Project developed by **PMG DOWNTOWN DEVELOPERS, LP** ("Owner"):

1. Subject to Cooperating Broker and/or Cooperating Agent's registration of Purchaser for the above-referenced Unit within the past ninety (90) days and involvement as participating broker/agent in connection with the above real estate transaction, Cooperating Broker shall be entitled to a total commission for the sale of the Unit to Purchaser in the amount of 7 % of the total Unit Purchase Price (the "Commission") as set forth in the purchase and sale agreement executed by Purchaser and Owner (the "PSA").

   In accordance with the aforementioned, the Commission shall be paid as follows:

   a.   Pre-Groundbreaking PSA's:

      i.   50% of the Commission shall be earned only upon the later of (x) the closing of Owner's construction loan with respect to the Project ("Groundbreaking") and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 20% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

      ii.  50% of the Commission shall be earned only upon the later of (x) one (1) year following Groundbreaking and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 30% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y);

   b.   Post-Groundbreaking PSA's:

      i.   100% of the Commission shall be earned only upon the later of (x) the expiration of the 15-day rescission period with respect to the applicable purchase and sale agreement; and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 30% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P

NYSCEF DOC. NO. 17

DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

2. **OTHER SALES TRANSACTIONS.** This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker for any prospective purchaser at the Project other than for Purchaser's purchase of the Unit. Such an obligation may only be pursuant to a written agreement in a form acceptable to Listing Broker in its sole discretion. Listing Broker reserves the right in its sole and absolute discretion to modify the terms under which it agrees to pay Cooperating Broker commissions. Neither Cooperating Broker nor Cooperating Agent may rely upon the terms of this agreement for any transaction other than the one specifically involving the Purchaser during the effective term of this registration. This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker in the event Purchaser purchases a unit in the Project which is not listed with Listing Broker.

3. **INDEMNIFICATION.** Cooperating Broker and Cooperating Agent jointly and severally agree to indemnify and hold Listing Broker and Owner harmless from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind including reasonable attorneys' fees and costs and appellate fees and costs relating to or arising out of any claims against Listing Broker and/or Owner as a result of any representation / or other conduct by either of them which are made or done without the express written consent of Listing Broker and Owner.

4. **NO INDUCEMENTS.** Neither Cooperating Broker or Cooperating Agent shall pay or offer to any person a referral fee, rebate, bonus gratuity, commission or other form of compensation or consideration, for the purchase by Purchaser of a unit at the Project, without the prior written consent of the Owner and the Listing Broker.

5. **CONFIDENTIALITY.** The registration forms, mailing lists, purchaser lists and other records of prospective or actual purchasers are proprietary to Listing Broker and/or Owner and are confidential trade secrets. Cooperating Broker and Cooperating Agent are not entitled to review the contents of any of the foregoing. Cooperating Broker and Cooperating Agent agree not to enter into any negotiations directly or indirectly with any purchaser at the Project or prospective purchaser deemed registered to Listing Broker regarding the reservation, purchaser, lease and or option of the Project, except with the direct participation or express prior written approval of Listing Broker.

6. **ATTORNEYS' FEES AND COSTS.** In the event of any litigation arising from this Agreement, the prevailing party shall be entitled to reimbursement from the other party of all reasonable attorneys' fees and cost associated with such matter at the pretrial, trial and appellate levels.

7. **COMPLIANCE WITH LAWS AND RULES.** Cooperating Broker and Cooperating Agent agree to comply, abide and be bound by all laws, rules, regulations and codes of ethics promulgated or adopted by any state or local authority or board realtors regulating the conduct of real estate brokers and salespersons and the payment of real estate commissions. In addition, Cooperating Broker and Cooperating Agent shall not interfere with Listing Broker's employee's performance or duty of loyalty to Listing Broker and/or the Owner. Further, and unless Cooperating Broker and Cooperating Agent notify Listing Broker in writing of their respective exclusion from the requirement for such licensure upon execution of this Agreement, Cooperating Broker and Cooperating Agent represent and warrant that their respective applicable Real Estate Licenses are current and in good standing and that they will maintain such status at all times material to this Agreement.

8. **RELEASE:** Simultaneously with delivery of the amount(s) provided for in paragraph 1, Cooperating Broker and Cooperating Agent shall provide Listing Broker with a Full General Release in favor of Owner and Listing Broker as to the amount(s) delivered. The Release provided for herein shall be on

FILED: NEW YORK COUNTY ~ERK 06/12/2023 11:39 P'

NYSCEF DOC. NO. 17

DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

a form prepared by and acceptable to Listing Broker within its sole discretion.

9. **DEFAULT BY COOPERATING BROKER.** If either Cooperating Broker or the Cooperating Agent violates any of the terms or conditions of this agreement or fails to fully and completely participate as needed throughout the transaction giving rise to the commission set forth herein, Listing Broker shall have the right, in its sole and absolute discretion to do any one or more of the following:

   a. Not pay any commission to Cooperating Broker or Cooperating Agent for any transaction involving the Purchaser;

   b. Not pay any commission to Cooperating Broker or Cooperating Agent for any other transaction(s) (whether involving the Purchaser or not) in which Cooperating Broker is a Cooperating Broker; and

   c. Refuse to recognize Cooperating Broker and Cooperating Agent as a Cooperating Broker for any future transactions (whether involving the Purchaser or not) in which the Listing Broker is involved.

10. **EXECUTION BY COOPERATING BROKER AND COOPERATING AGENT.** The execution of this agreement by Cooperating Agent shall be deemed to bind both the Cooperating Agent and the Cooperating Broker to the terms and conditions hereof. Notwithstanding the foregoing, this Agreement is not enforceable by Cooperating Broker or Cooperating Agent unless executed by both Listing Broker and Cooperating Broker.

11. **REJECTION OF PSA BY OWNER.** In the event that Owner, it its sole discretion, rejects the PSA, no commission shall be due to Cooperating Agent or Cooperating Broker.

12. Cooperating Agent acknowledges that s/he registered the Purchaser's name with the Project on behalf of Cooperating Broker. By registering the Purchaser's name on the form and by executing a copy of same, Cooperating Agent on behalf of itself and the Cooperating Broker acknowledges that he/she has read the terms and conditions of the Cooperating Broker Commission Agreement contained herein and agrees to abide and be bound thereby.

13. **CERTIFICATION BY COOPERATING BROKER and COOPERATING AGENT.** Cooperating Broker and Cooperating Agent hereby certify to Owner that each neither has nor will rebate, refund or otherwise credit to or for the benefit of Listing Broker or any agent or employee of Listing Broker any portion of the Commission. Further, Cooperating Broker and Cooperating Agent hereby agree that neither will look to Owner for enforcement of this Agreement or collection of the Commission provided for herein and that they will solely look to Listing Broker for same.

14. **ENTIRE AGREEMENT.** This Agreement sets for the entire agreement between Listing Broker and Cooperating Agent and shall not be altered, modified or amended, unless in writing and signed by all the parties hereto.

*[signatures on the following page]*

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM        INDEX NO. 651458/2023

NYSCEF DOC. NO. 17                                      RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

**PROJECT:** Waldorf Astoria Residences Miami                    **UNIT NO:** P H 1 0 2

**PURCHASE PRICE: $** 17,000,000.00

**PURCHASER:** Steven Vogel & Caroline Vogel

**LISTING BROKER:**                        **COOPERATING BROKER:**

**PMG RESIDENTIAL, LLC**                   **BESPOKE REAL ESTATE FLORIDA LLC**

By: _Rodrigo Pintos_                       By: _Kathleen Shadley_
                                           Cooperating Broker's Signature
                                           Licensed Real Estate Broker

Name: ___Rodrigo Pintos___                 Name: Kathleen Shadley

Title: ___Qualifying Broker___             Title: Qualifying Broker

Date: ___3/1/2022___                       Date: 2/7/2022 | 11:37 AM PST

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM                    INDEX NO. 651458/2023

NYSCEF DOC. NO. 17                                                   RECEIVED NYSCEF: 06/12/2023
DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

**CO-BROKER AGREEMENT**

**PROJECT:** Waldorf Astoria Residences Miami          **UNIT NO: PH 101** ("Unit")

**UNIT PURCHASE PRICE: $17,000,000.00**

**PURCHASER: Steven Vogel & Caroline Vogel**

**COOPERATING BROKER COMPANY: BESPOKE REAL ESTATE FLORIDA LLC**
("CooperatingBroker")

**COOPERATING AGENT** *(print name)* Harlan Goldberg                    ("Cooperating Agent")

**PMG RESIDENTIAL, LLC** ("Listing Broker"), Cooperating Broker and Cooperating Agent, agree as follows as to the purchase and sale of the Unit in the Project developed by **PMG DOWNTOWN DEVELOPERS, LP** ("Owner"):

1.  Subject to Cooperating Broker and/or Cooperating Agent's registration of Purchaser for the above-referenced Unit within the past ninety (90) days and involvement as participating broker/agent in connection with the above real estate transaction, Cooperating Broker shall be entitled to a total commission for the sale of the Unit to Purchaser in the amount of _7_% of the total Unit Purchase Price (the "Commission") as set forth in the purchase and sale agreement executed by Purchaser andOwner (the "PSA").

    In accordance with the aforementioned, the Commission shall be paid as follows:

    a.   Pre-Groundbreaking PSA's:

         i.    50% of the Commission shall be earned only upon the later of (x) the closing of Owner's construction loan with respect to the Project ("Groundbreaking") and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding 20% of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

         ii.   50% of the Commission shall be earned only upon the later of (x) one (1) year following Groundbreaking and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equalto or exceeding 30% of the purchase price set forth in the applicable PSA,and shall be payable thirty (30) days after the later to occur of (x) and (y);

    b.   Post-Groundbreaking PSA's:

         i.    100% of the Commission shall be earned only upon the later of (x) the expiration of the 15-day rescission period with respect to the applicable purchase and sale agreement; and (y) receipt by Owner (or by a third party designated by Owner), in clear funds, of an earnest money deposit equal to or exceeding **30%** of the purchase price set forth in the applicable PSA, and shall be payable thirty (30) days after the later to occur of (x) and (y); and

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 PM    INDEX NO. 651458/2023
NYSCEF DOC. NO. 17

DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA                       RECEIVED NYSCEF: 06/12/2023

2. **OTHER SALES TRANSACTIONS.** This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker for any prospective purchaser at the Project other than for Purchaser's purchase of the Unit. Such an obligation may only be pursuant to a written agreement in a form acceptable to Listing Broker in its sole discretion. Listing Broker reserves the right in its sole and absolute discretion to modify the terms under which it agrees to pay Cooperating Broker commissions. Neither Cooperating Broker nor Cooperating Agent may rely upon the terms of this agreement for any transaction other than the one specifically involving the Purchaser during the effective term of this registration. This agreement does not obligate Listing Broker to pay commissions to Cooperating Broker in the event Purchaser purchases a unit in the Project which is not listed with Listing Broker.

3. **INDEMNIFICATION.** Cooperating Broker and Cooperating Agent jointly and severally agree to indemnify and hold Listing Broker and Owner harmless from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind including reasonable attorneys' fees and costs and appellate fees and costs relating to or arising out of any claims against Listing Broker and/or Owner as a result of any representation / or other conduct by either of them which are made or done without the express written consent of Listing Broker and Owner.

4. **NO INDUCEMENTS.** Neither Cooperating Broker or Cooperating Agent shall pay or offer to any person a referral fee, rebate, bonus gratuity, commission or other form of compensation or consideration, for the purchase by Purchaser of a unit at the Project, without the prior written consent of the Owner and the Listing Broker.

5. **CONFIDENTIALITY.** The registration forms, mailing lists, purchaser lists and other records of prospective or actual purchasers are proprietary to Listing Broker and/or Owner and are confidential trade secrets. Cooperating Broker and Cooperating Agent are not entitled to review the contents of any of the foregoing. Cooperating Broker and Cooperating Agent agree not to enter into any negotiations directly or indirectly with any purchaser at the Project or prospective purchaser deemed registered to Listing Broker regarding the reservation, purchaser, lease and or option of the Project, except with the direct participation or express prior written approval of Listing Broker.

6. **ATTORNEYS' FEES AND COSTS.** In the event of any litigation arising from this Agreement, the prevailing party shall be entitled to reimbursement from the other party of all reasonable attorneys' fees and cost associated with such matter at the pretrial, trial and appellate levels.

7. **COMPLIANCE WITH LAWS AND RULES.** Cooperating Broker and Cooperating Agent agree to comply, abide and be bound by all laws, rules, regulations and codes of ethics promulgated or adopted by any state or local authority or board realtors regulating the conduct of real estate brokers and salespersons and the payment of real estate commissions. In addition, Cooperating Broker and Cooperating Agent shall not interfere with Listing Broker's employee's performance or duty of loyalty to Listing Broker and/or the Owner. Further, and unless Cooperating Broker and Cooperating Agent notify Listing Broker in writing of their respective exclusion from the requirement for such licensure upon execution of this Agreement, Cooperating Broker and Cooperating Agent represent and warrant that their respective applicable Real Estate Licenses are current and in good standing and that they will maintain such status at all times material to this Agreement.

8. **RELEASE:** Simultaneously with delivery of the amount(s) provided for in paragraph 1, Cooperating Broker and Cooperating Agent shall provide Listing Broker with a Full General Release in favor of Owner and Listing Broker as to the amount(s) delivered. The Release provided for herein shall be on

FILED: NEW YORK COUNTY CLERK 06/12/2023 11:39 P

NYSCEF DOC. NO. 17

DocuSign Envelope ID: FB602F90-52AB-4830-81b9-A42F7429DEAA

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

a form prepared by and acceptable to Listing Broker within its sole discretion.

9. **DEFAULT BY COOPERATING BROKER.** If either Cooperating Broker or the Cooperating Agent violates any of the terms or conditions of this agreement or fails to fully and completely participate as needed throughout the transaction giving rise to the commission set forth herein, Listing Broker shall have the right, in its sole and absolute discretion to do any one or more of the following:

   a. Not pay any commission to Cooperating Broker or Cooperating Agent for any transaction involving the Purchaser;

   b. Not pay any commission to Cooperating Broker or Cooperating Agent for any other transaction(s) (whether involving the Purchaser or not) in which Cooperating Broker is a Cooperating Broker; and

   c. Refuse to recognize Cooperating Broker and Cooperating Agent as a Cooperating Broker for any future transactions (whether involving the Purchaser or not) in which the Listing Broker is involved.

10. **EXECUTION BY COOPERATING BROKER AND COOPERATING AGENT.** The execution of this agreement by Cooperating Agent shall be deemed to bind both the Cooperating Agent and the Cooperating Broker to the terms and conditions hereof. Notwithstanding the foregoing, this Agreement is not enforceable by Cooperating Broker or Cooperating Agent unless executed by both Listing Broker and Cooperating Broker.

11. **REJECTION OF PSA BY OWNER.** In the event that Owner, it its sole discretion, rejects the PSA, no commission shall be due to Cooperating Agent or Cooperating Broker.

12. Cooperating Agent acknowledges that s/he registered the Purchaser's name with the Project on behalf of Cooperating Broker. By registering the Purchaser's name on the form and by executing a copy of same, Cooperating Agent on behalf of itself and the Cooperating Broker acknowledges that he/she has read the terms and conditions of the Cooperating Broker Commission Agreement contained herein and agrees to abide and be bound thereby.

13. **CERTIFICATION BY COOPERATING BROKER and COOPERATING AGENT.** Cooperating Broker and Cooperating Agent hereby certify to Owner that each neither has nor will rebate, refund or otherwise credit to or for the benefit of Listing Broker or any agent or employee of Listing Broker any portion of the Commission. Further, Cooperating Broker and Cooperating Agent hereby agree that neither will look to Owner for enforcement of this Agreement or collection of the Commission provided for herein and that they will solely look to Listing Broker for same.

14. **ENTIRE AGREEMENT.** This Agreement sets for the entire agreement between Listing Broker and Cooperating Agent and shall not be altered, modified or amended, unless in writing and signed by all the parties hereto.

*[signatures on the following page]*

FILED: NEW YORK COUNTY ERK 06/12/2023 11:39 P

NYSCEF DOC. NO. 17

INDEX NO. 651458/2023

RECEIVED NYSCEF: 06/12/2023

DocuSign Envelope ID: FB602F90-52AB-4830-81B9-A42F7429DEAA

**PROJECT:** Waldorf Astoria Residences Miami            **UNIT NO:** P H 1 0 1

**PURCHASE PRICE: $** 17,000,000.00

**PURCHASER:** Steven Vogel & Caroline Vogel

**LISTING BROKER:**                              **COOPERATING BROKER:**

**PMG RESIDENTIAL, LLC**                         **BESPOKE REAL ESTATE FLORIDA LLC**

                                                 ─DocuSigned by:

By:  *Rodrigo Pintos*                            By: *Kathleen Shadley*
     F009C437060A413                                 78S0T41AD69147F

                                                 Cooperating Broker's Signature
                                                 Licensed Real Estate Broker

Name:  Rodrigo Pintos                            Name: Kathleen Shadley

Title:  Qualifying Broker                        Title: Qualifying Broker

Date:  3/1/2022                                  Date: 2/7/2022 | 11:37 AM PST



# NYSCEF Confirmation Notice
## New York County Supreme Court



The NYSCEF website has received an electronic filing on 06/12/2023 11:39 PM. Please keep this notice as a confirmation of this filing.

**651458/2023**
**Harlan Goldberg et al v. Bespoke Real Estate LLC et al**
**Assigned Judge: None Recorded**

## Documents Received on   06/12/2023 11:39 PM

| Doc # | Document Type |
|---|---|
| 9 | SUMMONS (PRE RJI) (AMENDED) |
| 10 | COMPLAINT (AMENDED) |
| 11 | EXHIBIT(S) 1 |
| 12 | EXHIBIT(S) 2 |
| 13 | EXHIBIT(S) 3 (Redacted per 202.5(e) or 206.5(e)) |
| 14 | EXHIBIT(S) 4 |
| 15 | EXHIBIT(S) 5 |
| 16 | EXHIBIT(S) 6 |
| 17 | EXHIBIT(S) 7 |

### Filing User

Adam Bailey | alb@alblawfirm.com | 6313358453
1 Battery Park Plz Fl 18, New York, NY 10004

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

Page 1 of 2



# NYSCEF Confirmation Notice
## New York County Supreme Court



**651458/2023**
**Harlan Goldberg et al v. Bespoke Real Estate LLC et al**
**Assigned Judge: None Recorded**

### E-mail Notifications

An email regarding this filing has been sent to the following on 06/12/2023 11:39 PM:

  **ADAM BAILEY - alb@alblawfirm.com**
  **JOHN M. DESIDERIO - jdesiderio@alblawfirm.com**
  **WILLIAM M. PEKARSKY - wpekarsky@alblawfirm.com**
  **BRANDON M. ZLOTNICK - bzlotnick@alblawfirm.com**

### Email Notifications NOT Sent

| Role | Party | Attorney |
|------|-------|----------|
| Respondent | Bespoke Real Estate LLC | No consent on record. |
| Respondent | Bespoke Luxury Marketing LLC | No consent on record. |
| Respondent | Bespoke Real Estate Florida LLC | No consent on record. |
| Respondent | PMG Residential, LLC | No consent on record. |

* Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent.

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956     Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile