**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

HARLAN GOLDBERG, H GOLD LLC, and JARRET WILLIS,

                Plaintiffs,

    -against-

BESPOKE REAL ESTATE LLC, BESPOKE LUXURY MARKETING LLC, BESPOKE REAL ESTATE FLORIDA LLC, ZACHARY VICHINSKY and CODY VICHINSKY

                Defendants.
-------------------------------------------------------------------X

Civil Action No.:
23-cv-05614 (JPO)

**AFFIDAVIT OF**
**ZACHARY VICHINSKY**

STATE OF NEW YORK )
                        ) ss.
COUNTY OF SUFFOLK )

    **ZACHARY VICHINSKY**, being duly sworn, deposes and says:

    1.    I am the Chief Executive Officer and a principal of Defendants Bespoke Real Estate LLC, Bespoke Luxury Marketing LLC, Bespoke Real Estate Florida LLC and named as an individual defendant in the above-captioned matter (collectively, "Bespoke").

    2.    I submit this affidavit in support of Bespoke's motion to dismiss the Amended Complaint.

    3.    All of the exhibits submitted with this Affidavit are true and accurate copies of records maintained by Bespoke in the normal course of business.

***Mr. Goldberg's Retaliation Claim***

    4.    Mr. Goldberg's claim of retaliation is a multi-tiered fabrication of scurrilous defamation without a remote basis in fact.

5. Mr. Goldberg claims that his position was terminated because he disclosed certain "discriminatory" conduct against Jarret Willis, a former employee of Bespoke.

6. Moreover, Mr. Goldberg never reported any incidents of improper behavior at Bespoke to me or to anyone at Bespoke prior to his termination on September 22, 2022.

7. I am advised that his termination cannot be deemed retaliation for reporting discrimination, especially where the documents provided with Bespoke's motion conclusively establish that: (a) Mr. Goldberg was not terminated for any alleged "whistleblower" reporting to Bespoke (no such "whistleblowing" took place); (b) Mr. Goldberg made no mention of his "whistleblower" activities to anyone at Bespoke; and (c) Mr. Goldberg's Amended Complaint, coupled with correspondence from his counsel to Bespoke, concedes this timeline.

8. In fact, Mr. Goldberg's position with Bespoke was terminated because of his poor job performance and his failure to even show up at the office after months of discussions. Bespoke's September 22, 2022 email to Mr. Goldberg - terminating his contract with Bespoke - is submitted herewith as Exhibit A.

9. Mr. Goldberg's attorney first contacted Bespoke by letter dated September 29, 2022, **one week after Goldberg was terminated**. A copy of that September 29, 2022 correspondence is submitted as Exhibit B.

10. That letter made no mention of any claimed discrimination against Mr. Willis, nor did it address "whistleblower" action by Mr. Goldberg, or retaliation against him for the alleged "whistleblower" conduct. *See* Exhibit B.

11. Indeed, Mr. Goldberg's attorney never communicated any allegations by Mr. Goldberg about the treatment of Mr. Willis or a "hostile work environment" directly to Bespoke.

2

12. Upon information and belief, Mr. Goldberg's attorney first conveyed Mr. Goldberg's allegations about Mr. Willis to Bespoke's attorneys as part of a post-termination, unethical attempt to extort payments from Bespoke for commissions that were not yet due (and in amounts far in excess of what Mr. Goldberg was entitled) by threatening disclosure of false "discrimination" claims. *See* Exhibit C at 4, ¶ 2 (copy of a February 12, 2023 letter from Bespoke's attorneys to Mr. Goldberg's attorneys).

13. Regarding Mr. Hasson's purported attempt to "steal" Mr. Willis's clients, such acts cannot rationally be considered race-based animus. If Mr. Hasson attempted to takeover Mr. Willis' listings, he did so in order to earn more commissions. Regardless, Bespoke was not made aware of this alleged conduct until after Mr. Goldberg's relationship with Bespoke was terminated.

14. Goldberg never informed Bespoke of anyone referring to Mr. Willis by the "n-word" or of any race-based animus against Mr. Willis prior to this lawsuit.

15. Addressing the allegation that Mr. Willis was referred to as "Jafar" (after the manipulative Disney character in the film "Aladdin"); the idea that Bespoke conjured up that nickname is absurd because Mr. Willis came up with that moniker and called himself Jafar on countless occasions, both in conversation and in writing. Copies of emails from Mr. Willis calling himself "Jafar" are submitted as Exhibit D.

16. The character "Jafar", to my understanding, is a Middle Eastern sorcerer and powerful aid to a sultan. Mr. Willis (who is African American, not Middle Eastern), often referred to himself as "Jafar" as a comparison that character's cunning and abilities to persuade others; to my knowledge, the nickname (which Mr. Willis assigned to himself) was not in any way related to race or ethnicity.

17. As to the alleged use of the "n-word", and Bespoke allegedly fostering a hostile work environment, Mr. Willis used such language frequently when addressing himself and others at Bespoke. In fact, Mr. Willis is noted as saying that "racial humor is the best humor". *See* Affidavit of Cody Vichinsky, Exhibit B. I am advised that, under such circumstances, Mr. Goldberg's "whistleblower" claim under the Labor Law cannot stand (even if he did "blow the whistle," which he did not) because no objective person could reasonably believe that Mr. Willis was subjected to discrimination based on his own use and acceptance of racially-charged language.

18. The Court should note the irony in Mr. Goldberg claiming that he was President of Bespoke's Florida office without accepting primary responsibility for the purported discriminatory actions – if he was President, he had the authority and legal obligation to stop the alleged discriminatory behavior and did not.

19. His failure to plead contemporaneous attempts to stop the hostile work environment is proof that the hostile work environment did not exist.

20. To the contrary, Mr. Goldberg was more likely to create a hostile work environment than prevent it; Mr. Goldberg openly espoused anti-LGBTQ+ views in the office. *See* Exhibit E.

***Agreements Between Bespoke and Goldberg***

21. I negotiated the terms of compensation to be paid to Plaintiffs Harlan Goldberg and H Gold LLC (collectively, "Goldberg").

22. Goldberg became an independent contractor to Bespoke pursuant to a written agreement dated April 2, 2019 (the "IC Agreement"). A copy of that agreement is submitted herewith as Exhibit F.

23. The original terms of the IC Agreement did not set forth Goldberg's entitlement to commissions on real estate transactions in Florida. See Exhibit F at Exhibit B.

4

24. I subsequently engaged in negotiations with Goldberg to set forth the terms for Florida commissions.

25. After exchanging drafts and discussing the terms, Goldberg and Bespoke agreed to modify the terms for Goldberg's compensation for Florida transactions (the "Florida Commission Agreement"). A copy of the Florida Commission Agreement is submitted herewith as Exhibit G. Goldberg's entitlement to the commissions that are the subject of this lawsuit are provided in Exhibit G.

26. Mr. Goldberg did not sign the Florida Commission Agreement.

27. Nevertheless, Goldberg was paid pursuant to the terms of the Florida Commission Agreement on 8 transactions. Proof of Mr. Goldberg's acceptance of the Florida Commission Agreement are provided by the commission receipts signed by Goldberg for those 8 transactions. Copies of those signed commission receipts are submitted herewith as Exhibit H.

28. The 8 commission receipts constitute all of the commissions earned by Goldberg and paid by Bespoke as broker on Florida transactions prior to Goldberg's separation from Bespoke.

*The Waldorf Transaction*

29. As to the transaction identified by Goldberg in the Amended Complaint as the "Waldorf Transaction", the client who ultimately closed on the sale was originated and brought to Bespoke by Jarret Willis, another employee of Bespoke.

30. Mr. Goldberg in writing designated Mr. Willis as the originator of the purchaser relationship as per the terms and scope of work of his employment agreement. Copies of 2 emails from Mr. Goldberg designating Mr. Willis as the originator for the Waldorf Transaction are submitted herewith as Exhibit I.

31. After Mr. Willis brought the client to Bespoke, Bespoke assigned Mr. Goldberg as portfolio manager to work with the client to acquire the properties that were subsequently purchased as the "Waldorf Transaction".

32. Emails such as Exhibit I are typical documents used by Bespoke in the normal course of business for determining the allocation of commissions.

33. Therefore, under the normal business practice well known to Goldberg, Mr. Willis is deemed entitled to compensation for "bringing in" the client to Bespoke.

34. Mr. Willis's employment agreement as submitted herewith as Exhibit J.

35. Based upon the terms of Mr. Willis's agreement, as confirmed by Mr. Goldberg's emails, Mr. Willis was entitled to 35% of the commission as the originator of the buyer referral. See Exhibit J at Exhibit B, ¶ 2.B.

36. Based upon the terms of the Florida Commission Agreement, because Bespoke allocated the "Buyer" to Goldberg, Goldberg was entitled to 35% of the balance of the commission. See Exhibit G at Exhibit B, Buyer Services Commission Compensation Mechanics, ¶ a (first bullet point) (PDF p. 5).

37. Bespoke received the first installment of the commission payment and paid Mr. Willis and Goldberg pursuant to the terms of their respective agreements. Copies of the payments to Mr. Willis and Mr. Goldberg are submitted herewith as Exhibit K.

38. Bespoke has undertaken a search of its records to locate any documents pursuant to which Bespoke agreed to pay Goldberg a 60% commission. No such documents were located.

39. I never agreed on behalf of Bespoke to pay Goldberg a 60% commission on the Waldorf Transaction.

40. Kayt Gray, the Listing Manager and Licensed Real Estate Salesperson for Bespoke, did not have authority to negotiate or agree to modify Goldberg's compensation on behalf of Bespoke.

41. Goldberg's allegation that Bespoke agreed to pay him 60% commission on a transaction where another Bespoke employee was entitled to 35% is not credible, particularly where the terms of payment were previously agreed upon.

***The Asia and Parkland Transactions***

42. Goldberg has sued to recover commissions for what are defined in the Amended Complaint as the "Asia Transaction" and the "Parkland Transaction".

43. Goldberg has been paid for both transactions.

44. The "Asia Transaction" was the sale of an apartment at 900 Brickell Key Drive, Miami, Florida. Submitted herewith as Exhibit L is Goldberg's signed commission receipt for the Asia Transaction.

45. The "Parkland Transaction" was the sale of 7493 Knight Street, Parkland, Florida. Submitted herewith as Exhibit M is proof of payment of Goldberg's commission for the Parkland Transaction.

***The Override Commission***

46. As president of Bespoke Real Estate Florida LLC, Goldberg was entitled to an "override commission" on any transactions brokered by Bespoke in Florida to which he was not active participant in the transaction. *See* Exhibit G at Exhibit B, Listing Sales Compensation Mechanics, ¶ c (PDF p. 4) & Buyer Services Commission Compensation Mechanics, ¶ c (PDF p. 5).

7

47. During his tenure with Bespoke, Goldberg received a commission on every transaction brokered by Bespoke in Florida. See Exhibit H. Bespoke did not broker any transactions other than the transactions identified in the documents submitted as Exhibit H.

48. Goldberg therefore is not entitled to any payment under the override commission provision.

*Mr. Willis' Claims For Hostile Work Environment and Constructive Discharge*

49. Similar to Mr. Goldberg's claim of retaliation, Mr. Willis's claim of hostile work environment is a frivolous and an unfounded attempt to strong-arm his former employer based on offensive conduct he himself alone committed.

50. Bespoke maintains a comprehensive employee manual. The manual contains anti-harassment and anti-discrimination policies, and a complaint procedure. The policy manual expressly prohibits discrimination and all forms of employee harassment based on any protected characteristic. The employee manual advises aggrieved employees to immediately contact either their supervisor or the Senior Controller. Additionally, the policy manual expressly prohibits retaliation against any individual who reports discrimination or harassment or assists in investigating such charges. Bespoke's Employee Handbook and Complainant's signed acknowledgment receipt form are submitted herewith as Exhibit N.

51. Mr. Willis became employed with Bespoke as a licensed real estate associate in 2017. Mr. Willis' job description was detailed in an employment agreement. He earned a base salary of $75,000, and he earned commissions pursuant to an employment agreement with Bespoke. Copies of Mr. Willis' signed NYLL § 195 wage notice form and signed employment agreement are submitted herewith as Exhibit O. Mr. Willis' commissions agreement detailed the proper procedure for Bespoke to pay out any commissions earned by him. *See* Exhibit O. Bespoke

8

opened its headquarters on Montauk Highway, New York in 2014. Mr. Willis and his wife operated a clothing boutique, Blue One, located on Montauk Highway, New York. My brother, Cody Vichinsky ("Cody"), who is a co-principal along with myself, and I were first introduced to Mr. Willis at Blue One in or about 2014, prior to Mr. Willis becoming employed by Bespoke.

52. Cody and I thereafter developed a close friendship with Mr. Willis. In fact, Mr. Willis introduced Cody to his now wife who formerly worked as a salesperson at Blue One. Mr. Willis would later serve as a groomsman at Cody's wedding. We regularly, almost daily, socialized, spent time with each other's families outside of business including taking multiple vacations together, and attended events hosted by our respective businesses. My friendship with Mr. Willis would grow to the point where Mr. Willis asked me to serve as godfather to his son. For all intents and purposes, we considered each other family.

53. Mr. Willis alleges he was subjected to a hostile work environment based on race in violation of Section 1981.

54. Yet, as initially detailed *supra*, it was Mr. Willis himself who engaged in unseemly language and conduct. Even prior to Mr. Willis' eventual work relationship with Bespoke, he began referring to himself as "Jafar" and frequently referenced using his charisma to "Jafar" people. Mr. Willis' unsavory remarks were unsolicited and entirely initiated by himself. Indeed, there are numerous instances of Complainant referring to himself as "Jafar," or using racially charged language to Cody and I *via* email and text message in personal conversations. For example, Mr. Willis made remarks such as referring to a Bespoke client as a "I just had a nice conversation with Barbara [client] and I think I may have been able to Jafar her." He also frequently signed off on his emails as "Jafar." Mr. Willis also greeted me with "[s]up nigga" in communications on several occasions. Submitted herewith as Exhibit P are numerous examples of Mr. Willis using derogatory

9

and offensive language which he solely initiated, and also includes communications of Mr. Willis, ironically, expressing his love and gratitude for Cody and I.

55. Mr. Willis also developed a close friendship with Lisa Kling ("Ms. Kling") during his tenure. Ms. Kling was hired by Bespoke RE as an administrator in September 2020. She was introduced to Mr. Willis in March 2021. Ms. Kling was later promoted to executive assistant for Cody around the same time. Ms. Kling was required to work with Mr. Willis closely because Mr. Willis had assumed the role of Vice President of Bespoke Parallel. This entity was to be a Bespoke subsidiary focused on obtaining real estate referrals. Mr. Willis and Ms. Kling developed a friendship immediately.

56. Mr. Willis and Ms. Kling were frequently together, either at Bespoke's headquarters or outside the workplace, and left the office together to get ice cream and coffee. Mr. Willis and Ms. Kling also corresponded regularly *via* text message and Instagram. Mr. Willis was known by colleagues to refer to Ms. Kling as his "work wife." Mr. Willis also initiated racially derogatory language with Ms. Kling. Again, Mr. Willis apparently used this language in a familiar, social context. On occasion, Mr. Willis sent Ms. Kling messages to disparage and sexually objectify female coworkers. Sometimes, Mr. Willis' objectification was centered on Ms. Kling herself who was highly impressionable as a young professional newly acquainted with the real estate industry. Mr. Willis often solicited Ms. Kling to send him "nudes" or sexually explicit photos of herself. Submitted herewith as Exhibit Q are communications sent by Mr. Willis to Ms. Kling evidencing their friendship and Mr. Willis' sexual objectification.

57. Mr. Willis resigned his position on December 14, 2022. His resignation was sudden and came with no prior notice to Cody or me. Mr. Willis claims his resignation was "forced" because he "deal[t] with racial epithets and the 'Jafar' nickname," yet, he never lodged a complaint,

either written or otherwise, and the factual record bears out that Mr. Willis, remarkably, fostered, created and initiated all offending language including referring to himself as "Jafar" and his Jewish employers and Jewish clients as "Niggas."

58. On December 14, 2022, Mr. Willis sent Cody and I a text message stating "Fellas all communications must go through my lawyer moving forward…" A copy of the text message is is submitted herewith as Exhibit R. After receiving Mr. Willis' text message, and after learning of his sudden and unexpected resignation, I responded by requesting Mr. Willis reach out to me directly to discuss any concerns he had. My feelings of shock and betrayal became evident after I read Mr. Willis' message in conjunction with the immediately prior text message Mr. Willis sent us on Thanksgiving, reading "[h]appy Thanksgiving to you both. I am grateful to have you and your beautiful families in my life." *See Id.*

59. The factual record shows the Amended Complaint is a baseless claim brought by a jaded former employee who maintained a close friendship with his former employers and only left his position because he became disillusioned for reasons still unknown.

*Mr. Willis' Claim for Disparate Treatment*

60. Mr. Willis also claims he was subjected to disparate treatment because he is African American. However, he was subject to identical rules and afforded identical opportunities to all other Bespoke employees.

61. Mr. Willis claims Respondents did not allow him to show certain properties because he is African American. His position focused on utilizing his network to procure clients, not to sell, buy or otherwise close transactions on the properties of Bespoke's clients. The limited and clearly defined roles of Mr. Willis' position were outlined in his employment agreement. Indeed, Mr. Willis earned a larger commission referring clients than Bespoke's professionals who showed

homes. Since Mr. Willis' job duties simply required him to use his network to procure clients, he did not require a physical desk. Indeed, Mr. Willis frequently performed his duties at Blue One.

62. Mr. Willis also claims Cody and I permitted a White employee to "steal" his clients. Again, this claim is false and unsubstantiated. His clients were not "stolen." Certain employees of Bespoke were assigned to showcase the properties of Bespoke clients procured by Mr. Willis. However, Mr. Willis, himself, was not responsible for showing the properties.

63. Additionally, Mr. Willies alleges he was "demoted" from his position as Bespoke Parallel Vice President because of his race. However, the decision to remove Mr. Willis from the Vice President position was to his benefit and was only implemented after much collaboration between Mr. Willis, Cody and myself. Mr. Willis' role within Bespoke Parallel was to procure property listing referrals from external agents beyond Bespoke; essentially, third party contacts who would refer business to the company. Bespoke ran Bespoke Parallel initially as a pilot program for proof of concept. Mr. Willis' compensation on commissions would be directly tied to external referrals procured which would yield a smaller commission fee than that which he would gain if he procured a direct referral. The pilot program proved to be less fruitful for Mr. Willis in terms of commissions earned. As such, after much discussion, the decision was made to remove Mr. Willis from the Vice President of Bespoke Parallel in order to focus on his prior position as a referral agent so that he could earn higher referral fees and, consequently, more income.

64. Further, Mr. Willis claims he was "excluded from social functions" which all other Bespoke employees were invited to. Mr. Willis cites a single example of this alleged disparate treatment – his purported exclusion from the "Hampton Classic" each August. The Hampton Classic is an annual horse show grand prix event which includes a prominent social function. Mr. Willis was not excluded from the Hampton Classic. Rather, he, and every other employee of

Bespoke, were advised to contact our Portfolio Manager to obtain tickets to the Hampton Classic. Mr. Willis had the same opportunity as every other employee to procure tickets.

65. Mr. Willis alleges he was denied certain commissions because of his race. This claim is also unsubstantiated. Bespoke acknowledges certain commissions remain owed to Mr. Willis, post-employment, which will be paid when due in accordance with his commission agreement.

*Mr. Goldberg's Claims for Hostile Work Environment and Disparate Treatment*

66. Mr. Goldberg's claims for hostile work environment and disparate treatment are equally salacious and unfounded. Mr. Goldberg and Mr. Willis, by way of the instant litigation, are attempting to parlay their own untoward conduct into frivolous claims.

67. Mr. Goldberg alleges his work environment with Bespoke was permeated by anti-Semitism. However, Mr. Goldberg himself initiated and fostered any and all offensive language and conduct concerning being Jewish – no one else.

68. Indeed, Mr. Goldberg often sent Cody and I communications referencing the work "kike" and referring to Jewish people in a negative and stereotypical light. Submitted herewith as Exhibit S are communications sent by Mr. Goldberg evidencing his unprompted and unilateral offensive language.

69. Mr. Goldberg's claim he was subjected to disparate treatment because he is Jewish is another unabashed attempt to strongarm his former employer with contrived allegations.

70. As detailed *supra*, Mr. Goldberg was not deprived of any opportunity or benefits during his tenure with Bespoke. He received all benefits entitled to him under his clearly delineated employment agreements and contracts.

71. I do not understand how Mr. Goldberg and Mr. Willis' Amended Complaint can be allowed to move forward where, as my attorneys advise: (a) they failed to allege critical components of their causes of actions; (b) the documents prove that neither Mr. Goldberg's nor Mr. Willis' position were terminated, subjected to an adverse employment action or disparate treatment due to alleged "whistleblower" conduct or because of their membership in a protected class; and (c) Mr. Goldberg and Mr. Willis were paid all commissions due to them pursuant to the agreements between them and Bespoke.

72. In my view, the documents conclusively establish that Mr. Goldberg and Mr. Willis' allegations are false and this action is nothing more than a callous attempt to extort money from Bespoke and to damage its reputation. It is my understanding that the Court does not have to accept Mr. Goldberg's and Mr. Willis' allegations as true in the face of documents that conclusively disprove their claims.

_____
Zachary Vielinsky

Sworn to before me this
___ day of August, 2023

_____
Notary Public

ASHLEY T MCDERMOTT
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01MC6332051
Qualified in Suffolk County
Commission Expires Jan. 14, 20 24