UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HARLAN GOLDBERG, *et al.*,
                                        Plaintiffs,

                    -v-

BESPOKE REAL ESTATE LLC, *et al.*,
                                        Defendants.

23-CV-5614 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiffs Harlan Goldberg, H Gold LLC, and Jarret Willis bring this action against

Defendants Bespoke Real Estate LLC, Bespoke Luxury Marketing LLC, Bespoke Real Estate

Florida LLC, Zachary Vichinsky, and Cody Vichinsky.  Plaintiffs, real estate employees who

previously worked for the entity Defendants, bring a range of common law and statutory claims

based on allegations of discrimination and unpaid commissions.

Before the Court is Defendants' motion to dismiss the complaint for failure to state a

claim.  For the reasons that follow, the Court denies Defendants' motion.

I.      **Background**

        A.      **Factual Background**

        The following facts are drawn from the allegations in Plaintiffs' second amended

complaint, which are presumed true for the purpose of resolving Defendants' motion to dismiss.

(*See* ECF No. 26 ("SAC").)

        Plaintiff Harlan Goldberg ("Goldberg"), who is Jewish, is a real estate broker who

transacts all his real estate brokerage business through Plaintiff H Gold LLC ("Gold").  (*Id.* ¶¶ 7-

9.)  Gold is a limited liability company, of which Goldberg is the sole owner and member

(collectively, the "Goldberg Plaintiffs").  (*Id.* ¶¶ 5-6.)  Plaintiff Jarret Willis ("Willis"), who is

African American, is a real estate salesperson.  (*Id.* ¶¶ 12-13.)

Defendants Bespoke Real Estate LLC ("Bespoke RE") and Bespoke Real Estate Florida

("Bespoke Florida") are real estate brokerage firms that represent buyers and sellers in

residential real estate transactions involving properties with sale prices exceeding $10 million.

(*Id.* ¶¶ 14, 16-17.)  Defendant Bespoke Luxury Marketing LLC ("Bespoke Marketing") serves as

the marketing arm for Bespoke RE and Bespoke Florida (collectively, the three entities are the

"Bespoke Entities").  (*Id.* ¶¶ 15, 19.)  Defendant Cody Vichinsky ("C. Vichinsky") is a founding

partner and the president of Bespoke RE and Bespoke Florida, while Defendant Zachary

Vichinsky ("Z. Vichinsky") is a founding partner, CEO, and managing member of the Bespoke

Entities.  (*Id.* ¶¶ 22, 24.)

### 1.    Willis

Willis worked for the Bespoke Entities from 2017 to December 2022 as a licensed real

estate sales associate on behalf of both buyers and sellers.  (*Id.* ¶¶ 53, 55, 78.)  During his

employment, Willis procured multiple clients, leading to what Willis describes as "substantial

business for, and income to," the Bespoke Entities.  (*Id.* ¶ 80.)

From 2017 to late 2021, Willis sometimes worked out of Bespoke RE's office in New

York, where he was supervised by both the Vichinskys.  (*Id.* ¶¶ 70-71, 74.)  In March 2021,

Willis entered into a written employment agreement with the Bespoke Entities, which provided

Willis with an annual salary and commissions on property sales.  (*Id.* ¶¶ 58, 61.)  In March or

April 2021, Willis was promoted to Vice President of Bespoke Parallel, a division of Bespoke

that operated in real estate markets in which the Bespoke Entities did not have a significant

presence.  (*Id.* ¶¶ 68-69.)  From September or October 2021 to April 2022, Willis temporarily

relocated to Miami Beach, Florida to work for Bespoke Florida; there, he sometimes worked from the Miami Beach office and reported to, among others, Z. Vichinsky and Goldberg. (*Id.* ¶¶ 75-76.) In April 2022, Willis returned to New York and resumed working from the New York office through November 22. (*Id.* ¶ 77.) Finally, Willis temporarily returned to Florida from December 1, 2022 through December 12, 2022, at which point Plaintiffs allege he was constructively discharged. (*Id.* ¶ 78.)

Plaintiffs allege that Lisa Kling, a Bespoke employee who started as a secretary and became C. Vichinsky's assistant, orally addressed Willis daily with racial epithets, such as the word "nigger"; she also occasionally did so in writing. (*Id.* ¶¶ 101-05.) Both the Vichinskys consistently heard the racial epithets that Kling directed at Willis. (*Id.* ¶ 110.) In August or September 2022, C. Vichinsky told Kling that she would "put the company out of business" if she continued using racist language with Willis, but Kling continued to address Willis as a "nigger" on a daily basis. (*Id.* ¶ 113.) In October 2022, Kling also sent Willis a series of text messages about Willis's new real estate salesperson license, which included the following messages: "The orange shirt really makes you look like an inmate," "Kinda scared," and "Lmao so Niggerish." (*Id.* ¶¶ 107-08.) Kling sent those messages the day after an attorney retained by Goldberg in a dispute about commissions informed the Bespoke Entities' counsel that Kling had previously sent a racist text message to Willis and asked them to stop those messages from being sent. (*Id.* ¶ 106.) Kling remains employed by Bespoke and has not been disciplined. (*Id.* ¶ 115.)

Plaintiffs also allege that the Vichinskys engaged in racist behavior toward Willis. From 2018 through 2022, C. Vichinsky frequently orally addressed Willis as a "nigger," "sand nigger," and "spear chucker." (*Id.* ¶ 119.) In early 2021, when Willis asked C. Vichinsky what they should get for lunch, C. Vichinsky replied in a manner audible to both Willis and Goldberg,

"How about some watermelon and fried chicken, you nigger?"  (*Id.* ¶ 118.)  Plaintiffs allege that

Z. Vichinsky similarly used racial epithets, and that he sent Willis a message through Instagram

containing a vulgar and racist video.  (*See id.* ¶¶ 122-24.)  The Vichinskys, along with other

employees, also called Willis "Jafar," which refers to the name of the villain in the Disney

animated movie Aladdin.  (*Id.* ¶¶ 125-28.)  When Willis asked why people referred to him that

way, Z. Vichinsky replied that it was because Willis "look[s] like Jafar" and that, like Jafar,

Willis is an evil person who conjures things up and manipulates his friends.  (*Id.* ¶ 128.)

Willis was also allegedly excluded in other ways.  While Willis worked in the New York

office, all employees had an assigned seat, except Willis, who had to see on a daily basis whether

there was an available seat.  (*Id.* ¶ 134.)  Willis was also excluded from a social function in

Bridgehampton, New York to which every New York employee, except Willis, was invited.  (*Id.*

¶ 135.)  And on multiple occasions, both of the Vichinskys, in the presence of Goldberg, would

tell Willis that he was stupid and knew nothing about the real estate industry; C. Vichinsky

allegedly repeatedly told Willis in front of other employees to "say you are a piece of shit Jarret.

Say it in front of everyone."  (*Id.* ¶ 136.)

Plaintiffs also allege that Willis suffered discrimination in his job-related duties and

compensation.  While the Bespoke Entities typically allowed their employees to show properties

to prospective buyers alone with no other employees present, Willis was never permitted to show

a property by himself.  (*Id.* ¶¶ 239-45.)  Other employees who were not African American were

permitted to do so, and Willis was not provided with any reason for that differential treatment.

(*Id.* ¶¶ 246-49.)  Willis also experienced attempts by Ira Hasson, another Bespoke employee, to

convince Willis's clients not to deal with him and to instead deal with the Bespoke Entities

exclusively through Hasson.  (*Id.* ¶¶ 250-60.)  Goldberg reported those attempts to the

Vichinskys and Kayt Gray Schadley ("Gray"), a vice president, but they declined to take any action.  (*Id.* ¶¶ 254-57.)  Finally, Plaintiffs also allege multiple additional instances in which Defendants systematically refused to pay or underpaid commissions owed to Willis.  (*Id.* ¶ 238.)

In April 2022, Willis was informed that he was being stripped of his position as Vice President and that he would be replaced by Hasson.  (*Id.* ¶ 261.)  The Vichinskys told Willis that he was being demoted due to poor work performance, but Willis had been bringing in significant business.  (*Id.* ¶¶ 263-66.)  On December 12, 2022, Willis resigned after discovering that the password the Bespoke Entities had made for his email account was "Jafar24!"  (*Id.* ¶¶ 274-75.)

## 2.      The Goldberg Plaintiffs

In April 2019, the Goldberg Plaintiffs began working for Bespoke RE and Bespoke Marketing pursuant to a written agreement, which provided for a fixed annual salary and commissions to be paid to the Goldberg Plaintiffs (the "Goldberg Agreement").  (*Id.* ¶¶ 29-31.) In March 2021, Goldberg became the president of Bespoke Florida, at which point he received his compensation from Bespoke Florida instead of the other Bespoke Entities.  (*Id.* ¶¶ 33, 35.) The Goldberg Agreement did not mention Bespoke Florida and did not address transactions involving property in Florida, but Bespoke Florida paid Gold commissions on those transactions. (*Id.* ¶¶ 41-42.)  While he was president of Bespoke Florida, Goldberg worked at the entity's Miami Beach Office, where he reported to Z. Vichinsky.  (*Id.* ¶¶ 45-46.)

Plaintiffs allege that the Bespoke Entities' work environment was anti-Semitic.  Both Vichinskys frequently used the denigrating term "kike" in reference to Jewish people, and Z. Vichinsky used various words to denigrate Jewish people, including "kikey" and "cheap Jew." (*Id.* ¶¶ 141-43.)  During a disagreement about whether Bespoke Florida would pay Goldberg certain commissions, Z. Vichinsky called Goldberg "a Jewish American princess."  (*Id.* ¶ 144.)

The third founding partner of the Bespoke Entities, Michael Cantwell, would begin conference calls by asking Goldberg, "How is your Jewish penis?"  (*Id.* ¶¶ 145-47.)  The Vichinskys were present on these calls, and Cantwell was not disciplined.  (*Id.* ¶¶ 148-49.)

Plaintiffs also allege that the Bespoke Entities systematically failed to pay Goldberg the commissions and amounts that he was owed for his work.  When Bespoke Florida's Miami Beach office opened in early 2021, Z. Vichinsky promised Goldberg that the Goldberg Plaintiffs would receive a 10% override on commissions for all transactions brokered through the Miami Beach office, regardless of whether the Goldberg Plaintiffs were involved in the transactions (the "Override Agreement").  (*Id.* ¶ 153.)  That promise was repeated by Z. Vichinsky and Gray .  (*Id.* ¶ 154.)  Although at least two transactions have been brokered through the Miami Beach office since that promise, Goldberg has never received any money pursuant to the Override Agreement. (*Id.* ¶¶ 157-58.)

Goldberg also played a role in brokering the sale of two units at the Waldorf Astoria Residencies Miami (the "Waldorf transaction").  (*See id.* ¶¶ 160-96.)  The Waldorf transaction was brokered pursuant to three separate agreements, which provided that Bespoke Florida would receive an 8% commission (or $720,000) on one unit and a 7% commission (or $2,380,000) on another unit.  (*Id.* ¶¶ 197-99.)  The Vichinskys frequently told Goldberg to speak to Gray about how much he would receive in commissions, and Gray orally told Goldberg (and later confirmed) that the Goldberg Plaintiffs would receive 60% of the commissions that Bespoke Florida received from the Waldorf transaction.  (*Id.* ¶¶ 201-11.)  After those communications, however, the Bespoke Entities' controller informed Goldberg that the Goldberg Plaintiffs would receive only $707,650 in commissions on the Waldorf transaction.  (*Id.* ¶ 212.)  To date, the Bespoke Entities have received $1,550,000 in commissions, $930,000 of which the Goldberg

Plaintiffs claim should be paid to them, but the Goldberg Plaintiffs have received only $352,625 thus far.  (*Id.* ¶¶ 215-18.)

The Goldberg Plaintiffs were also uncompensated or undercompensated for other transactions that Goldberg brokered.  Goldberg brokered the sale of an apartment in Miami, Florida in a building known as the Asia Apartment, but Z. Vichinsky reassigned the listing to someone who sold the property through a different brokerage firm, and Goldberg was not paid the full commission he would have earned had the property been sold through Bespoke Florida. (*Id.* ¶¶ 219-29.)  Goldberg also helped sell a property called the Parkland Property in Florida, for which the Goldberg Plaintiffs received $1,400 in commissions, which is less than they are allegedly owed.  (*Id.* ¶¶ 230-37.)

In August 2022, Goldberg informed his counsel that the Bespoke Entities had unlawfully discriminated against Willis on the basis of race, and Goldberg's counsel advised the Bespoke Entities that it had learned of the discrimination against Willis from Goldberg.  (*Id.* ¶¶ 269-70.) In September 2022, Z. Vichinsky terminated the Goldberg Plaintiffs' employment with the Bespoke Entities, even though Goldberg was qualified for his role.  (*Id.* ¶¶ 271-73.)

### B.    Procedural History

On March 21, 2023, the Goldberg Plaintiffs commenced an action against the Bespoke Entities in the Supreme Court of New York, County of New York.  (ECF No. 1 ¶ 1.)  On June 12, 2023, Goldberg filed an amended complaint in that proceeding that added Plaintiff Willis and Defendants Z. Vichinsky and C. Vichinsky.  (*Id.* ¶ 4.)  On June 30, 2023, Defendants filed a notice of removal to this Court.  (*See id.*)

On August 7, 2023, Defendants filed a motion to dismiss the complaint for failure to state a claim.  (ECF No. 14.)  On September 28, 2023, Plaintiffs filed a second amended complaint,

which is the operative complaint.  (ECF No. 26.)  Plaintiffs then filed an opposition to the motion

to dismiss on November 6, 2023 (ECF No. 30), and Defendants filed a reply in support of their

motion to dismiss on November 21, 2023 (ECF No. 33).

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a plaintiff must state "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This means that a complaint is properly dismissed where "the allegations in a complaint,

however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  A

complaint is also properly dismissed "where the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  While

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most

favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.

2007).  Determining whether a complaint states a plausible claim is ultimately a "context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense."  *Iqbal*, 556 U.S. at 679.

## III.    Discussion

Plaintiffs bring eleven claims against Defendants, and the Court first addresses the claims

against the Goldberg Plaintiffs before turning to the claims against Willis.  As an initial matter,

Defendants introduce significant additional evidence in their motion to dismiss, such as

affidavits, additional agreements and communications between the parties, and evidence of past

payments to Plaintiffs.  (*See* ECF No. 14.)  But in adjudicating a motion to dismiss, a "district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'"  *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  A document that is not incorporated by reference can be considered if it is "integral" to the complaint, but only if it is "clear on the record that no dispute exists regarding the authenticity or the accuracy of the document."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citation omitted).

Much of the documentary evidence Defendants present and cite with their motion to dismiss cannot be properly considered by the Court on a motion to dismiss, as Defendants fail to show that the additional evidence is incorporated by reference or integral to Plaintiffs' complaint. As a result, the Court cannot consider those materials at this stage.  The Court is instead "constrained . . . to ascertain [whether] the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Defendants alternatively ask the Court to convert its motion to dismiss to a motion for summary judgment.  (ECF No. 33 at 16-17.)  To be sure, it is possible for a court to consider materials outside of the pleadings that are not attached to or incorporated by the complaint if the court "convert[s] the motion into one for summary judgment."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  If a court does so, however, it "also must provide all parties with a reasonable opportunity to present all material made pertinent to such a motion."  *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 556 (S.D.N.Y. 2005).  Here, the parties, and

specifically Plaintiffs, have not had that reasonable opportunity.  The Court accordingly declines

to convert the present motion to a motion for summary judgment.

### A.      The Goldberg Plaintiffs' Claims

#### 1.      Breach of Contract

The Goldberg Plaintiffs bring a breach of contract claim against the Bespoke Entities,

alleging that they unlawfully refused to pay the Goldberg Plaintiffs the full amount of

commissions owed for the Waldorf transaction, the Asia Apartment transaction, the Parkland

transaction, and other transactions, including transactions subject to the Override Agreement.

The elements of a breach of contract claim are "the making of an agreement, performance by the

plaintiff, breach by the defendant, and damages suffered by the plaintiff."  *Whitehurst v. 230*

*Fifth, Inc.*, 998 F. Supp. 2d 233, 246 (S.D.N.Y. 2014).

Defendants first move to dismiss the breach of contract claim as it relates to the Waldorf

transaction and the Override Agreement transactions on the ground that the relevant agreements

are impermissible oral modifications of the Goldberg Agreement that are prohibited by the

Statute of Frauds.  Contrary to Plaintiffs' argument, "[c]onsideration of the Statute of Frauds as

an affirmative defense is appropriate on a motion to dismiss."  *Zeising v. Kelly*, 152 F. Supp. 2d

335, 343 (S.D.N.Y. 2001).

As an initial matter, Defendants are correct that the Goldberg Agreement states that it

"cannot be changed or terminated orally" (ECF No. 26-1 ¶ 15 (no oral modification clause)), and

the Statute of Frauds provides that agreements with such clauses cannot be changed by further

agreement "unless such executory agreement is in writing and signed by the party against whom

enforcement of the change is sought."  N.Y. Gen. Oblig. Law. § 15-301(1).  In other words, "a

written agreement that expressly states it can be modified only in writing cannot be modified

orally." *Towers Charter & Maine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). Thus, it appears that Plaintiffs' claims are premised upon unenforceable oral modifications.

There are exceptions to the bar on oral modifications, however.  One such exception, "[p]artial performance of an oral modification," can "circumvent the § 15-301(1) statutory bar on oral modifications to agreements with no-oral-modifications clauses." *CMC Transaction Servs., LLC v. IDEX Corp.*, No. 18-CV-4925, 2019 WL 3496643, at *3 (S.D.N.Y. Aug. 1, 2019) (citing N.Y. Gen. Obl. Law § 5-703(4)).  That exception excuses a claim from the requirements of the Statute of Frauds if a plaintiff's conduct is "unequivocally referable to the oral modification or not otherwise compatible with the agreement as written." *Id.* (citing *Towers Charter*, 894 F.2d at 522).  Here, granting all inferences in favor of Plaintiffs, the Court determines that it cannot dismiss the breach of contract claim at this stage.  The parties do not dispute that the Goldberg Agreement did not address compensation for the sale of Florida properties, and Goldberg's continued work on such sales on behalf of Bespoke is intelligible only in light of some agreement that he would be compensated for that work.[*]

The Court also rejects the other reason Defendants provide for why the Statute of Frauds prohibits Plaintiffs' claim: that there was insufficient additional consideration to support the

---

[*] It appears that the New York Court of Appeals has "firmly stated" that the "partial performance doctrine . . . does not apply to agreements for broker or finder fees," which are required to be in writing under N.Y. Gen. Obl. Law Section 5-701(a)(10). *CMC Transaction*, 2019 WL 3496643, at *3 (internal quotation marks and citation omitted); *see also Duckett v. Hadley Engelhard, Esq.*, No. 15-CV-8645, 2017 WL 512455, at *3 (S.D.N.Y. Feb. 6, 2017); *Castellotti v. Free*, 27 N.Y.S.3d 507, 513 (1st Dep't 2016).  Still, it also appears that Section 5-701(a)(10) does not necessarily apply to *all* agreements for broker or finder fees, as the New York Court of Appeals has explained that Section 5-701(a)(10)'s requirement of a writing does "not apply to an oral agreement between two finders to share a commission," *Snyder v. Bronfman*, 13 N.Y.3d 504, 509 (2009), and applies instead only to "brokers and finders in their dealings with principals, not with one another," *Dura v. Walker, Hart & Co.*, 27 N.Y.2d 346, 350 (1971).  Because none of the parties discuss any of these precedents in their submissions, however, the Court declines to consider them.

alleged modification of the original Goldberg Agreement.  (*See* ECF No. 15 at 22.)  To the

contrary, Plaintiffs allege that Goldberg did additional work in Florida on behalf of Bespoke that

was not contemplated by the original Goldberg Agreement in exchange for additional

compensation.  Such additional work on behalf of Bespoke constitutes additional consideration.

The Court also disagrees with Defendants' contention that Gray, who made the

representations to Goldberg about his share of commissions related to the Waldorf and the

Override Transactions, did not have the authority to bind Bespoke on that issue.  (ECF No. 15 at

20.)  Even if an agent does not have actual authority, a principal can still be liable for a putative

agent's conduct if the "principal has created the appearance of authority, leading . . . [another]

party to reasonably believe that actual authority exists."  *Precedo Cap. Grp. Inc. v. Twitter Inc.*,

33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014) (quoting *Highland Cap. Mgmt. LP v. Schneider*, 607

F.3d 322, 328 (2d Cir. 2014)).  "[T]o adequately plead the existence of apparent authority, a

plaintiff must allege words or conduct of the principal, communicated to a third party, that give

rise to the appearance and belief that the agent possesses authority to enter into a transaction on

behalf of the principal."  *Id.* (internal quotation marks, citation, and emphasis omitted).  Here,

Plaintiffs' allegations support the inference that Gray had at least apparent authority to negotiate

commissions, as they include allegations that both C. Vichinsky and Z. Vichinsky "repeatedly

told Goldberg, from early 2021 on, to speak to Gray to determine the portion of commissions

that he would receive on each real estate transaction."  (SAC ¶ 207.)

Finally, the Court disregards Defendants' citation of extrinsic evidence.  Defendants

contend that certain documentary evidence establishes that there was a separate agreement that

provided the terms of Goldberg's commissions for transactions that occurred in Florida, and that

Goldberg was paid for the Waldorf transaction.  Defendants also contend that Willis, and not

Goldberg, was the procurer of the Waldorf transaction.  (ECF No. 15 at 20-22.)  But those arguments rely on extrinsic evidence that was not incorporated in or integral to Plaintiffs' complaint, and that evidence therefore cannot be considered in resolving Defendants' motion to dismiss.  Similarly, Defendants' only argument to dismiss breach of contract claims related to the other transactions—the Asia Apartment transaction, the Parkland transaction, and the Override Agreement transactions—is that Goldberg was indeed paid for those transactions, but that argument improperly relies on extrinsic evidence.  (ECF No. 15 at 22-23.)  The Court therefore denies Defendants' motion to dismiss the Goldberg Plaintiffs' breach of contract claim.

### 2.    Promissory Estoppel

The Goldberg Plaintiffs next bring a claim of promissory estoppel with respect to commissions owed to them related to the Waldorf transaction and the Override Agreement.  A cause of action for promissory estoppel requires three elements: "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."  *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

Defendants contend that the existence of a contract precludes a claim for promissory estoppel, but it is "well-established that plaintiffs who allege the existence of a valid contract may nonetheless plead the alternative theories of promissory estoppel and breach of contract when the defendant does not concede the enforceability of such contract."  *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 214 (S.D.N.Y. 2021) (internal quotation marks and citation omitted).  Here, because Defendants do not concede that Plaintiffs have pleaded an enforceable contract regarding the commissions owed to them for the Waldorf transaction and Override Agreement transactions, Plaintiffs are entitled to plead in the alternative.  Defendants also maintain that a claim that is barred by the Statute of Frauds cannot be circumvented by

alleging promissory estoppel, but as explained earlier, the Goldberg Plaintiffs' claims may be subject to an exception to the Statute of Frauds.

The Court also disagrees with Defendants' objection that the Goldberg Plaintiffs failed to plead detrimental reliance or damages.  The Goldberg Plaintiffs allege that they forewent other employment opportunities and compensation associated with those opportunities in reliance on the promise that they would receive certain commissions from the Waldorf and other transactions.  (*See* SAC ¶¶ 335-37.)  Such actions can constitute detrimental reliance and damages to support a promissory estoppel claim.  *See Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (plaintiff pleaded the elements of promissory estoppel because she alleged that she "relied on [a] promise in learning her lines and forgoing other career opportunities, and that she has been financially and emotionally harmed by her reliance" (citation omitted)).  The Court therefore denies Defendants' motion to dismiss the Goldberg Plaintiffs' claim of promissory estoppel.

### 3.    Unjust Enrichment and Quantum Meruit

The Goldberg Plaintiffs also assert claims of unjust enrichment and quantum meruit, alleging that the Bespoke Entities were enriched because they did not sufficiently compensate the Goldberg Plaintiffs for the Waldorf, Asia, Parkland, or Override Agreement transactions.

The Court again rejects Defendants' contention that Plaintiffs cannot plead those claims because the parties agree that a contract exists and disagree only over the scope and terms of that contract.  "[C]ourts regularly allow plaintiffs to maintain unjust enrichment and quantum meruit claims as pleadings in the alternative at the motion to dismiss stage"—and they do so not only "where the parties dispute[] the existence of a contract" altogether, but also "where the validity and scope of the contract is difficult to determine," or "where the claims arise out of agreements

or understandings of the parties that were not expressly written in the contract." *Keybanc Cap.*

*Mkts., Inc. v. Extreme Steel, Inc.*, ___ F. Supp. 3d ___, 2024 WL 62457, at *6 (S.D.N.Y. 2024)

(internal quotation marks and citation omitted). The Court therefore denies Defendants' motion

to dismiss the Goldberg Plaintiffs' claims for unjust enrichment and quantum meruit.

### 4.    Hostile Work Environment Under Section 1981

The Goldberg Plaintiffs next bring a claim of hostile work environment under 42 U.S.C.

§ 1981 against Defendants for the allegedly racist behavior that Goldberg experienced while

employed by the Bespoke Entities. To establish a claim of hostile work environment in violation

of Section 1981, a plaintiff must show "[1] that the harassment was sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment, and [2] that a specific basis exists for imputing the objectionable conduct to the

employer." *Charley v. Total Off. Planning Servs., Inc.*, 202 F. Supp. 3d 424, 428-29 (quoting

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

Defendants claim that Goldberg cannot show discrimination because he himself "used

offensive language and conduct concerning Jewish people." (ECF No. 15 at 31-32.) As

explained earlier, though, the Court declines at this juncture to rely on extrinsic evidence such as

communications between the parties and affidavits by Defendants that were not included in or

incorporated by the complaint. Even if the Court were to consider those materials, "[i]t is not

unheard of for in-group members to simultaneously re-appropriate racialized terminology for

use, while maintaining an objection to its use by out-group members." *Pardovani v. Crown*

*Bldg. Maint. Co.*, No. 15-CV-9065, 2020 WL 2555280, at *4 (S.D.N.Y. May 20, 2020). Thus,

Defendants' assertions about Goldberg's conduct, even if true, do not necessarily defeat

Plaintiffs' claims.  Accordingly, the Goldberg Plaintiffs' hostile work environment claim survives Defendants' motion to dismiss.

### 5.      Disparate Treatment Under Section 1981

The Goldberg Plaintiffs also assert a claim of disparate treatment under Section 1981 against all Defendants.  Their disparate treatment claim is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  Under that framework, "a plaintiff must first establish a *prima facie* case of discrimination," which involves showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).  Because this case involves "a motion to dismiss, we focus only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Defendants assert in a conclusory fashion that Goldberg cannot meet the standard for disparate treatment because he cannot show that Bespoke treated him less favorably than a similarly situated employee outside his protected group.  But making such a showing is not the only way to demonstrate an inference of discrimination.  For example, such an inference can also arise from "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group." *Id.* at 312 (internal quotation marks and citation omitted).  In that vein, the Goldberg Plaintiffs allege that the Vichinskys frequently used derogatory terms for Jewish people, both Goldberg and others, and that they coined a new word "to denigrate Jewish clients."  (SAC ¶¶ 144-43.)  Defendants also

claim that Goldberg received payment for all his commissions, but the Court declines to consider

such evidence of payments to Goldberg on Defendants' motion to dismiss.

The Court therefore denies Defendants' motion to dismiss the Goldberg Plaintiffs' claim

of disparate treatment under Section 1981.

### 6.   Retaliation Under Section 1981

The Goldberg Plaintiffs also assert a claim of unlawful retaliation under Section 1981

based on Goldberg's opposition to the Bespoke Entities' treatment of Willis and the subsequent

termination of Goldberg.  "To establish a *prima facie* case of retaliation under § 1981, a plaintiff

must show that (1) he was engaged in a protected activity, (2) the employer was aware of his

participation in the protected activity, (3) the employer took an adverse action against him, and

(4) a causal connection existed between the protected activity and the adverse action."  *Cook v.*

*CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (summary order).

The Court rejects Defendants' argument that the Goldberg Plaintiffs have not stated a

claim for retaliation because they do not allege that Goldberg directly informed the Bespoke

Entities about his protected activity.  While the Goldberg Plaintiffs need to plead that Goldberg

was engaged in a protected activity and that the employer was aware of that activity, nothing in

the statute or the case law imposes an additional requirement that the employer be made aware of

that activity directly by the employee himself.  "[A]n individual who has opposed discrimination

prohibited by the statute" has engaged in protected activity, *Johnson v. J Walter Thompson*

*U.S.A., LLC*, 224 F. Supp. 3d 296, 313 (S.D.N.Y. 2016) (internal quotation marks and citation

omitted), and such protected activity can include not only "making complaints to management"

but also activities like "writing critical letters to customers" or "expressing support of co-workers

who have filed formal charges," *Littlejohn*, 795 F.3d at 317.  Thus, activity such as "having

[one's] lawyer send Defendants a letter alleging discrimination and filing [a] lawsuit" constitutes protected activity, even if the plaintiff does not personally inform Defendants about the unlawful nature of their conduct.  *Johnson*, 224 F. Supp. 3d at 313.

The Goldberg Plaintiffs sufficiently allege protected activity.  They allege that in August 2022, Goldberg told his counsel that the Bespoke Entities had unlawfully discriminated against Willis on the basis of his race, and that Goldberg's counsel in turn informed Defendants, through their counsel, about that accusation.  (SAC ¶¶ 269-70.)  That conduct represents actions taken by the Goldberg Plaintiffs in opposition to practices by the Bespoke Entities that they understood to constitute unlawful discrimination.  Moreover, even if that particular instance somehow does not constitute protected activity, Plaintiffs allege that Goldberg informed management that Hasson's attempt to steal Willis's clients constituted discrimination.  (*Id.* ¶ 255).  Goldberg's actions appear to have been "sufficient to put the Defendants on notice that [he] felt the conduct was discriminatory."  *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 227 (E.D.N.Y. 2018).  As a result, "[a]t this early stage, the Court cannot conclude that these were generalized complaints that the Defendants 'could not reasonably have understood that [he] was complaining of conduct prohibited by [§ 1981].'"  *Id.* (quoting *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

Defendants briefly contend that because Goldberg supervised Willis, Goldberg himself is also responsible for any allegedly discriminatory treatment of Willis.  (ECF No. 15 at 34.)  Even if that were the case (despite Plaintiffs' allegations that Goldberg protested Willis's treatment), Defendants fail to explain why that requires dismissal of Goldberg's retaliation claim, as it does not preclude the possibility that Defendants also unlawfully retaliated against Goldberg. Defendants' remaining argument—that Goldberg could not possibly have believed that unlawful

discrimination was occurring against Willis—again improperly relies on extrinsic evidence.
Defendants' motion to dismiss the Goldberg Plaintiffs' Section 1981 retaliation claim is
therefore denied.

### 7. Retaliation Under New York Labor Law Section 740

The Goldberg Plaintiffs also assert a claim of unlawful retaliation under New York Labor
Law ("NYLL") Section 740.  Specifically, they allege that the Bespoke Entities terminated
Goldberg and refused to pay his commissions due to his opposition to their unlawful treatment of
Willis.  Section 740 prohibits an employer from "tak[ing] any retaliatory action against an
employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to
a public body an activity, policy or practice of the employer that the employee reasonably
believes is in violation of law, rule or regulation," or because the employee "objects to, or
refuses to participate in any such activity, policy or practice."  N.Y. Lab. L. § 740(2)(a), (c).
That section "requires, therefore, that [a plaintiff] show (1) retaliatory action, (2) activity
protected by the statute, and (3) a causal link between the two."  *Pierce v. Better Holdco, Inc.*,
No. 22-CV-4748, 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023).

Defendants again contend that to constitute protected activity, Goldberg's actions had to
involve disclosures that were made directly to supervisors at Bespoke.  That argument finds
more support in the text of NYLL Section 740, as the statute prohibits an employer for retaliating
because an employee "discloses, or threatens to disclose" certain activity "to a supervisor."  N.Y.
Lab. L. § 740(2)(a).  But Defendants do not explain why a plaintiff cannot meet Section
740(2)(a)'s requirement that an employee disclose certain activity to a supervisor by showing
that he did so indirectly through an intermediary or an agent such as counsel.  Construed in the
light most favorable to Plaintiffs, the complaint appears to allege that Goldberg, through a

representative, communicated his belief to Bespoke that it was engaged in unlawful practices with regard to Willis.  (SAC ¶¶ 269-70.)  On that view, Plaintiffs have alleged enough to state a claim of retaliation under Section 740, as the Goldberg Plaintiffs informed Bespoke about a host of allegedly discriminatory activities in August 2022 and Goldberg was terminated the following month.  *See Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 245 (S.D.N.Y. 2013) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." (internal quotation marks and citation omitted)).

Even if such indirect disclosure were insufficient, however, the complaint contains enough allegations to otherwise state a claim for unlawful retaliation under Section 740. Retaliation due to disclosure of an unlawful activity or practice to a supervisor is not the only way an employer can run afoul of Section 740; an employer can also violate that section if it retaliates against an employee because the employee "objects to, or refuses to participate" in that activity or practice.  N.Y. Lab. L. § 740(2)(c).  Here, Plaintiffs allege that Goldberg reported Hasson's attempts to steal Willis's clients to both the Vichinskys and Gray, and that Goldberg told Gray that those attempts were discriminatory and unacceptable.  (SAC ¶¶ 255, 529.) Goldberg also "opposed and objected to" what he perceived to be the Vichinskys' "unfounded" criticism of Willis—criticism that Plaintiffs allege was motivated by Willis's race—and he told the Vichinskys that Willis was Bespoke's star employee.  (*Id.* ¶ 137.)

Defendants object that Hasson's client interference cannot constitute an "activity, policy or practice of the employer," as Hasson was not Goldberg's supervisor.  But Defendants do not explain why discriminatory action by another employee that is sanctioned by supervisors cannot constitute unlawful activity.  Plaintiffs allege that after Goldberg complained about Hasson's

actions to the Vichinskys, the Vichinskys never disciplined Hasson and instead replaced Willis with Hasson as Vice President.  (*Id.* ¶¶ 255, 257.)  Plaintiffs need not definitively prove that the objected-to activity constituted a violation of a specific law, *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 453 (2014), and Goldberg could have "reasonably believe[d]" that Hasson's actions, along with management's failure to take action, constituted unlawful activity, *cf. Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (under New York law, "a co-worker who actually participates in the conduct giving rise to a discrimination claim" can be "held liable . . . even though that co-worker lacked the authority to either hire or fire the plaintiff" (internal quotation marks and citation omitted)).  The Court also rejects Defendants' argument that Goldberg could not have "reasonably believe[d]" that Hasson's actions were unlawful because it is not unusual for coworkers to try to steal clients:  Plaintiffs' allegations are that Hasson did so, and Bespoke failed to intervene, *because of* Goldberg's race—which one could reasonably believe to be unlawful.  Moreover, separate and apart from the Hasson interference, Goldberg also objected to the Vichinskys' unfounded and allegedly racially motivated criticism of Willis (SAC ¶ 137), and Defendants never suggest that such treatment was not an "activity, policy or practice of the employer."

Defendants also briefly object that there are insufficient allegations of temporal proximity between the protected conduct and the retaliatory actions.  It is unclear from the complaint exactly when Goldberg objected to Hasson's actions and the Vichinskys' criticism of Willis, and when his unpaid commissions accrued.  But drawing all inferences in favor of Plaintiffs, the Court concludes that the termination of Goldberg and the non-payment of his commissions may be close enough in time to his protected activity support an inference of retaliation.  Hasson was hired in July 2021 (*id.* ¶ 250), and the Vichinskys' criticism of Willis that Goldberg objected to

occurred "[o]n many occasions, from in or about March 2021 to in or about December 2022" (*id.* ¶ 136). Goldberg was terminated in September 2022, and it appears that the nonpayment of his commissions happened throughout 2021 and 2022. (*See id.* ¶¶ 157, 215, 227; *see also* ECF No. 30 at 33.) It is therefore plausible that some of Goldberg's objections happened shortly before the adverse actions taken against him. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (explaining that the Second Circuit has "previously held that five months is not too long to find the causal relationship" in the retaliation context). Moreover, "the absence of close temporal proximity of the protected activity to the adverse action is not necessarily fatal, because evidence of an ongoing pattern of retaliatory conduct and intent can also establish a causal connection." *Shub v. Westchester Cmty. Coll.*, 556 F. Supp. 2d 227, 246 (S.D.N.Y. 2008). Here, Plaintiffs allege multiple actions suggesting such retaliatory conduct and intent.

The Court also disagrees with Defendants that Plaintiffs have insufficiently pleaded the nonpayment or underpayment of Goldberg's commission as an adverse action. Defendants characterize the dispute to be about the "amount of commissions due," rather than wholesale nonpayment of commissions (ECF No. 15 at 17-18), but refusing to pay an employee their full due compensation can constitute adverse action. *See Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 348 (S.D.N.Y. 2014) ("paying . . . wages late" can "constitute an actionable adverse employment action" in the Title VII discrimination context). Nor does it matter that one could possibly infer from the complaint that the Bespoke Entities were also underpaying Goldberg prior to the alleged retaliation. (*See* ECF No. 15 at 18.) The more natural reading of the complaint's numerous allegations is that Goldberg suffered additional nonpayment of his commissions in response to his protected activity.

Defendants' remaining arguments cite extrinsic evidence that is not incorporated into Plaintiffs' complaint.  (*See* ECF No. 15 at 16-17.)  As a result, Defendants' motion to dismiss the Goldberg Plaintiffs' claim for retaliation under Section 740 is denied.

### B.      Willis's Claims

#### 1.      Hostile Work Environment and Constructive Discharge Under Section 1981

Willis also brings a claim of hostile work environment under 42 U.S.C. § 1981 against Defendants due to the allegedly racist treatment that he experienced during his employment with the Bespoke Entities.  Defendants move to dismiss Willis's hostile work environment claim on the ground that his allegations "are nullified by his own conduct," including instances in which he used racially offensive language to refer to himself and others.  (ECF No. 15 at 27-29.)  As explained earlier with respect to the Goldberg Plaintiffs' claims, the fact that a plaintiff uses racialized language is not necessarily incompatible with allegations that he was subject to a hostile work environment based on others' use of that language.  That is especially so when "it is undisputed that none of the . . . supervisors who used the word were African American." *Pardovani*, 2020 WL 255280, at *4.  As with many of Defendants' other arguments, this argument also improperly relies on extrinsic evidence, making it doubly irrelevant.

For similar reasons, the Court also declines to dismiss Willis's claim of constructive discharge under Section 1981, which is based on allegations that Defendants deliberately made Willis's working conditions so intolerable as to force him to resign.  *See Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (describing standard for constructive discharge claim).  Defendants insist that "Willis himself initiated, created and fostered all derogatory language with Bespoke" based on extrinsic evidence (ECF No. 15 at 29), but again, that evidence

is both improper at this stage and not incompatible with Plaintiffs' *prima facie* case of constructive discharge.

### 2.     Disparate Treatment Under Section 1981

Willis also brings a claim of disparate treatment under Section 1981 based on the allegedly racially discriminatory treatment he experienced, such as the restrictions placed on his ability to show properties alone, Hasson's interference with his client relationships, his demotion from Vice President, and the nonpayment of his commissions.

Defendants contend that Willis cannot show a necessary element of a disparate treatment claim—that the adverse action took place under circumstances giving rise to the inference of discrimination, *Ruiz*, 609 F.3d at 491—as he cannot establish that he was treated less favorably than a similarly situated employee outside the protected group.  Instead, Defendants contend, Willis's employment agreement defined his duties narrowly to be "to simply procure referrals and identify residents seeking to buy or sell properties, not to showcase the properties or otherwise close transactions."  (ECF No. 15 at 31.)

The Court rejects that argument.  Even if Willis's employment agreement were so limited, the complaint includes allegations of discriminatory conduct that cannot fairly be explained by Willis's purportedly limited employment duties, such as his allegedly discriminatory demotion from the role of Vice President and the nonpayment of his commissions.  Defendants' only response to those allegations—that extrinsic evidence shows them to be untrue—is one the Court has already rejected.  Accordingly, Defendants' motion to dismiss Willis's claim of disparate treatment under Section 1981 is denied.

### IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is DENIED.

Defendants are directed to file an answer to Plaintiffs' complaint within 21 days after the date of this opinion and order.

The Clerk of Court is directed to close the motion at ECF Number 14.

SO ORDERED.

Dated: March 25, 2024
      New York, New York

_____
J. PAUL OETKEN
United States District Judge